1  Daniel Pascucci (SBN 166780)
   Email: dpascucci@mintz.com
2  Bridget Moorhead (SBN 166298)
   Email: bmoorhead@mintz.com
3  MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.
   3580 Carmel Mountain Road, Ste 300
4  San Diego, CA 92130
   (858) 314-1500
5  (858) 314-1501

6  Victor F. Mustelier
   Email: vfmustelier@mintz.com
7  MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.
   666 Third Avenue
8  New York, NY 10017
   (212) 692-6227
9  (212) 983-3115

10  *Pro Hac Vice* Application Pending

11  Attorneys for Plaintiffs

12

13             UNITED STATES DISTRICT COURT

14           SOUTHERN DISTRICT OF CALIFORNIA

15

16  ezGDS, Inc., and Thomas DeRosa,        Case No. 10 CV 0635 JAH   WVG

17                        Plaintiffs,       COMPLAINT FOR:
                                            (1) DECLARATORY RELIEF;
18       vs.                                (2) BREACH OF CONTRACT; AND
                                            (3) BAD-FAITH COVERAGE DENIAL
19  Philadelphia Indemnity Insurance Company,
                                            JURY TRIAL DEMANDED
20                        Defendant.

21

22       Plaintiffs ezGDS, Inc, and Thomas DeRosa (together, "Plaintiffs") allege as follows:

23                    **JURISDICTION AND VENUE**

24       1.    The Court has jurisdiction over this action pursuant to 28 U.S.C. Section 1332(a).

25  This is a civil action in which the matter in controversy exceeds the sum or value of $75,000, and

26  there is complete diversity of citizenship between plaintiffs and defendant.

27       2.    An actual controversy within the meaning of 28 U.S.C. Section 2201 exists between

28  the parties.

- 1 -

3.      Venue is proper in this District under 28 U.S.C 1391(a)(2) because jurisdiction is founded on diversity of citizenship and a substantial part of the events giving rise to this action occurred in this District.

## THE PARTIES

4.      Plaintiff ezGDS, Inc., ("ezGDS") is a California corporation with its principal place of business at 225 Broadway, Suite 1760, San Diego, California.

5.      Plaintiff Thomas DeRosa, an individual, was at all times mentioned herein a resident of San Diego County.

6.      Plaintiffs are informed and believe and thereon allege that Defendant Philadelphia Indemnity Insurance Company (hereafter, "Philadelphia Indemnity") is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania.

## THE INSURANCE POLICY

7.      Philadelphia Indemnity, in consideration of the premium paid to it, issued its Commercial Lines Policy No. PHSD24875 with a policy period from May 1, 2007, to May 1, 2008, to ezGDS (the "Philadelphia Liability Policy"). The Philadelphia Liability Policy includes "Directors & Officers Liability Insurance," ("D&O Coverage") with a limit of liability of $2,000,000 for claims reported during the policy period. (Exhibit 1 is a true and complete copy of the Philadelphia Liability Policy.)

8.      Coverage B of the Philadelphia Liability Policy's D&O Coverage states: "[Philadelphia Indemnity] shall pay on behalf of [ezGDS], Loss from Claims made against Individual Insureds [including Thomas DeRosa] during the Policy Period …, and reported to [Philadelphia Indemnity] pursuant to the terms of this Policy, for D&O Wrongful Acts, if [ezGDS] has indemnified such Individual Insureds for such Loss."

9.      Coverage C of the Philadelphia Liability Policy's D&O Coverage states: "[Philadelphia Indemnity] shall pay on behalf of [ezGDS], Loss from Claims made against [ezGDS] during the Policy Period…, and reported to [Philadelphia Indemnity] pursuant to the terms of this Policy, for a D&O Wrongful Act."

- 2 -

4864042V.1

10.    The "Definitions" Section of the Philadelphia Liability Policy's D&O Coverage states that a "D&O Wrongful Act means any actual or alleged: ... act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an Individual Insured in his/her capacity [as such]," or any "act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by [ezGDS]."

11.    The "Common Policy Exclusions" Section applicable to the Philadelphia Liability Policy's D&O Coverage excludes any claim "brought or maintained by any Individual Insured." This type of exclusion commonly is referred to as an "Insured-Versus-Insured Exclusion."

12.    The "Common Definitions" Section applicable to the Philadelphia Liability Policy's D&O Coverage defines "Loss" as follows: "Loss means: 1. Damages; 2. Defense Costs."

13.    The "Common Definitions" Section applicable to the Philadelphia Liability Policy's D&O Coverage defines "Damages," in relevant part, as follows: "Damages means any monetary judgment... or monetary settlement."

14.    The "Common Definitions" Section applicable to the Philadelphia Liability Policy's D&O Coverage defines "Defense Costs," in relevant part, as follows: "Defense Costs means: 1. Any reasonable and necessary legal fees and expenses incurred in the defense of a Claim... with [Philadelphia's] consent."

15.    Mr. DeRosa and ezGDS both are insured under the Philadelphia Liability Policy's D&O Coverage.

16.    The required premium has been paid with respect to the Philadelphia Liability Policy.

17.    Plaintiffs have performed in a timely manner all conditions and covenants to be performed under the Philadelphia Liability Policy, or have by virtue of Philadelphia Indemnity's conduct been excused from doing so.

## THE UNDERLYING LAWSUIT

18.    On or around January 31, 2008, during the coverage period of the Philadelphia Liability Policy, Stephen T. Barber ("Barber") and Suzanne S. Riley ("Riley"), individually and derivatively as shareholders of Travel Support Center, Inc., a wholly-owned subsidiary of ezGDS

- 3 -

4864042V.1

1   ("TSC"), filed a complaint (*Barber v. ezGDS, Inc et al.* (San Diego Superior Court No. 37-2008;

2   hereinafter, the "Barber Complaint," "Barber Claim," or "Underlying Lawsuit")) against ezGDS,

3   Mr. DeRosa, and other individuals insured under the Philadelphia Liability Policy alleging claims

4   for fraud and breach of fiduciary duties.  The Barber Complaint alleged that ezGDS and Mr.

5   DeRosa had committed fraud and other misconduct in connection with ezGDS's acquisition, *via* a

6   stock purchase agreement, of TSC.  (Exhibit 2 is a true and complete copy of the Barber

7   Complaint.)

8        19.    The Barber Complaint has been amended three times.  The "Verified Third Amended

9   Complaint" (hereinafter, the "Third Amended Barber Complaint") filed by Barber and Riley

10  (individually but no longer derivatively) still alleges fraud and breach of fiduciary duty against

11  ezGDS and Mr. DeRosa in connection with the stock purchase agreement whereby TSC became a

12  wholly-owned subsidiary of ezGDS.

13       20.    Essentially, the Third Amended Barber Complaint alleges that the stock purchase

14  agreement's 10:1 ratio -- pursuant to which Barber and Riley got one (1) share of ezGDS stock in

15  exchange for every ten (10) shares they surrendered of TSC stock -- was unfair.   The Third

16  Amended Barber Complaint further alleges that the separation agreement -- pursuant to which, six

17  months after the merger of ezGDS and TSC, Barber ceased working for ezGDS -- was procured by

18  fraud or duress and that ezGDS breached that separation agreement. (Exhibit 3 is a true and

19  complete copy of the Third Amended Barber Complaint.)

20       21.    Mr. DeRosa and ezGDS vigorously deny the allegations of the Third Amended

21  Barber Complaint and the previous pleadings but have been unable to obtain dismissal of the entire

22  Barber Claim on the pleadings. Although the claims of both plaintiffs are weak, the claims of

23  Barber are relatively weaker.  This is because Barber was the president of TSC before its merger

24  with ezGDS and, as such, highly knowledgeable concerning the details of the stock purchase

25  agreement, whereas Riley was just a shareholder and not directly involved in the negotiations of the

26  merger.  The fact that the greater potential exposure to liability of the Barber Claim is for the claims

27  filed by Riley is significant for ezGDS's position *vis à vis* coverage, because one of the principal

28  bases on which Philadelphia Indemnity attempted to argue that the claims filed against ezGDS and

- 4 -

CASE NO._____

1 Mr. DeRosa by Barber are barred was that he was an officer of ezGDS and thus an "insured" under

2 the Philadelphia Liability Policy's Insured-Versus-Insured Exclusion. No such argument even is

3 possible with respect to claims filed by Riley, who never was an officer of ezGDS.

**PHILADELPHIA'S RESPONSE TO EZGDS'S SUBMISSION OF THE
BARBER CLAIM FOR COVERAGE AND REQUESTS FOR
SETTLEMENT FUNDS AND REIMBURSEMENT OF DEFENSE EXPENSES**

6  22.  On or around February 12, 2008, ezGDS gave Philadelphia Indemnity timely notice

7 of the Barber Claim and of its wish to retain Mintz Levin Cohn Ferris Glovsky and Popeo ("Mintz

8 Levin") to represent the company and Mr. DeRosa in the Barber Claim.

9  23.  On February 13, 2008, Philadelphia Indemnity advised ezGDS's insurance

10 representative by email that the Barber Claim "probably is not covered," that "we [Philadelphia

11 Indemnity] do not have a duty or right to defend," and that "ezGDS should undertake to defend

12 while we set up a claim, assign [it] to an examiner and evaluate [the claim] for potential coverage."

13  24.  On February 18, 2008, Thomas Allen, who then was chief operating officer of

14 ezGDS, spoke to Susan A. Shue, a senior claims manager at Philadelphia Indemnity, regarding the

15 Barber Complaint. On behalf of ezGDS, Mr. Allen requested Philadelphia Indemnity's approval to

16 appoint Mintz Levin as defense counsel in the Underlying Action.

17  25.  On February 19, 2008, Ms. Shue responded to Mr Allen's request, writing: "As we

18 discussed, I will be discussing coverage with my supervisor before a decision is made, but in the

19 meantime, Philadelphia Indemnity can approve your counsel [at Mintz Levin] subject to his

20 qualifications and rates. You indicated you would hold off providing this information until we

21 acknowledged coverage."

22  26.  On June 4, 2008, Philadelphia Indemnity finally responded to ezGDS's request for

23 coverage for the Barber Claim with an eleven-page letter from its outside counsel Kelly Nugent.

24 That letter neither granted nor denied coverage for the Barber Claim. Instead Ms. Nugent advised

25 ezGDS of "certain coverage issues and reservations," and reserved the right to raise additional

26 issues at a later time. The letter listed every potential ground of which Philadelphia Indemnity's

27 lawyers were then aware that could support a denial of coverage.

28

CASE NO._____

4864042V.1

27.     The letter stated, "Assuming coverage is otherwise afforded, the Policy provides that 'the Insured and not the Underwriter shall have the responsibility to defend any Claim.'" The letter made no representation that Philadelphia Indemnity would cover ezGDS's or Mr. Barber's defense expenses of the Barber Claim, and the letter did not request any information regarding Mintz Levin's qualifications or rates. The letter requested copies of essentially every document in ezGDS's possession concerning the Barber Claim.

28.     On July 16, 2008, Philadelphia's outside counsel Kelly Nugent followed up on her June 4 letter, stating: "we continue to await the materials requested in our June 4, 2008 letter, which are copied below for your convenience." The requested information included all "correspondence by, between, and among the parties" and "all EZGDS Board Meeting Minutes as respects the merger" with TSC.

29.     Based on the tone and substance of all of Ms. Nugent's formal and informal communications with ezGDS regarding the Barber Claim, ezGDS believed for a year after hiring Mintz Levin (in February 2008) to represent it in the Underlying Lawsuit that Philadelphia Indemnity already had decided to deny coverage for the Barber Claim.

30.     By January, 2009, ezGDS had been forced to retain separate coverage counsel, Eric Little, of the Irvine law firm of Little Reid & Karzai, to represent it in its efforts to obtain coverage for the Barber Claim. On information and belief, fees charged by Mr. Little's firm for these efforts to date exceed $90,000.

31.     Then, on January 14, 2009, Philadelphia Indemnity through Ms. Nugent advised ezGDS for the first time that Philadelphia Indemnity acknowledged an obligation to reimburse ezGDS for the defense costs of the Underlying Lawsuit.

32.     The January 14, 2009, letter to Mr. Little stated, "Philadelphia has received no request for payment or any other information confirming whether defense costs as respects any potentially covered claims (if any) have exceeded the $25,000 retention." As of January 14, 2009, ezGDS had incurred over $293,085 in legal fees for Mintz Levin's defense of the Barber Claim, and based on the letter, ezGDS promptly submitted its fees to Philadelphia Indemnity for payment.

- 6 -

33.     On March 20, 2009, Ms. Nugent responded to ezGDS's submission of bills with another twelve-page letter to ezGDS.  That letter made another ten-item request for additional documents and again reserved ezGDS's right to deny coverage on any of the numerous grounds discussed in the letter, but the letter agreed nonetheless to process the legal fees submitted by ezGDS for payment.  At page 10 of the letter, Ms. Nugent performed a calculation of the defense costs Philadelphia Indemnity would thereafter process for reimbursement.  The calculation filled the whole of page 10 of Ms. Nugent's letter.  The calculation discounted ezGDS's fees and costs in five different ways (six counting the application of the retention), including by capping the $274,085 in fees (after the retention) at $95,881 based on "Philadelphia Fee Caps" and by then further reducing "Total Potentially Covered Fees and Costs" of $91,019 to $45,510 based on a "50% Allocation" of the Barber Claim as uncovered. (Exhibit 4 is a true and complete copy of Kelly Nugent's March 20, 2009, letter to Eric Little.)

34.     Thereafter, on June 23, 2009, the claimants in the Underlying Action made a $1.5 million settlement demand of ezGDS.  EzGDS conveyed the demand to Philadelphia Indemnity on June 25 and requested that Philadelphia Indemnity fund a settlement. On July 9, 2009, Philadelphia Indemnity, once again by outside counsel Kelly Nugent, acknowledged and, in an eleven-page coverage discussion, rejected the demand calling it "unreasonable."

35.     Even though Philadelphia Indemnity had by July 2009 acknowledged its coverage obligation for the Barber Claim (albeit under a reservation of rights), the letter reiterated once more Ms. Nugent's previous demands for board minutes and correspondence from 2007 and 2008 relative to the TSC merger: "Despite repeated requests that have been outstanding for more than a year, Philadelphia continues to await copies of [the minutes and correspondence]."  The letter concluded by (1) stating that "Philadelphia has no obligation to fund that portion of the settlement which is…expressly excluded by the Policy," and (2) "invit[ing] [ezGDS] to propose a… counter-offer and a reasonable allocation of same as between the Insureds and Philadelphia, in recognition of the coverage issues raised by this matter."  In fact, by this time, ezGDS already had supplied to Philadelphia voluminous information and Philadelphia's requests were duplicative of earlier requests.

- 7 -

36.     Even though Philadelphia Indemnity has acknowledged its coverage obligation for the Barber Claim continually since January 14, 2009, to date Philadelphia Indemnity has paid only $66,950 of ezGDS's legal fees out of a total of $718,096 (after satisfaction of the deductible). In other words, Philadelphia Indemnity has paid less than 10% of the defense expenses of a claim it acknowledges is covered.

37.     Philadelphia Indemnity has dictated that it will pay no more than $190 per hour for Mintz Levin's representation of ezGDS and Mr. DeRosa. This rate is far below the rate customarily charged by law firms in San Diego for multi-million commercial litigation like the Barber Claim.

38.     Ms. Nugent's March 20, 2009, letter dictated further that, subject to its continuing right to deny coverage, "Philadelphia Indemnity [would] agree to a 50/50 allocation of reasonable and necessary Defense Costs." The "allocation" referred to by Ms. Nugent is only appropriate to the extent that the total costs of a claim to an insurance carrier are higher by virtue of uncovered claims, or that uncovered claims account for a significant exposure to liability and damages relative to the exposure from covered claims. Philadelphia has argued in its numerous extensive coverage analyses that the claims of the Barber Complaint filed by Barber himself are barred by the Philadelphia Liability Policy's Insured-Versus-Insured Exclusion. The greatest exposure to Plaintiffs of the Barber Claim in fact is from the claims of Suzanne Riley, because of her lack of involvement and knowledge regarding the stock purchase agreement. Her claims, unlike those of Barber, are not even arguably barred by the Insured-Versus-Insured Exclusion. Since the greater exposure to ezGDS and Mr. DeRosa of the Barber Complaint is due to Riley's claims, no allocation for uncovered claims is appropriate. Instead, 100% of defense costs and of any settlement are covered.

39.     Although Plaintiffs' right to coverage for the Barber Complaint is clear, the financial strength of ezGDS has been severely tested by Philadelphia Indemnity's refusal to pay for clearly covered defense expenses. Rather than continuing its futile efforts to self-fund litigation for which it has insurance coverage, ezGDS was forced to hire counsel at another law firm, Wilson Elser Moskowitz Edelman & Dicker LLP ("Wilson Elser"), selected by Philadelphia Indemnity and to whom Philadelphia Indemnity pays a much lower rate than is typically charged by law firms for the

- 8 -

1  handling of commercial litigation in San Diego courts.  On or around October 12, 2009, Wilson

2  Elser was substituted in as defense counsel for ezGDS and Mr. DeRosa in the Underlying

3  Litigation.

4      40.    The Philadelphia Liability Policy's Defense Expense provision requires Philadelphia

5  Indemnity's payment of reasonable and necessary legal fees and expenses incurred in the defense of

6  a covered claim with Philadelphia's consent.  The entire amount ($743,096) of ezGDS's fees was

7  reasonable and necessary to the defense of the Barber Claim.  As to the approximately $293,000 in

8  defense expense incurred by ezGDS in the year that it took Philadelphia Indemnity to agree to cover

9  the Barber Claim (and included in the $743,096 total), it was not even possible to obtain

10  Philadelphia Indemnity's consent.  Therefore ezGDS is excused entirely from the Philadelphia

11  Liability Policy's consent requirement as to $293,000, which amount at the very least should have

12  been paid immediately and in its entirety when Philadelphia Indemnity acknowledged coverage for

13  the Barber Claim.

**FIRST CLAIM FOR RELIEF (DECLARATORY RELIEF --**
**REIMBURSEMENT OF DEFENSE EXPENSES AND**
**INDEMNIFICATION FOR REASONABLE SETTLEMENT)**

16      41.    Plaintiffs re-allege and incorporate by reference as if fully set forth herein the

17  allegations of paragraphs 1-40 of this complaint.

18      42.    An actual controversy exists between Plaintiffs and Philadelphia Indemnity

19  regarding Philadelphia Indemnity's obligation under the Philadelphia Liability Policy to pay

20  Plaintiffs for their defense of the Barber Claim and to fund a reasonable settlement of the Barber

21  Claim up to the remaining policy limits.

22      43.    Plaintiffs desire a judicial determination and declaration that Philadelphia Indemnity

23  is obligated (i) to pay defense expenses of $718,096 incurred by ezGDS while it was being

24  represented in the Underlying Litigation by Mintz Levin, minus the $25,000 policy deductible; and

25  (ii) to fund a reasonable settlement of the barber Claim within policy limits.  A judicial declaration

26  is appropriate at this time because ezGDS still refuses to pay $718,096 in defense expenses of the

27  Barber Claim, and because until the Barber Claim is resolved by settlement or adjudication it will

28  remain pending against ezGDS and Mr. DeRosa.

- 9 -

## SECOND CLAIM FOR RELIEF (BREACH OF CONTRACT)

44. Plaintiffs re-allege and incorporate by reference as if fully set forth herein the allegations of paragraphs 1-43 of this complaint.

45. Under the Philadelphia Liability Policy, Philadelphia Indemnity is contractually obligated to reimburse Plaintiffs for their reasonable defense expenses incurred in connection with a covered claim.

46. Philadelphia Indemnity has failed to honor its contractual obligations under the Philadelphia Liability Policy.

47. As a proximate result of Philadelphia Indemnity's breach of its contractual duties, ezGDS has suffered consequential damages, including attorneys fees of not less than $718,096 (after satisfaction of the Philadelphia Liability Policy's $25,000 deductible), which it has incurred in connection with the defense of the Barber Claim, plus the interest thereon, the exact amount of which has yet to be ascertained.

## THIRD CLAIM FOR RELIEF (BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

48. Plaintiffs re-allege and incorporate by reference as if fully set forth herein the allegations of paragraphs 1-47 of this complaint.

49. Philadelphia Indemnity has breached its duty of good faith and fair dealing owed to Plaintiffs in at least the following respects:

(a) Unreasonably advising ezGDS and Mr. DeRosa that the Barber Claim was almost certainly not covered by the terms of the Philadelphia Liability Policy and then delaying almost a year to acknowledge coverage for the claim;

(b) Unreasonably withholding payments of $268,000 ($293,000 minus the policy deductible of $25,000) in defense expenses during the year that it took for Philadelphia Indemnity to acknowledge coverage for the Barber Claim;

(c) Unreasonably refusing to consent to pay even 10% of Plaintiffs' attorneys fees of $718,096 (after application of the deductible) reasonably incurred in their defense of the Barber

- 10 -

CASE NO._____

1   Claim, including $268,000 in fees incurred by ezGDS before Philadelphia Indemnity's

2   acknowledgement of coverage;

3        (d)     Intentionally hindering, by the repeated burdensome and dilatory requests of its

4   outside counsel for unnecessary information, ezGDS in its attempts to obtain an adequate defense

5   and coverage for a reasonable settlement of the Barber Claim; and

6        (e)     Unreasonably refusing to approve a reasonable settlement within policy limits.

7        50.     As a proximate result of the foregoing wrongful conduct of Philadelphia Indemnity,

8   ezGDS has sustained damages and out-of-pocket expenses, including but not limited to, attorneys

9   fees in an amount not less than $100,000 attributable to ezGDS's efforts through insurance coverage

10   counsel, including the undersigned firm and Little, Reid & Karzai, to obtain the full and adequate

11   defense and indemnity coverage afforded under the Philadelphia Indemnity Policy and California

12   law.

13        51.     Philadelphia Indemnity tortiously has withheld from Plaintiffs benefits due under the

14   Philadelphia Liability Policy, and consistent with the holding of *Brandt v. Superior Court*, 37 Cal

15   3d 813 (1985),  ezGDS is entitled to recoup reasonable attorneys fees expended to recover such

16   benefits.

17        52.     In addition, because of Philadelphia Indemnity's wrongful conduct, Plaintiffs have

18   had to self-fund or are liable for litigation expenses of not less than $718,096 and, further, have

19   been deprived of the opportunity to settle the Barber Claim within the Philadelphia Liability

20   Policy's coverage limits.

21        53.     As a proximate result of Defendants' inability to settle the Barber Claim and of

22   ezGDS's uninsured liability for the defense expenses of the claim, ezGDS has been unable to take

23   advantage of numerous opportunities to raise capital, secure credit, or sell itself outright to

24   numerous financiers who, but for ezGDS's liability for the unfunded defense expenses of the

25   Barber Claim and ezGDS's uncertainty regarding the existence and amount of coverage for any

26   settlement by or judgment obtained against them in the Barber Claim, clearly would have invested

27   in ezGDS (whether by purchasing part or all of the stock of ezGDS or extending credit to the

28

CASE NO._____

1  company). The opportunities of which ezGDS has been so deprived are worth not less than $6
2  million.

3      54.    Philadelphia Indemnity's conduct described herein was done with a conscious
4  disregard of Plaintiffs' rights and with the intent to vex, injure, or annoy Plaintiffs, such as to
5  constitute oppression, fraud, or malice under California Civil Code, Section 3294, entitling
6  Plaintiffs to punitive damages in an amount appropriate to punish or make an example of
7  Philadelphia Indemnity.

8                          **PRAYER FOR RELIEF**

9      WHEREFORE, Plaintiffs prays judgment against Philadelphia Indemnity as follows:

10     1.    As to the First Claim for Relief:

11     a.    For a declaration that the Philadelphia Liability Policy requires Philadelphia
12  Indemnity to pay to or on behalf of Plaintiffs all of the defense expenses incurred in the defense of
13  the Underlying Action, including all amounts billed to plaintiffs by Mintz Levin, whether paid or
14  unpaid; and

15     b.    For a declaration that the Philadelphia Liability Policy requires Philadelphia
16  Indemnity to indemnify Plaintiffs for any reasonable settlement of the Underlying Action.

17     2.    As to the Second Claim for Relief:

18     a.    For general damages according to proof breach of the Philadelphia Liability Policy,
19  the exact amount of which has yet to be ascertained; and

20     b.    For pre- and post-judgment interest thereon at the legal rate until paid.

21     3.    As to the Third Claim for Relief:

22     a.    For general damages according to proof of Philadelphia Indemnity's bad faith;

23     b.    For attorneys fees and other legal expenses attributable to ezGDS's efforts to obtain
24  a full and adequate defense in connection with the Barber Claim;

25     c.    For punitive and exemplary damages under California Civil Code Section 3294
26  against Philadelphia Indemnity, according to proof.

27     4.    As to all claims for relief:

28     a.    For attorneys fees;

- 12 -

CASE NO._____

4864042V.1

| | | |
|---|---|---|
| 1 | b. | For costs of suit incurred herein; and |
| 2 | c. | For such other relief as the Court deems just and proper. |

3

4  Dated: March 24, 2010                    Respectfully submitted,

5                                           MINTZ LEVIN COHN FERRIS
                                            GLOVSKY AND POPEO P.C.
6

7                                           *Bridget Moorhead*

8                                           Daniel Pascucci
                                            Bridget Moorhead
9                                           Victor F. Mustelier (*pro hac vice* application
                                            pending)

10                                          *Attorneys for Plaintiffs ezGDS, Inc., and Thomas
                                            DeRosa*

11

12                          **DEMAND FOR JURY TRIAL**

13

14          Plaintiffs hereby demand trial by jury.

15

16  Dated: March 24, 2010                    Respectfully submitted,

17                                           MINTZ LEVIN COHN FERRIS
                                             GLOVSKY AND POPEO P.C.
18

19                                           *Bridget Moorhead*

                                             Daniel Pascucci
20                                           Bridget Moorhead
                                             Victor F. Mustelier (*pro hac vice* application
21                                           pending)

22                                           *Attorneys for Plaintiffs ezGDS, Inc., and Thomas
                                             DeRosa*

23

24

25

26

27

28

- 13 -

CASE NO. _____

4864042V.1

**EXHIBIT 1**

 **Philadelphia Indemnity Insurance Company**

(A Stock Company founded in 1927)
One Bala Plaza, Suite 100, Bala Cynwyd, Pennsylvania 19004
1-800-759-4961

# Commercial
# Lines
# Policy

THIS POLICY CONSISTS OF:

- DECLARATIONS
- COMMON POLICY CONDITIONS
- ONE OR MORE COVERAGE PARTS. A COVERAGE PART CONSISTS OF:
- ONE OR MORE COVERAGE FORMS
- APPLICABLE FORMS AND ENDORSEMENTS

BJP-190-1 (12-98)

**IN WITNESS WHEREOF**, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

President

Secretary

BJP-190-1 (12-98)

 # Loss Control Notice

Welcome to PIC Loss Control Services.   PIC is familiar with the unique loss control programming needs of your organization and has achieved superior results in this area.  We are committed to delivering quality and timely loss prevention services and risk control products to your organization.  Customer satisfaction through the delivery of these quality professional products to achieve measurable risk improvement results is our goal.  We know the fulfillment of the loss control commitment is not complete until we deliver upon our promises.

Our product specific service capabilities follow on the next few pages. They include a multi-faceted approach to risk management covering safety program development, site audits, and training (including a new interactive web-based training).  We offer a wide range of products and value-added services at no cost to help you achieve your risk management goals.

Please take a moment to register for our website @ _www.losscontrol.com_ to gain full access to these resources. Please assign yourself your own username and password.   Your registration request will be processed within two business days.

We look forward to helping to make your insurance program a success.  We are standing by if you have any questions or if we may be of further assistance. Please contact us at:

Jeffrey M. Collins, AVP & Director
Loss Control Department
Phone: 610-617-7717
E-Mail: jcollins@phlyins.com


Mark A. Konchan, Manager
Loss Control Department
Phone: 610-538-2967
E-Mail: mkonchan@phlyins.com



# Access PHLY Loss Control Services

## Loss Control Services

### *Innovative* Service Producing *Optimum* Results

Missing the Last Piece to Your Risk Management Solution?

Our custom Training Services will give you many benefits.

The possibilities are endless with AccessPhly Loss Control.

**Downloads**

# Philadelphia Insurance Companies (PIC) AccessPHLY Loss Control Services

## About Loss Control Services                    more...

- Our Motto
- Our Mission

## Contact Information                    more...

## Risk Management Resources                    more...

- DuraFile "Your Online Safety Deposit Box"
- IntelliCorp Records, Inc (Employment Background Screening and MVR Checks)
- Non-Profit Risk Management Center
- PureSafety (online driver training course)
- SafetyFirst (Fleet Monitoring Program)
- WEMED Loss Assistance Hotline
- AGOSNET: web-enabled EPLI (Employment Practices Liability Insurance) Risk Management Services

## Proprietary Risk Management Services                    more...



- Monthly E-Brochures
- Large Account Service Capabilities
- Loss Trend Analysis / Risk Management Information System
- Responding to Recommendations Via www. losscontrol.com

**"Outside the Box": ePIC Loss Control Services (Unbundled Risk Management Services)**                    more...

**Contact Information**                    more...

## About Loss Control Services                    back to top...

**OUR MOTTO: *"Innovative Solutions Producing Optimum Results":*** This mantra reflects our commitment to utilize innovative products and solutions to help our customers achieve measurable results. Customer satisfaction through the delivery of these quality professional products is our goal. We know the fulfillment of our loss control commitment is not complete until we deliver upon our promises.

**OUR MISSION:** We welcome the opportunity to demonstrate how we can tailor a risk management program suitable to our customer's needs. We are committed to providing our customers with improved communications, quicker implementation of loss control servicing initiatives, and specific benchmarking goals that help us quantify the true value of our services.

Our product specific resources, alliances and service capabilities are highlighted in this E-Brochure. They include a multi-faceted approach to risk management covering safety program development, site audits, and training (including a new interactive web-based training). We offer a wide range of products and value-added services at financial terms to be agreed upon to help you achieve your risk management goals. Included within this E-Brochure is also a quick synopsis of two proprietary servicing capabilities (large account servicing and loss trend analysis).

In order to gain full access to these resources and others, please take a moment to register on our website @ www.losscontrol.com.

You must assign yourself a username and password.  Your registration request will be processed within two business days.

## Risk Management Resources

back to top.

These services are pre-negotiated arrangements with "Best in Class" vendors and provide solutions to your human resources and risk management needs. PIC does not receive any revenue from these alliances.

### DuraFile: "Your Online Safe Deposit Box"

back to top.

 

Natural Disasters **Will** Happen – Have You and Your Clients Prepared?

Philadelphia Insurance Companies has created a partnership with DuraFile to provide an innovative loss control tool for our insurance agents and our clients. DuraFile is a secure online safe deposit box for people who are serious about protecting their important documents in case of disaster. Fully encrypted and secure, DuraFile provides members 24/7 access to vital papers from any web-based computer. Insurance policies, home inventory, escrow documents, deeds, birth certificates, photos – any and all kinds of documents can be easily and securely organized and protected in your own personal online vault.

The PIC / DuraFile partnership is a win-win opportunity.  As a PIC agent or customer, you receive:

- 25% off the retail price for all DuraFile products and services (DuraFile retail price is $96/year ($8/month) for a one-year membership and $249 for a 3-year membership. PIC agents and insureds receive a 25% discount on single/ small quantity memberships – with a larger price discount on larger volume).
- Access to your online safe deposit box to secure insurance policies, loan documents, home closing files, medical records, trust deeds, passports, or any business documents accessible 24 hours a day anywhere in the world.
- The ability to provide leading edge consumer protection to your clients.
- A solution to decrease document storage space and increase employee efficiency.

**Marketing Presentation:**
DuraFile PHLY Marketing Presentation

**E-Brochure:**
DuraFile "Your Online Safety Deposit Box"

**E-Brochure Landing Page:**
http://www.durafile.com/phly.html

**IntelliCorp Records, Inc.**                                    back to top




**IntelliCorp Records, Inc.** - IntelliCorp Records, Inc., an affiliate of the Insurance Services Offices (ISO), is a provider of innovative decision-support products for employment and background checks and offers the best screening tools in the industry. IntelliCorp offers a wide range of innovative pre-employment verification and screening services, including criminal background checks, previous employment and education references, MVRs and more.

As a PIC client, you receive the value-added benefit of reduced pricing (click here to view our reduced pricing and coverage guide) and access to the largest criminal history database available. IntelliCorp provides customers with industry leading information solutions enabling them to make better decisions. No other provider gets you closer to the comprehensive, timely and accurate data you need. Your organization will avoid costly hiring and recruiting mistakes and limit exposure to risk litigation. You can access IntelliCorp's employment solutions by visiting www.losscontrol.com.

Please make certain you have your Policy Number available. Some of the information available includes:

| Workers compensation records | Nationwide criminal records searches | Single-county court searches |
|---|---|---|
| Education verification | Criminal Super Search - 50 states of criminal record data | Federal criminal records search in all U.S. district courts |
| Employment verification | Arrest and booking records | Motor vehicle records - all 50 states |
| Personnel assessments | Statewide criminal searches | Social Security number verification |
| Drug testing | Civil court records | Credit reports |

**Website: (Getting started):**

1. Click on "Total Solution Pre-Employment Verification, Screening Services, and Motor Vehicle Record Checks" located on the front page of www. losscontrol.com.
2. Enter promotion code PHLY
3. As part of the activation process, you will need to submit a photocopy of one of these documents:
   o Business license
   o Vendor license
   o Federal identification number (on a legal/government document)
4. The system will invoice you when you register. You can pay by monthly invoice or credit card. If you choose monthly invoicing, you must complete our Credit Authorization Form. You can submit the form on-line during the registration process or fax it to 440-505-0261. IntelliCorp submits all invoices through e-mail and will invoice you on the first business day after the end of the month. If you pay by credit card, you will receive an e-mail statement.

**Marketing Presentation:**
IntelliCorp Marketing Presentation

**E-Brochure:**
IntelliCorp Records, Inc.

Nonprofit Risk Management Center                                    back to top..

**Nonprofit**
**Risk Management**
**Center**

**Nonprofit Risk Management Center -** The Center offers risk management help specifically designed to address the needs of nonprofit organizations. FREE Workplace Safety Tool Kit, Business Continuity Planning course, *Pillars of Accountability*, tutorials, articles, e-news, risk management glossary and other downloadable resources. Affordable resources include online training, monthly Web Seminars, web-based risk assessment tool (Nonprofit CARES) and *My Risk Management Plan*. All of these resources can be accessed through www.losscontrol. com.

**Resources include the following:**
Workplace Safety is No Accident
Business Continuity Planning Course

Pillars of Accountability
Risk Management Tutorials
Articles
E-News
Glossary
State Liability Laws for Charitable Organizations and Volunteers
Risk Management Classroom
Web Seminars
My Risk Management Plan
Nonprofit CARES

## PureSafety (online driver training course)                    back to top



**PureSafety** - This **interactive online defensive driver training course** is designed to teach the driver how to minimize the risks involved with driving any type of vehicle, and how to avoid dangerous driving situations and improper driving techniques. These are skills that everyone should know master, both on and off the job. This can be accessed through www.losscontrol.com at no cost to PIC policyholders. A final exam and completion certificate are also available online.

## SafetyFirst (Fleet Monitoring Program)                    back to top

 

**"A pro-active approach to monitoring your organization's fleet exposures."**

**Named "Best in Class" for reducing automobile collisions and their related costs.**

**Driver Monitoring Program** - SafetyFirst Systems, LLC ("SafetyFirst") provides a vehicle driver monitoring system uniquely geared to the transportation industry. SafetyFirst's primary product is a driver performance feedback service that highlights risk-taking behaviors. Independent studies by major insurance companies have shown a 20-65% reduction in collisions when information developed by the program is used to coach drivers on their performance and influence a behavior change. "1-800-550-SAFE" decals are placed on rear of commercial vehicles (vans, pickups, delivery trucks, tractor trailers, etc.) that encourage motorists to report risk-taking behaviors. Calls are received at staffed, 'round the clock (24/7/365), dedicated call center for documentation and reporting to the client for management review.

**Subject to negotiated terms, this program provides:**

- Sales and Enrollment by Safety First staff
- Implementation and support materials
- Coaching tools for managers
- Countermeasure fact sheets for drivers
- Report Analysis (trend spotting) by Safety First specialists
- Real time data at their website (ad hoc reporting and preformatted exception reports)
- AND, Monthly Driver Training Package delivered by email

**Safety First - FIVE Reasons Why!!**

- **Saves Lives** - Reduces accidents because drivers know they are operating in a supervised environment. Confirmed by several insurance carrier studies.
- **Retains Employees** - Positive recognition.
- **Saves Money -** Studies by major insurance companies reported: if properly utilized, driver-monitoring programs lower accident rates.
- **Enhances Clients Public Image** - Shows concern for public safety, letting the driving public know you care when you make it easy to report driving performance.
- **Promotes job stability and security** - Shows your organization's investment in their career.

**Website:**
http://www.safetyfirst.com/

**Marketing Presentation:**

Safety First Marketing Presentation.ppt

**Marketing Brochure:**
Safety First Brochure - Client Draft.doc
A Drivers Guide To Safety First
Reviewing Safety First Management Reports
Motorist Observation Reports (MOR)
Handling Motorist Observation Reports

**Video Presentation:**
Safety First Television Video

**WEMED Loss Assistance Hotline**                                                   back to top

 

**WEMED Loss Assistance Hotline** - Philadelphia Insurance Companies (PIC) has
partnered with nationally recognized law firm Wilson, Elser, Moskowitz, Edelman
and Dicker LLP (WEMED) to offer a Loss Assistance Hotline. This hotline provides
policyholders with 2 free hours of legal consultation per inquiry with knowledgeable
attorneys on any matter that could potentially result in a claim under your PIC
policy. This Loss Assistance Hotline is NOT a loss reporting hotline. Please visit
www.losscontrol.com for full details including contact information.

**You can also contact WEMED online to inquire about loss assistance by
visiting the following Website:**
WEMED Loss Assistance Hotline

**Technical Bulletin:**
WEMED Loss Assistance Hotline.doc

**Marketing Presentation:**
Loss Assistance Hotline Marketing Presentation.ppt

**AGOSNET: web-enabled EPLI (Employment Practices
Liability Insurance) Risk Management Services**                          back to top



AGOSNET - LOGO

**Benefits of the PIC AGOSNET Program:**

**TRAINING**

- **Weekly Manager's Training Bulletins**
- **SmartTrain.com® - web-based training courses** enable you to keep your managers and supervisors trained on the most up-to-date and relevant information. Courses provided are:

  o **Abuse Prevention** — This program covers five key areas: (1) What is child sexual abuse, (2) the damage caused by child sexual abuse, (3) the warning signs of child sexual abuse and of abusers, (4) how to appropriately respond to suspected child sexual abuse, and (5) what caring adults can do to prevent child sexual abuse in their workplaces, homes, and communities.

  o **Sexual Harassment** — This module explores a common and devastating problem for organizations—sexual harassment. Topics include the personal and economic impacts of sexual harassment; the legal duties of managers and supervisors; what sexual harassment is and isn't; how to spot and prevent potential sexual harassment, how to defend your organization with effective reporting systems, the importance of investigations, and more.

  o **Discrimination** — This module discusses the prohibitions against discrimination on the basis of race, color, national origin, religion, disability, sex, and age. It explains what discrimination is; how even well-meaning conduct can be interpreted as discriminatory; the personal and economic impacts of discrimination; the legal duties of managers and supervisors; how to spot and prevent potential discrimination; how to defend your organization with effective reporting systems; the importance of investigations, and more.

  o **Smart Hiring** — More now than any other time prior to this century, organizations looking to hire are presented with a wide range of candidates. There are numerous economic, social, and cultural changes that are having, and will continue to have, a profound impact on the hiring process. This module is designed to reinforce the importance of fair, lawful, and consistent hiring practices. Such practices will help

organizations mitigate the unnecessary exposures to liability created by incorrect, improper, and inconsistent hiring procedures ... and, in the end, to promote successful new hires.

## HR & RISK MANAGEMENT TOOLS & RESOURCES

- An online **library of articles** - management briefs on a range of workplace related topics for risk managers, human resources professionals, and other upper-level management
- Best Practices Knowledge Base - a **searchable archive of real-life workplace scenarios** that provides insight into the proper management of workplace-related risks and exposures
- **Self-Assessments** - assist in evaluating your company's risk exposure levels and provide training to shore up your defense
- Model Employment **Handbook**
- Model Workplace **Policies and Forms**
- **Links** to hundreds of helpful workplace-related websites
- **Communication Center** - electronic access to other AGOSNET™ users within your organization

Access to these services are available through www.losscontrol.com.

## LOOKING FOR OPTIONS?

Additional AGOS resources, which are shown below, can be added to your PIC AGOSNET with preferred PIC pricing.

- TRAC™ (Teamwork, Respect, Awareness, and Communication) Web-based training for all employees
- SmartTrain.com™ web-based training for Managers and Supervisors
- Family and Medical Leave Act (FMLA)
- Workers' Compensation Fraud & Retaliation
- Wrongful Termination
- Workplace Violence
- Unsafe Acts
- Workplace Theft
- Ethics
- Diversity
- SmartTrain.com™ web-based training for Human Resource Managers and Senior Managers
- Hotlines
- Smarter Adults - Safer Children™ (SASC)

For more information, contact AGOS directly at 800-205-5262 and identify yourself as a Philadelphia Insurance Companies insured.

**E-Brochure:**
AGOSNET Employment Practice Liability Risk Management E-Brochure

**Marketing Presentation:**
AGOSNET Marketing Presentation - Introducing AGOSNET

## Proprietary Risk Management Services                    back to top

### I. Monthly E-Brochures

As a registered user to the www.losscontrol.com website you are eligible to receive our monthly loss control E-Brochures: (see below list of some archived E-Brochures)

Below is a sampling of some **Archived E-Brochures**:

Cold Weather Freeze-Up Precautions
Driver Eligibility Criteria
IntelliCorp Records, Inc.
HIPPA
Sexual Harassment in the Workplace
Employment Background Checks
Employee Discipline
Crisis Management and Emergency Response
Windstorm and Rainstorm Emergency Checklists
Disaster Support - Temporary Shelters
Slips and falls
Transporting People with Special Needs and Wheelchair Securement
DuraFile: Your Online Safety Deposit Box
De-escalation
Schools - Security Alert!!!

### II. Large Account Service Capabilities

Effective communication between PHLY Associates (Marketing, Underwriting, Claims, and Loss Control), the policyholder and the producer is the key ingredient to the development and implementation of servicing a large account.

**Ten Reasons Why:** Through proper initiation, selling, coordination, analysis, monitoring and measuring, and the **Ten Reasons Why**, PHLY will demonstrate once again why we are the superior market for niche large accounts.

1. **LOSS REDUCTION:** Improved loss ratio performance
2. **ACCOUNT SELECTION:** Involvement in prospective stage allows us to fully evaluate exposures and controls and management practices
3. **ACCOUNT RETENTION:** service plan will increase our presence to our customers and improve loyalty
4. **BENCHMARKED APPROACH TO QUANTIFY LOSS CONTROL**
5. **ENHANCED CUSTOMIZED SERVICE:** Full availability to our innovative loss control resources with specialized service capabilities. Annual stewardship meetings conducted prior to renewal
6. **LOSS TREND ANALYSIS:** Automated proprietary loss trend analysis capabilities
7. **CULTIVATE LONG-TERM RELATIONSHIPS**
8. **IMPROVED COMMUNICATION:**
   o INTERNALLY WITHIN PHLY DEPARTMENTS
   o EXTERNALLY WITH CUSTOMERS AND AGENTS
9. **IMPROVED AGENT SATISFACTION:** Better relationship between Agent, customer and PIC
10. **A PLETHORA OF RESOURCES** – Our technology provides easy access to Loss Control information, links, E-Brochures, etc

**Defining Benchmarking Standards**

Standards of performance will be established. These include Results Standards and Activity Standards.

- **Results Standards** – Results will be based on benchmarked historical loss data for each business insurance line of coverage. PIIC will focus on achieving agreed upon loss reduction goals with the insured. Where the client has exceptional loss experience, PIIC will focus on Activity Standards which include "Interest-Sustaining Activities" and program reviews as a partnership to help maintain the experience.
- **Activity Standards** – This will be measured by completing agreed upon specific location surveys, training courses and providing program support materials.

Each goal should be based off actual loss trends and must be developed with impact in mind – including exposure reduction, frequency reduction, severity reduction, and/or customer retention. If the account has been loss free, then

potential causes of loss (controlled exposures) should be addressed.

## III. Loss Trend Analysis / Risk Management Information System

- Ability to analyze claims data through a windows™-based software system.
- Ability to utilize claims data from any length or time period.
- Ability to provide extensive loss trending data analysis by line of coverage, loss frequency, loss severity, cause of loss, location, reporting time, reporting day, etc.
- Ability to chart and graph loss trend data and import into a PowerPoint™-presentation.
- Ability to benchmark risk's loss data against product loss data.

For additional value-added safety information, please log on to our loss control website and register at: www.losscontrol.com

## IV. Responding to Loss Control Recommendations via www.losscontrol.com



Philadelphia Insurance Company's Loss Control department has streamlined the recommendation response process by offering our policyholders and agents a new and exciting feature to respond to our recommendation letter(s) online, via our loss control website (www.losscontrol.com).

In order to take advantage of this exciting new feature, you must be a registered user to www.losscontrol.com

If you are not a registered user, you will need to do the following:

- Log into www.losscontrol.com
- Select the register button
- Fill in the required information
- Select the submit button
  - o You will receive a general email stating we have received your registration application
- LC personnel will sign your username and password up to our website

o   You will receive an email advising that your username and password
    have been set-up
o   You may begin using your PIIC website

Once you are registered to our website or if already a current customer, you will
then need to log into www.losscontrol.com with your username and password and
select the following button.

**E-Brochure:**
Respond to Recommendations via losscontrol.com

## "Outside the Box"                                              back to top



## ePIC Loss Control Services (Unbundled (For-Fee) Risk Management Services Available)

### *For Policyholders:*

Do you have a need for "Fee-Based" loss control services to fill
that last missing piece in you Risk Management program? ePIC
Loss Control is your total solution to fill the void where loss control
services are not included as part of your insurance policy, or are
beyond the scope of what was provided as part of the original
insurance agreement.



1. *ePIC Loss Control Services'* customized loss control surveys, risk
   management programs and seminar training modules are specific to your
   operation providing maximum impact to the organization.
2. Since you are all ready an established policyholder, ePIC's partnership and
   team approach understands the individualized attention your organization
   demands in developing cost effective solutions to reduce your exposure to
   loss.

3.  *ePIC Loss Control Services'* offers a preferred fee structure arrangement that is only offered to Philadelphia Insurance Company policyholders.

**For Agents and Brokers:**



Philadelphia Insurance Companies (PIC) understands that not all accounts meet PIC's strict underwriting criteria and guidelines necessary to become PIC policyholders. In this instance, PIC has created a new loss control and risk management profit center called *ePIC Loss Control Services*. PIC would like to provide its preferred Agents and Brokers with an opportunity to allow us to become more knowledgeable with your account so your client and PIC can potentially have a future relationship. *ePIC Loss Control Services* is that opportunity.

Contracting loss control service work through *ePIC Loss Control Services* will have two prominent benefits:

1.  We will set the foundation for loss frequency and severity reduction through the implementation of *ePIC Loss Control Services'* customized risk management programs and training modules.
2.  We will create a team approach to risk management by enabling us to become more knowledgeable about an account's risk management philosophy, safety practices and procedures.

*ePIC Loss Control Services* would also like to be your primary choice for risk management services for accounts that do not quite fit into the PIC underwriting appetite. We will provide the same quality customized loss control services for these clients as well.

Please take the time to visit our new website and review the attached marketing brochures. We look forward to servicing your client's risk management needs.

**Marketing Brochure and Information:** (call for specific pricing)
ePIC Online Interactive Defensive Driver Training
ePIC Loss Control Services Brochure
ePIC LCS -  Program Highlight Sheet
ePIC LCS Loss Control Programs
ePIC LCS Loss Control Training

## Contact Information                                      back to top

**HOME OFFICE CONTACTS**

**Jeffrey M. Collins, ARM**
**Vice President**
Home Office – Bala Cynwyd, PA
Phone: 800-873-4552 ext. 7717
E-Mail: jcollins@phlyins.com


**Mark A. Konchan, ARM CSP**
**Loss Control Manager**
**(Mid-Atlantic Region, Southeast, Florida Regions)**
Home Office – Bala Cynwyd, PA
Phone: 800-873-4552 ext. 2967
E-Mail: mkonchan@phlyins.com

**Joe Sweeney, Loss Control Consultant**
Home Office - Bala Cynwyd, PA
Phone: 800-873-4552 ext. 5876
E-Mail: jsweeney@phlyins.com


## REGIONAL OFFICE CONTACTS

**Brett Hines, Regional Loss Control Manager**
**(Central, Southwest Regions)**
Independence, MO
Phone: 877-439-7459 Ext. 3267
E-Mail: bhines@phlyins.com


**Leslie Dugan, Regional Loss Control Manager**
**(Sunbelt, West, Northwest, Rocky Mountain Regions)**
Mission Viejo, CA
Phone: (800) 994-4121 ext. 236
E-Mail: ldugan@phlyins.com


**Ron Quattrochi, Sr. Loss Control Consultant**
**(Northeast, Metro Regions)**
Stoughton, MA
Phone: 888-292-3881 ext. 268
E-Mail: rquattrochi@phlyins.com


**George Kalule, Loss Control Consultant**
**(North Central, Ohio Valley Regions)**
Naperville, IL
Phone: 800-547-9967 ext. 2256
E-Mail: gkalule@phlyins.com

IMPORTANT NOTICE - The information and suggestions presented by Philadelphia Indemnity Insurance Company in this E-Brochure is for your consideration in your loss prevention efforts. They are not intended to be complete or definitive in identifying all hazards associated with your business, preventing workplace accidents, or complying with any safety related, or other, laws or regulations. You are encouraged to alter them to fit the specific hazards of your business and to have your legal counsel review all of your plans and company policies.

LossControl.com     800.873.4552 ext 7717

## POLICYHOLDER NOTICE (LOSS ASSISTANCE HOTLINE)

We are pleased to enclose an original copy of your policy.  Please take a moment to review the policy to ensure it meets your needs.

Please feel free to contact our local sales representatives or our customer service unit at 877-GET-PHLY, if you need further assistance.

As a free loss control benefit to our policyholders, Philadelphia Insurance Companies (PIC) has partnered with a nationally recognized law firm Wilson, Elser, Moskowitz, Edelman and Dicker LLP (WEMED), to offer a toll-free **Loss Assistance Hotline**.  The toll-free loss assistance hotline telephone number is **1-877-742-2201**.  You can also contact a WEMED attorney online at either of the following internet addresses: **http://www.wemed.com/pic/ or <http://www.losscontrol.com>** . This hotline provides policyholders 2 free hours of legal consultation with a knowledgeable attorney on any matter that could potentially result in a claim under your PIC policy.  This loss assistance hotline is **NOT** a loss reporting hotline.  To report a claim, read the claim reporting instructions in your Policy, or ask your agent.  If you have questions concerning the loss assistance hotline, please contact us at 1-800-759-4961 x7717.

The Philadelphia Insurance Companies thanks you for choosing us to meet your insurance needs.


Sincerely,


Philadelphia Insurance Companies



# Philadelphia Insurance Companies
One Bala Plaza, Suite 100, Bala Cynwyd, Pennsylvania 19004

Philadelphia Indemnity Insurance Company

## COMMON POLICY DECLARATIONS

**Policy Number:** PHSD248785

**Named Insured and Mailing Address:**
EZGDS, Inc.
225 Broadway Ste 1670
San Diego, CA 92101-5000

**Producer:** 22778
Westland Insurance Brokers
3838 Camino del Rio North, #31
San Diego, CA, 92186

**Policy Period From:** 05/01/2007  **To:** 05/01/2008

at 12:01 A.M. Standard Time at your mailing address shown above.

**Business Description:** For Profit Organization

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED.  THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

| | PREMIUM |
|---|---|
| Commercial Property Coverage Part | |
| Commercial General Liability Coverage Part | |
| Commercial Crime Coverage Part | |
| Commercial Inland Marine Coverage Part | |
| Commercial Auto Coverage Part | |
| Businessowners | |
| Workers Compensation | |
| | |
| Private Company Protection | 8,415.00 |

| | | |
|---|---|---|
| Total | $ | 8,415.00 |

**FORM (S) AND ENDORSEMENT (S) MADE A PART OF THIS POLICY AT THE TIME OF ISSUE**
**Refer To Forms Schedule**

*Omits applicable Forms and Endorsements if shown in specific Coverage Part/Coverage Form Declarations

Countersignature Date                    Authorized Representative

Philadelphia Indemnity Insurance Company

Form Schedule – Policy

**Policy Number:** PHSD248785

Forms and Endorsements applying to this Coverage Part and made a part of this policy at time of issue:

| Form | Edition | Description |
|---|---|---|
| BJP-190-1 | 1298 | Commercial Lines Policy Jacket |
| LAH-Notice | 1002 | Policyholder Notice (Loss Assistance Hotline) |
| Common Policy Dec | 0100 | Common Policy Declarations |
| PP 0701 | 0701 | Privacy Policy Notice |
| IL0985 | 0103 | Disclosure Pursuant to Terrorism Risk Ins Act of 2002 |

PI-PRD-1 (09/02)

## Private Company Protection Plus

DIRECTORS AND OFFICERS & PRIVATE COMPANY LIABILITY
EMPLOYMENT PRACTICES LIABILITY INSURANCE
FIDUCIARY LIABILITY INSURANCE

[X] Philadelphia Indemnity Insurance Company          [ ] Philadelphia Insurance Company

Policy Number:  PHSD248785

DECLARATIONS

**NOTICE: EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THIS POLICY IS WRITTEN ON A CLAIMS MADE BASIS AND COVERS ONLY THOSE CLAIMS FIRST MADE DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN.  THE AMOUNTS INCURRED FOR DEFENSE COST SHALL BE APPLIED AGAINST THE RETENTION.**

Item  1.      Private Company Name and Address:
              EZGDS, Inc.
              225 Broadway Ste 1670
              San Diego, CA 92101-5000

              Internet Address: www. ezgds.com

Item  2.      Policy Period:        From: 05/01/2007          To:  05/01/2008
                                    (12:01 A.M. local time at the address shown in Item 1.)

Item  3.      Limits of Liability:
      (A)     Part 1, D&O Liability:           $      2,000,000 each Policy Period.
      (B)     Part 2, Employment Practices:    $      1,000,000 each Policy Period.
      (C)     Part 3, Fiduciary Liability:     $                each Policy Period.
      (D)     Aggregate, All Parts:            $      2,000,000 each Policy Period.

Item  4.      Retention:
      (A)     Part 1, D&O Liability:     $      25,000 for each Claim under Insuring Agreement B & C.
              Private Offering: $              10,000 for each Claim under Insuring Agreement B & C.
      (B)     Part 2, Employment Practices:  $   10,000 for each Claim.
      (C)     Part 3, Fiduciary Liability:   $          for each Claim.

Item  5.      Prior and Pending Date: Part 1 05/01/2007      Part 2  05/01/2007      Part 3  No Date Applies

Item  6.      Premium:          Part 1 $   4,395.00    Part 2 $   4,020.00    Part 3

                                *Total Premium:* $    8,415.00

Item  7.      Endorsements:   See Form List Attached

PAGE 1 OF 2

PI-PRD-1 (09/02)

In witness whereof, the Insurer issuing this Policy has caused this Policy to be signed by its authorized officers, but it shall not be valid unless also signed by the duly authorized representative of the Insurer.

_____          _____          _____
Authorized Representative                         Countersignature                                      Countersignature Date

Philadelphia Indemnity Insurance Company

Form Schedule – Private Company Protection Plan

**Policy Number: PHSD248785**

Forms and Endorsements applying to this Coverage Part and made a part of this policy at time of issue:

| Form | Edition | Description |
|------|---------|-------------|
| PI-PRD-New App | 1002 | Private Company Protection Plus (New Application) |
| PI-PRD-1 | 0902 | Private Company Protection Plus Declarations |
| PI-BELL-1 | 0406 | Bell Endorsement |
| PI-PRD-2 | 0902 | Private Company Protection Plus Policy |
| PI-PRD-5 | 0902 | Professional Services Exclusion |
| PI-PRD-22 | 0402 | Past Acts Exclusion |
| PI-PRD-38 | 0902 | Shared Limits Endorsement |
| PI-PRD-55 | 0902 | Known Circumstances Revealed in the Application Excl |
| PI-PRD-72 | 0506 | Business Advantage Pro-Pak Elite Coverage |
| PI-PRD-75 | 1203 | Amendment of Exclusions |
| PI-PL-CA | 0198 | California Amendatory Endorsement |
| PI-SLD-001 | 0103 | Cap on Losses from Certified Acts of Terrorism |

PP-0701 07-01

# PHILADELPHIA INSURANCE COMPANIES

## PRIVACY POLICY NOTICE

__Philadelphia Insurance Company & Philadelphia Indemnity Insurance Company__

The Philadelphia Insurance Companies values your privacy and we are committed to protecting personal information that we collect during the course of our business relationship.

The collection, use and disclosure of certain nonpublic personal information are regulated by law.

This notice is for your information only and requires no action on your part. It will inform you about the types of information we collect and how it may be disclosed. This does not reflect a change in the way we do business or handle your information.

### Information We Collect:

We collect personal information about you from the following sources:
- Applications or other forms such as claims forms or underwriting questionnaires completed by you;
- Information about your transactions with us, our affiliates or others; and
- Depending on the type of transaction you are conducting with us, information may be collected from consumer reporting agencies, health care providers, employers and other third parties.

### Information We Disclose:

We will only disclose the information described above, as permitted by law, to our affiliates and non-affiliated third parties when necessary to conduct our normal business activities.

For example, we may make disclosures to the following types of third parties:
- Your agent or broker;
- Parties who perform a business, professional or insurance function for our company, including our reinsurance companies;
- Independent claims adjusters, investigators, other insurers, medical care institutions and attorneys who need the information to investigate, defend or settle a claim involving you;
- Insurance regulatory agencies in connection with the regulation of our business; and
- Lienholders, mortgagees, lessors or other persons shown on our records as having legal or beneficial interest in your policy.

We do not sell your information to others for marketing purposes.
We do not disclose the personal information of persons who have ceased to be our customers.

### Protection of Information:

The Philadelphia Insurance Companies maintains physical, electronic and procedural safeguards that comply with state and federal regulations to protect the confidentiality of your personal information. We also limit employee access to personally identifiable information to those with a business reason for knowing such information.

### How to Contact Us:

Feel free to call or write to us for additional information.

Philadelphia Insurance Companies
One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
(877)-438-7459

POLICY NUMBER: PHSD248785                                                    IL 09 85 01 03

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT OF 2002. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT OF 2002

## SCHEDULE*

| |
|---|
| **Terrorism Premium (Certified Acts)**<br>$ 0<br><br><br>**Additional Information, if any, concerning the terrorism premium:** |
| *    Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations. |

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act of 2002, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under that Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 90% of that portion of the amount of such insured losses that exceeds the applicable insurer retention.

© ISO Properties, Inc., 2003                    ☐

PI-BELL-1 (04/06)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## BELL ENDORSEMENT



Unless otherwise stated herein, the terms, conditions, exclusions and other limitations set forth in this endorsement are solely applicable to coverage afforded by this endorsement, and the policy is amended as follows:

### I.   SCHEDULE OF ADDITIONAL COVERAGES AND LIMITS

The following is a summary of Limits of Insurance or Liability and/or additional coverages provided by this endorsement.  This endorsement is subject to the provisions of the policy to which it is attached.

| | |
|---|---|
| Identity Theft Expense | $5,000 |
| Terrorism Travel Reimbursement | $5,000 |
| Emergency Real Estate Consulting Fee | $5,000 |
| Temporary Meeting Space Reimbursement | $5,000 |
| Workplace Violence Counseling | $5,000 |
| Kidnap Expense | $50,000 |
| Key Individual Replacement Expenses | $50,000 |
| Image Restoration and Counseling | $5,000 |
| Donation Assurance | $5,000 |
| Business Travel | $5,000 |

### II.  CONDITIONS

#### A.  Applicability of Coverage

Coverage provided by your policy and any endorsements attached thereto is amended by this endorsement where applicable.

PI-BELL-1 (04/06)

B.  **Limits of Liability or Limits of Insurance**

1.  When coverage is provided by this endorsement and another coverage form or endorsement attached to this policy, the greater limit of Limits of Liability or Limits of Insurance will apply. In no instance will multiple limits apply to coverages which may be duplicated within this policy. Additionally, if this policy and any other coverage part or policy issued to you by us, or any company affiliated with us, apply to the same occurrence, offense, wrongful act, accident or loss, the maximum Limits of Liability or Limit of Insurance under all such coverage parts or policies combined shall not exceed the highest applicable Limits of Liability or Limit of Insurance under any one coverage part or policy.

2.  Limits of Liability or Limits of Insurance identified in Clause I. above are not excess of, but are in addition to the applicable Limits of Insurance stated in the Declarations.

C.  **Claim Expenses**

Coverages provided herein are not applicable to the generation of claim adjustment costs by you; such as fees you may incur by retaining a public adjuster or appraiser.

## III. ADDITIONAL COVERAGES

A.  **Identity Theft Expense**

We will reimburse any present Director or Officer of the Named Insured, for "Identity Theft Expenses" incurred as the direct result of any "Identity Theft" first discovered and reported during the policy period; provided that it began to occur subsequent to the effective date of the Insured's first policy with the Company.   The limit for this coverage will be $5,000 per policy period for all Insureds combined.  No deductible applies to this coverage.

B.  **Terrorism Travel Reimbursement**

The Company will reimburse any present Director or Officer of the Named Insured in the event of a "Certified Act of Terrorism" during the policy period which necessitates that he/she incurs "Emergency Travel Expenses."  The limit for this coverage will be $5,000 per policy period for all Insureds combined. No deductible applies to this coverage.

C.  **Emergency Real Estate Consulting Fee**

The Company will reimburse the Insured any realtor's fee or real estate consultant's fee necessitated by the Insured's need to relocate due to the "Unforeseeable destruction" of the Insured's principal location listed on the Declarations page during the policy period. The limit for this coverage will be $5,000 per policy period for all Insureds combined. No deductible applies to this coverage.

D.  **Temporary Meeting Space Reimbursement**

The Company will reimburse the Insured for rental of meeting space which is

PI-BELL-1 (04/06)

necessitated by the temporary unavailability of the Insured's primary office space due to the failure of a climate control system, or leakage of a hot water heater during the policy period.  Coverage will exist only for the renting of temporary meeting space required for meeting with parties who are not insured under this policy.  The limit for this coverage will be $5,000 per policy period for all Insureds combined. No deductible applies to this coverage.

### E.  Workplace Violence Counseling

In the event that an incidence of "workplace violence" occurs at any of the Insured's premises during the policy period, the Company will reimburse the Insured for expenses incurred for the emotional counseling of employees of the Insured, during the policy period.  The limit for this coverage will be $5,000 per policy period for all Insureds combined. No deductible applies to this coverage.

### F.  Kidnap Expense

The Company will pay on behalf of any Officer or Director of the Insured, reasonable fees incurred as a result of the kidnapping of them or their spouse, "domestic partner", parent or child during the policy period, subject to a limit of $50,000 each Policy Period, but not subject to any deductible.  Coverage will not apply to any kidnapping by or at the direction of any present or former family member of the victim.

Reasonable fees will include:

1.  fees and expenses of an independent negotiator or consultant retained with prior approval of the Company;

2.  interest on any loan taken by the Named Insured to pay Damages covered under this Policy; provided, however, that the Company shall not be liable for any interest accruing prior to thirty (30) days preceding the date of such payment, nor subsequent to the date of reimbursement from the Company for any portion of damages recoverable under this Policy;

3.  costs of travel and accommodations incurred by the Named Insured which become necessary due to the applicable kidnapping;

4.  the reward paid by the Named Insured, which is pre-approved by the Company, to an informant for information not otherwise available which leads to the arrest and conviction of persons responsible for any damages under this Policy; and

5.  current salary to an Officer or Director of the Insured who is kidnapped; provided, however, that the employee shall be held for more than thirty (30) days.  Salary shall be paid for a period commencing upon abduction and ceasing upon the earliest of either the release of the employee or discovery of the death of the employee, or 120 days after the Company receives the last credible evidence that the employee is still alive, or twelve (12) months after the date of kidnapping, or the exhaustion of the kidnap expense limit, whichever comes first.

### G.  Key Individual Replacement Expenses

PI-BELL-1 (04/06)

The Company will pay "Key Individual Replacement Expenses" if the Chief Executive Officer or Executive Director suffers an "injury" during the Policy Period which results in the loss of life during the Policy Period. The "Key Individual Replacement Expenses" amount shall be the lesser of $50,000 or ten (10) times the annual premium paid for this policy. No deductible applies to this coverage.

## H. Image Restoration and Counseling

The Company shall reimburse to the Insured expenses incurred for image restoration and counseling arising out of "Improper Acts" by any natural person Insured up to a limit of $5,000 per Policy Period for all Insureds combined. Covered expenses are limited to:

1.   the costs of rehabilitation and counseling for the accused natural person Insured provided the natural person Insured is not ultimately found guilty of criminal conduct, said reimbursement to occur after acquittal of the natural person Insured;

2.   the costs, charged by a recruiter or expended on advertising, of replacing an Officer as a result of "Improper Acts"; and

3.   the costs of restoring the Named Insured's reputation and consumer confidence through image consulting.

No deductible applies to this coverage.

## I. Donation Assurance

The Company shall reimburse the insured for "Failed Donation Claim(s)". The limit for this coverage will be $5,000 per policy period for all Insureds combined. No deductible applies to this coverage.

With respect to any "Failed Donation Claim", it is further agreed as follows:

1.   the donor must never have been in bankruptcy, nor have filed for bankruptcy/reorganization prior to the time said pledge was made to the Insured;

2.   for non-cash donations, payment by the Insurer of a "Failed Donation Claim" shall be based on the fair market value of said non-cash donation at the time of the "Failed Donation Claim;"

3.   in the case of unemployment/incapacitation of a natural person donor and as a condition of payment of the "Failed Donation Claim;"

    (a)  neither the natural person donor nor the Insured shall have had reason to believe the donor would become unemployed or incapacitated subsequent to the donation date and;

    (b)  the donor shall be unemployed for at least 60 days prior to the Insurer making payment;

4.   no coverage shall be afforded for a written pledge of funds or other measurable

PI-BELL-1 (04/06)

tangible property to the Insured dated prior to the Policy Period;

5.  a donation amount which is to be collected by the Insured over more than a 12 month period shall be deemed a single donation.

## J. Business Travel

The Company will pay a Business Travel Accidental Death Benefit to the Named Insured if a Director or Officer suffers an "injury" while traveling on a common carrier for business purposes during the Policy Period which results in loss of life not later than 180 days after the Policy Period expiration, the date of cancellation or the date of non-renewal. The Accidental Death Benefit amount shall be $5,000 per occurrence. No deductible applies to this coverage. The "injury" must be reported to the Company during the Policy Period.

The Business Travel Accidental Death Benefit shall not be payable if the cause of the "injury" that resulted in loss of life was:

1.  an intentional act by the insured;

2.  an act of suicide or attempted suicide, whether or not the deceased was sane or insane at the time of the attempted suicide;

3.  an act of war;

4.  a disease process.

## IV. Definitions

A.  "Certified Act of Terrorism", whenever used in this endorsement will mean any act so defined under the Terrorism Risk Insurance Act of 2002.

B.  "Domestic Partner", whenever used in this endorsement means any person who qualifies as a domestic partner under the provisions of any federal, state or local statute or regulation, or under the terms and provisions of any employee benefit or other program established by the Named Insured.

C.  "Emergency Travel Expenses", whenever used in this endorsement will mean:

1.  hotel expenses incurred which directly result from the cancellation of a scheduled transport, by train or air, by a commercial transportation carrier resulting directly from and within forty-eight hours of a "Certified Act of Terrorism;" and

2.  the increased amount incurred in air or train fare which may result from re-scheduling comparable transport, to replace a similarly scheduled transport canceled by a commercial transportation carrier in direct response to a "Certified Act of Terrorism."

D.  "Failed Donation Claim", whenever used in this endorsement will mean written notice to the Insured during the Policy Period of:

PI-BELL-1 (04/06)

1.  the bankruptcy or reorganization of any donor whereby such bankruptcy or reorganization prevents the donor from honoring a prior written pledge of funds or other measurable tangible property to the Insured;

2.  the unemployment or incapacitation of a natural person donor preventing him/her from honoring a prior written pledge of funds or other measurable tangible property to the Insured.

E.  "Identity Theft ", whenever used in this endorsement means the act of knowingly transferring or using, without lawful authority, a means of identification of any Officer or Director (or spouse thereof) of the Named Insured with the intent to commit, or to aid or abet another to commit, any unlawful activity that constitutes a violation of federal law or a felony under any applicable state or local law.

F.  "Identity Theft Expenses", whenever used in this endorsement means:

1.  costs for notarizing affidavits or similar documents attesting to fraud required by financial institutions or similar credit grantors or credit agencies;

2.  costs for certified mail to law enforcement agencies, credit agencies, financial institutions or similar credit grantors;

3.  loan application fees for re-applying for a loan or loans when the original application is rejected solely because the lender received incorrect credit information.

G.  "Improper Acts", whenever used in this endorsement means any actual or alleged act of:

1.  sexual abuse;

2.  sexual intimacy;

3.  sexual molestation; and/or

4.  sexual assault;

committed by an Insured against any natural person who is not an Insured. Such "Improper Acts" must have been committed by the Insured while in his or her capacity as an insured.

H.  "injury", whenever used in this endorsement means any physical damage to the body caused by violence, fracture or an accident that results in physical damage or hurt.

I.  "Key Individual Replacement Expenses", whenever used in this endorsement means the following necessary expenses:

1. costs of advertising the employment position opening;

2. travel, lodging, meal and entertainment expenses incurred in interviewing job

PI-BELL-1 (04/06)

applicants for the employment position opening; and

   3.  miscellaneous extra expenses incurred in finding, interviewing and negotiating with the job applicants, including, but not limited to, overtime pay, costs to verify the background and references of the applicants and legal expenses incurred to draw up employment contracts.

J.  "Unforeseeable Destruction", whenever used in this endorsement means damage resulting from a  "Certified Act of Terrorism", fire, crash or collapse which renders all of the Insured's primary office completely unusable.

K.  "Workplace violence", whenever used in this endorsement means any intentional use of or threat to use deadly force by any natural person, with intent to cause harm and that results in bodily "injury" or death of a member of the Insured or any  other natural person while on the Insured's premises.

PI-PRD-2 (09/02)

# PRIVATE COMPANY PROTECTION PLUS

### Directors and Officers & Private Company Liability Insurance
### Employment Practices Liability Insurance
### Fiduciary Liability Insurance

In consideration of the premium paid and in reliance upon all statements made and information furnished to the **Underwriter**, including all statements made in the **Application**, the **Underwriter** agrees to provide coverage as shown in the Declarations and described as follows:

### PART 1
### DIRECTORS & OFFICERS LIABILITY INSURANCE

(To be read in conjunction with the Common Policy Definitions, Exclusions and Conditions Sections, Part 4, 5, 6 below)

I.   **INSURING AGREEMENTS**

    A.   INDIVIDUAL LIABILITY COVERAGE

        The **Underwriter** shall pay on behalf of the **Individual Insured**, **Loss** from **Claims** made against **Individual Insureds** during the **Policy Period** (or, if applicable, during the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for **D&O Wrongful Acts**, except to the extent the **Private Company** has indemnified the **Individual Insured** for such **Loss**.

    B.   PRIVATE COMPANY INDEMNITY COVERAGE

        The **Underwriter** shall pay on behalf of the **Private Company**, **Loss** from **Claims** made against **Individual Insureds** during the **Policy Period** (or, if applicable, during the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for **D&O Wrongful Acts**, if the **Private Company** has indemnified such **Individual Insureds** for such **Loss**.

    C.   PRIVATE COMPANY LIABILITY COVERAGE

        The **Underwriter** shall pay on behalf of the **Private Company**, **Loss** from **Claims** made against the **Private Company** during the **Policy Period** (or, if applicable, during the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **D&O Wrongful Act**.

II.   **DEFINITIONS**

    A.   **D&O Wrongful Act** means any actual or alleged:

        1.   act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured**; or

        2.   act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by the **Private Company**; or

        3.   act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an **Individual Insured** arising out of serving in his/her capacity as a director, officer, governor or trustee of an **Outside Entity**, but only:

PI-PRD-2 (09/02)

  a. if such service is at the written request or direction of the **Private Company**; and

  b. if, at the time such service began, the **Individual Insured** did not know or could not have reasonably foreseen that such act, error, omission, misstatement, misleading statement, neglect, or breach of duty could lead to a **Claim** under this Policy.

B. **Outside Entity** means:

  1. any not-for-profit entity described in section 501(c)(3) of the Internal Revenue Code of 1986 (as amended); or

  2. any other entity listed as an **Outside Entity** in an endorsement to this Policy.

III. EXCLUSIONS

The **Underwriter** shall not be liable under this Part 1 to make any payment for **Loss** in connection with any **Claim** made against the **Private Company** under Insuring Agreement C:

A. arising out of, based upon or attributable to any actual or alleged plagiarism, infringement of copyright, patent, trademark, trade name, trade dress, service mark, title or slogan, piracy or misappropriation of ideas or trade secrets;

B. arising out of, based upon or attributable to any actual or alleged price fixing, restraint of trade, monopolization, unfair competition, or violation of the Federal Trade Commission Act, the Sherman Anti-Trust Act, the Clayton Act, the Robinson-Patman Act, the Hart-Scott-Rodino Anti-Trust Improvement Act or any other similar federal, state, or local statutory provision or common law anywhere in the world;

C. for any actual or alleged liability under any written or oral contract or agreement; however, this exclusion does not apply to any of the following:

  1. liability of the **Private Company** which would have attached even in the absence of such contract or agreement; or

  2. **Defense Costs**.

D. arising out of, based upon or attributable to any failure to comply with any law concerning workers compensation, unemployment insurance, social security, disability benefits or any similar laws;

E. for any actual or alleged violation of any of the responsibilities, obligations, or duties imposed by ERISA, the National Labor Relations Act (including the Labor Management Relations Act of 1947), Fair Labor Standards Act, Occupational Safety and Health Act, Consolidated Omnibus Budget Reconciliation Act of 1985, Worker Adjustment and Retraining Notification Act; or any amendments to or rules, regulations or orders promulgated pursuant to these laws, or similar provisions of any federal, state or local statutory or common law;

F. for any actual or alleged malfunction of any product or failure of any product to perform in any manner as a result of any defect, deficiency, inadequacy or dangerous condition in such product or in its design or manufacture;

G. arising out of, based upon or attributable to an **Employment Practices Act** or a **Fiduciary Liability Act**.

IV. PRESUMPTIVE INDEMNIFICATION

If the **Private Company** is permitted or required by common or statutory law, but fails to indemnify the **Individual Insured** for **Loss** (except by reason of its financial insolvency), any payment by the **Underwriter** of such **Loss** shall be subject to the Insuring Agreement C Retention Amount set forth in Item 4.(A) of the Declarations. The charter, by-laws, shareholder and board of director's resolutions of the **Private Company** shall be deemed to provide indemnification for such **Loss** to the fullest extent permitted by law.

<div align="center">

**PART 2**
**EMPLOYMENT PRACTICES LIABILITY INSURANCE**

</div>

(To be read in conjunction with the Common Policy Definitions, Exclusions and Conditions Sections, Part 4, 5, 6 below)

I.  INSURING AGREEMENT

The **Underwriter** shall pay on behalf of the **Insured**, **Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for an **Employment Practice Act**.

II. DEFINITIONS

A. **Employment Practice Act** means any actual or alleged:

1. wrongful dismissal, discharge or termination of employment;

2. breach of a written or oral employment contract or implied employment contract;

3. employment related misrepresentation;

4. wrongful failure to promote;

5. violation of employment discrimination laws (including harassment);

6. wrongful deprivation of a career opportunity;

7. employment related wrongful discipline;

8. negligent employee evaluation;

9. employment related invasion of privacy;

10. employment related defamation (including libel and slander);

11. sexual or workplace harassment of any kind;

12. constructive discharge of employment;

13. employment related **Retaliation**;

14. employment related humiliation;

15. wrongful demotion;

16. negligent reassignment;

17. violation of any federal, state or local civil rights laws;

and committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured** or by the **Private Company**.

Solely with respect to any **Claim** brought by or on behalf of any **Third Party**, **Employment Practice Act** means any actual or alleged wrongful failure to employ, discrimination, sexual

PI-PRD-2 (09/02)

harassment or violation of such **Third Party's** civil rights in relation to such wrongful failure to employ, discrimination or sexual harassment, whether direct, indirect, or unintentional, committed by an **Individual Insured** in his/her capacity as an **Individual Insured** or by the **Private Company.**

B.  **Retaliation** means retaliatory treatment against an **Individual Insured** on account of such individual:

1. exercising his or her rights under law, including but not limited to rights under any workers compensation laws, the Family and Medical Leave Act, or the Americans with Disabilities Act;

2. refusing to violate any law;

3. having assisted or testified in or cooperated with a proceeding or investigation regarding alleged violations of law by the **Insured**;

4. disclosing in writing to a superior or to any governmental agency any alleged violations of law;

5. filing any claim against the **Insured** under the Federal False Claims Act or any other similar "whistle blower" federal, state, or local law.

C.  **Third Party** means any natural person who is an active or current customer, supplier, vendor, applicant, business invitee or other client of the **Private Company.**

## III. EXCLUSIONS

The **Underwriter** shall not be liable under this Part 2 to make any payment for **Loss** in connection with any **Claim** made against the **Insured:**

A. arising out of, based upon or attributable to any failure to comply with any law concerning workers compensation, unemployment insurance, social security, disability benefits or any similar laws; however, this exclusion shall not apply to any **Claim** for **Retaliation;**

B. for any actual or alleged violation of any of the responsibilities, obligations, or duties imposed by ERISA, the National Labor Relations Act (including the Labor Management Relations Act of 1947), Fair Labor Standards Act (except the Equal Pay Act ), Occupational Safety and Health Act, Consolidated Omnibus Budget Reconciliation Act of 1985, Worker Adjustment and Retraining Notification Act; or any amendments to or rules, regulations or orders promulgated pursuant to these laws, or similar provisions of any federal, state or local statutory or common law; however, this exclusion shall not apply to any **Claim** for **Retaliation;**

C. arising out of, based upon or attributable to a lockout, strike, picket line, replacement or other similar action resulting from labor disputes, labor negotiations, or collective bargaining agreements; provided that this exclusion will not apply to any **Claim** for **Retaliation;**

D. arising out of, based upon or attributable to obligations or payments owed under (i) an express (written or verbal) contract of employment, (ii) an agreement to make payments in the event of the termination of employment, or (iii) an agreement to assume another's liability; however, this exclusion does not apply to any of the following:

1. liability of the **Private Company** which would have attached even in the absence of such contract or agreement; or

PI-PRD-2 (09/02)

2.     **Defense Costs**;

E.   to the extent such **Loss**, other than **Defense Costs**, constitutes employment-related benefits, stock options, perquisites, deferred compensation, payment of insurance, or any other type of compensation earned by the claimant in the course of employment or the equivalent value thereof; however, this exclusion shall not apply to front pay or back pay;

F.   arising out of, based upon or attributable to a **D&O Wrongful Act** or a **Fiduciary Liability Act**.


## PART 3
## FIDUCIARY LIABILITY INSURANCE

(To be read in conjunction with the Common Policy Definitions, Exclusions and Conditions Sections, Part 4, 5, 6 below)

I.   INSURING AGREEMENT

The **Underwriter** shall pay on behalf of the **Insured**, **Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **Fiduciary Liability Act**.

II.   DEFINITIONS

A.   **Administration** means:  (i) giving counsel to **Employees**, beneficiaries or participants regarding any **Benefit Plan**, (ii) providing interpretations and handling records in connection with any **Benefit Plan**, or (iii) effecting enrollment, termination or cancellation of **Employees** or participants under any **Benefit Plan**.

B.   **Benefit Plan** means:

1.   any **Welfare Benefit Plan** which was, is now or becomes sponsored by the **Private Company** solely for the benefit of the **Employees** of the **Private Company**;

2.   any **Pension Benefit Plan** which was, on or prior to the effective date of this Policy, sponsored by the **Private Company** solely for the benefit of the **Employees** of the **Private Company**, provided that coverage was available in respect of such **Pension Benefit Plan** under any policy of which this Policy is a renewal or replacement and such **Pension Benefit Plan** has been reported in writing to the **Underwriter** as part of the **Application**;

3.   any **Pension Benefit Plan** created or acquired (through merger, consolidation or otherwise) during the **Policy Period** by the **Insured** solely for the benefit of the **Employees** of the **Private Company**, but only upon the condition that within 90 days after such creation or acquisition, the **Insured** shall have (i) provided written notice to the **Underwriter** of such newly created **Pension Benefit Plan**, and (ii) agreed to any additional terms and paid any additional premium required by the **Underwriter** in its sole discretion;

4.   any government-mandated benefit program for workers compensation, unemployment, social security or disability benefit for **Employees** of the **Private Company**.

However, **Benefit Plan** does not include any multi-employer plan.

Coverage for **Benefit Plans** which are sold, terminated or spun-off during or prior to the **Policy Period** shall apply only with respect to any **Fiduciary Liability Act** occurring prior to the date

Case 3:10-cv-00635-JAH-WVG   Document 1   Filed 03/25/10   PageID.55   Page 55 of 140

PI-PRD-2 (09/02)

of such sale or spin-off, or in the case of termination, prior to the final date of asset distribution of such **Benefit Plan**.

C. **Fiduciary Liability Act** means any actual or alleged:

    1. breach by an **Insured** of the responsibilities, obligations or duties imposed upon fiduciaries of any **Benefit Plan** by ERISA; or

    2. negligent act, error or omission by an **Insured** solely in the **Administration** of any **Benefit Plans**.

D. **Pension Benefit Plan** means any employee pension benefit plan, as defined in **ERISA**.

E. **Welfare Benefit Plan** means any employee welfare benefit plan, as defined in **ERISA**.


III.   **EXCLUSIONS**

The **Underwriter** shall not be liable under this Part 3 to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A. arising out of, based upon or attributable to the actual or alleged failure to collect or fund contributions owed to any **Benefit Plan**; or for the return or reversion to any employer of any contribution to or asset of a **Benefit Plan**;

B. to the extent such **Loss** constitutes benefits due or to become due under a **Benefit Plan** or benefits which would be due under a **Benefit Plan** if its terms complied with all applicable law; however, this exclusion shall not apply to **Defense Costs**;

C. arising out of, based upon or attributable to any failure or omission to effect and maintain insurance or bonding for the property or assets of any **Benefit Plan**;

D. arising out of, based upon or attributable to any liability of others assumed by the **Insured** under any contract or agreement, other than any contract or agreement establishing a **Benefit Plan**.

E. arising out of, based upon or attributable to any failure to comply with any law concerning workers   compensation, unemployment insurance, social security, disability benefits or any similar laws;

F. arising out of, based upon or attributable to an **Employment Practices Act** or a **D&O Wrongful Act**.

Page 6 of 19

PI-PRD-2 (09/02)

## PART 4
### COMMON POLICY DEFINITIONS

A. **Application** means:

    1. the **Application** for this Policy, including any material submitted therewith; and

    2. the **Application**(s), including any material submitted therewith, for all previous policies issued by the **Underwriter** of which this Policy is a direct or indirect renewal or replacement,

    all of which shall be deemed a part of this Policy as if physically attached hereto.

B. **Claim** means:

    1. a written demand for monetary or non-monetary relief;

    2. a judicial or civil proceeding commenced by the service of a complaint or similar pleading;

    3. a criminal proceeding commenced by a return of an indictment;

    4. a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigation order or similar document, including, but not limited to, proceedings before the Equal Employment Opportunity Commission or any similar governmental agency;

    5. an arbitration or mediation or other alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the **Underwriter's** written consent, such consent not to be unreasonably withheld;

    6. solely with respect to Part 3 (Fiduciary Liability Insurance), a written notice of commencement of an investigation by the Department of Labor or the Pension Benefit Guaranty Corporation;

    against an **Insured** for a **Wrongful Act**, including any appeal therefrom; or

    7. a written request received by an **Insured** to toll or waive a statute of limitations, relating to a potential **Claim** as described above.

However, **Claim** shall not include a labor or grievance proceeding pursuant to a collective bargaining agreement.

A **claim** shall be considered made when an **Insured** first receives notice of the **Claim**.

C. **Damages** means any monetary judgment (including any pre- and post- judgment interest thereon) or monetary settlement, including the punitive, exemplary or multiple portion of any judgment (to the extent such damage is insurable under law of any jurisdiction which has a substantial relationship to the **Insured** or to the **Claim** seeking such damage and which is most favorable to the insurability of such damage).

D. **Defense Costs** means:

PI-PRD-2 (09/02)

1.  any reasonable and necessary legal fees and expenses incurred in the defense of a **Claim**, whether by the **Insured** with the **Underwriter's** consent or directly by the **Underwriter**, in the investigation, adjustment, defense and appeal of a **Claim**, except that **Defense Costs** shall not include:

    a.  any amounts incurred in defense of any **Claim** for which any other insurer has a duty to defend, regardless of whether or not such other insurer undertakes such duty; or

    b.  salaries, wages, overhead or benefit expenses associated with any **Insured** except as specified in subparagraph 2. below; or

    c.  salaries, wages, overhead or benefit expenses associated with employees of the **Underwriter**; and

2.  a $250 per day per **Individual Insured** supplemental payment for the attendance at the request or with the consent of the **Underwriter** by such **Individual Insured** at hearings, trials or depositions. Such payment shall not exceed $5000 in the aggregate for all **Individual Insureds** in each **Claim**.

E.  **Employee** means any natural person whose labor or service is engaged by and directed by the **Private Company**, including part-time, seasonal, leased and temporary employees as well as volunteers, but only while that natural person is acting in his or her capacity as such. **Employee** shall not include any independent contractors, unless specifically scheduled by endorsement.

F.  **ERISA** means the Employee Retirement Income Security Act of 1974, as amended, any similar federal, state, local or common law, and any rules and regulations promulgated thereunder.

G.  **Individual Insured** means:

    1.  any individual who has been, now is or shall become a director, officer, governor, trustee, **Employee**, volunteer, management committee member, or member of the Board of Managers of the **Private Company** or, solely with respect to Part 3 (Fiduciary Liability Insurance), a director, officer, governor, trustee or **Employee** of any **Benefit Plan**;

    2.  the lawful spouse of a director, officer, governor, trustee, or equivalent executive of the **Private Company**, but only for actual or alleged **Wrongful Acts** of such person for which such spouse may be liable as the spouse of such person;

    3.  the estate, heirs, legal representatives or assigns of a deceased director or officer, or the legal representatives or assigns of such a person who is incompetent, but only for **Wrongful Acts** of the person described in G. (1) or (4) which, in the absence of such death or incompetence, would have been covered by this Policy;

    4.  with respect to a **Private Company** chartered outside the United States of America, any individual who has been, now is or shall become a person serving in a position with such **Private Company** that is equivalent to any position described in (1) above.

H.  **Insured** means the **Private Company** and **Individual Insured**.

I.   **Interrelated Wrongful Act** means: any causally connected **Wrongful Act** or any series of the same, similar or related **Wrongful Acts**.

J.   **Loss** means:

      1.   **Damages;**

      2.   **Defense Costs;**

but **Loss** does not include:

      1.   criminal or civil fines or penalties imposed by law except that solely with respect to Part 3 (Fiduciary Liability Insurance) **Loss** includes fines or penalties imposed under Section 502 (i) and (l) of **ERISA;** or

      2.   taxes; or

      3.   matters deemed uninsurable under the law to which this Policy shall be construed; or

      4.   any amounts other than **Defense Costs**, which an **Insured** is obligated to pay as a result of a **Claim** seeking relief or redress in any form other than monetary damages; or

      5.   any costs other than **Defense Costs** associated with any accommodation required pursuant to the American With Disabilities Act (removed Civil Rights Act of 1964) and the rules or regulations promulgated thereunder, amendments thereto, or similar provisions of any federal, state or local law or common law.

K.   **Named Corporation** means the first entity named in Item 1 of the Declarations Page.

L.   **Private Company** means:

      1.  the **Named Corporation**, and

      2.  any **Subsidiary**, and

      3.  any entity or person as a debtor in possession within the meaning of the United States Bankruptcy Code or similar legal status under foreign law, and

      4.  solely with respect to Part 3 (Fiduciary Liability Insurance), any **Benefit Plan**.

M.   **Policy Period** means the period of time specified in Item 2 of the Declarations Page.

N.   **Private Offering** means securities offered or issued by the **Private Company** which are exempt from registration with the United States Securities and Exchange Commission pursuant to Section 3 (b) of the Securities Act of 1933.

O.   **Public Offering** means securities issued by the **Private Company** for initial public offering, public sale, public solicitation or public distribution to the general public and which is subject to full registration with the United States Securities & Exchange Commission (SEC). **Public Offering** does not include a **Private Offering.**

P.   **Run-Off Policy** means a new policy of insurance offered by the **Underwriter** at the request of the **Named Corporation** in the event of a **Transaction.** The **Run-Off Policy** shall apply to

PI-PRD-2 (09/02)

Claims made and reported to the **Underwriter** during the term of the **Run-Off Policy**, but only for **Wrongful Acts** occurring prior to the effective date of said **Transaction**.

Q.   **Subsidiary** means:

1.   a corporation of which the **Named Corporation** owns on or before the inception of the **Policy Period** more than 50% of the issued and outstanding voting stock either directly, or indirectly through one or more of its **Subsidiaries** or the right to elect, appoint or designate more than 50% of such entity's **board** of directors, trustees, or managers and which is set forth in the **Application**;

2.   a corporation which becomes a **Subsidiary** during the **Policy Period** and whose assets total less than 25% of the total consolidated assets of the **Named Corporation** as of the inception date of this **Policy Period**.  The **Named Corporation** shall provide the **Underwriter** with full particulars of the new **Subsidiary** before the end of the **Policy Period**;

3.   a corporation, which becomes a **Subsidiary** during the **Policy Period** other than a corporation described in paragraph 2. above, but only upon the condition that within 90 days of its becoming a **Subsidiary**, the **Named Corporation** shall have provided the **Underwriter** with full particulars of the new **Subsidiary** and agreed to any additional premium and/or amendment of the provisions of this **Policy** required by the **Underwriter** relating to such new **Subsidiary**.  Further, coverage as shall be afforded to the new **Subsidiary** is conditioned upon the **Named Corporation** paying when due any additional premium required by the **Underwriter** relating to such new **Subsidiary**.

A corporation becomes a **Subsidiary** when the **Named Corporation** owns more than 50% of the issued and outstanding voting stock, either directly, or indirectly through one or more of its **Subsidiaries**.  A corporation ceases to be a **Subsidiary** when the **Named Corporation** ceases to own more than 50% of the issued and outstanding voting stock, either directly, or indirectly through one or more of its **Subsidiaries**.  Coverage for **Claims** made against any **Subsidiary** or the **Individual Insureds** of any **Subsidiary** shall only apply to **Wrongful Acts** of such **Subsidiary** or the **Individual Insureds** of such **Subsidiary** occurring after the effective time that such **Subsidiary** became a **Subsidiary** and prior to the time that such **Subsidiary** ceased to be a **Subsidiary**.

R.   **Transaction** shall mean:

1    the **Private Company** merging into or consolidating with another entity such that the other entity is the surviving entity; or

2.   another entity, or person or group of entities and/or persons acting in concert acquiring securities or   voting rights which result in ownership or voting control by the other entity(ies) or person(s) of more     than 50% of the outstanding securities representing the present right to vote for the election of directors of the **Private Company**; or

3.   **Public Offering**.

S.   **Underwriter** means the stock insurance company check marked on the Declarations Page of this Policy.

T.   **Wrongful Act** means:

PI-PRD-2 (09/02)

1.      with respect to Part 1, any **D&O Wrongful Act**,
2.      with respect to Part 2, any **Employment Practice Act**,
3.      with respect to Part 3, any **Fiduciary Liability Act**.

## PART 5
## COMMON POLICY EXCLUSIONS

The **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A.      arising out of, based upon or attributable to such **Insured** gaining any profit, remuneration or advantage to which they were not legally entitled; however, this exclusion shall only apply if a final and non-appealable judgment or adjudication establishes the **Insured** committed such act or omission;

B.      arising out of, based upon or attributable to any dishonest or fraudulent act or omission or any criminal act or omission by such **Insured**; however, this exclusion shall only apply if a final and non-appealable judgment or adjudication establishes the **Insured** committed such act or omission;

No **Wrongful Act** of any **Insured** shall be imputed to any other **Individual Insured** for purpose of determining the applicability of Exclusions A and B above.

C.      arising out of, based upon or attributable to the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials, or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, or any cost or expense arising out of any governmental direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any pollutants;

D.      arising out of, based upon or attributable to any bodily injury or property damage in connection with tobacco smoke, asbestos or mold including, without limitation, the use, exposure, presence, existence, detection, removal, elimination or avoidance of tobacco smoke, asbestos or mold to any persons and in any environment, building or structure;

E.      arising out of, based upon or attributable to the radioactive, toxic, or explosive properties of nuclear material which includes, but is not limited to, Source Material, Special Nuclear Material and Byproduct Material as those terms are defined in the Atomic Energy Act of 1954 and any amendments thereto and any similar provisions of any federal, state or local statutory or common law;

F.      arising out of, based upon or attributable to:

1.      any litigation or demand against an **Insured** pending on or before the respective Prior and Pending Date set forth in Item 5 of the Declarations Page, or the same or essentially the same facts as alleged in such prior litigation; or

2.      any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other policy of insurance prior to inception of this Policy; or

3.      any **Wrongful Act**, fact, circumstance or situation of which, as of the respective Prior and Pending Date set forth in Item 5 of the Declarations Page, the **Insured** had knowledge and from which the **Insured** could reasonably expect a **Claim** to arise.

PI-PRD-2 (09/02)

G.    arising out of, based upon or attributable to the insolvency, conservatorship, receivership, bankruptcy or liquidation of any bank, banking firm, broker, dealer, investment company, investment banker, insurance company, or other entity of a similar nature; or the failure to pay or suspension of payment by any such entity;

H.    to the extent such **Loss** constitutes **Defense Costs** in a **Claim** directly or indirectly by, on behalf of, or for the benefit of any insurance carrier or bond carrier of the **Insured** or any affiliate of the **Insured**, regardless of in whose name such **Claim** is actually made;

I.    for any actual or alleged bodily injury, mental anguish, emotional distress, sickness, disease or death of any person, or damage to or destruction of any tangible property including **Loss** of use thereof; however, this exclusion shall not apply to mental anguish or emotional distress under Part 2 (Employment Practices Liability Insurance);

J.    brought or maintained by or on behalf of, or in the right of, the **Private Company** except a derivative action **Claim** by any person who is not a past or present director, officer, governor, trustee, equivalent executive, management committee member, or member of the Board of Managers of the **Private Company** and who brings or maintains the **Claim** without the solicitation, assistance or participation of such persons; provided, however that this exclusion shall not apply to a **Claim** brought or maintained by or on behalf of a bankruptcy or insolvency receiver, trustee, examiner, conservator, liquidator or rehabilitator for the **Private Company**, or any assignee of such receiver, trustee, examiner, conservator, liquidator or rehabilitator;

K.    brought or maintained by any **Individual Insured** except:

    1.    any **Claim** in the form of a cross claim, third party claim or other claim for contribution or indemnity by an **Individual Insured** which is part of or results directly from a **Claim** which is not otherwise excluded by this Policy;

    2.    a **Claim** for an **Employment Practice Act** or a **Fiduciary Liability Act**;

    3.    a **Claim** for a **D&O Wrongful Act** brought or maintained by an **Employee(s)** who is not a past or present director, officer, governor, trustee, equivalent executive, management committee member, or member of the Board of Managers of the **Private Company** if such **Claim** for a **D&O Wrongful Act** is brought and maintained by such **Employee** without the assistance, participation or solicitation of any such persons.

L.    for a **Wrongful Act** committed or attempted by a **Subsidiary**, **Benefit Plan** or an **Individual Insured** of a **Subsidiary** or **Benefit Plan** before such entity or plan became an **Insured** or after the entity or plan ceased to be an **Insured**;

M.    for service by the **Individual Insured** in any position or capacity in any entity other than the **Private Company**, a **Benefit Plan** or an **Outside Entity**, even if the **Private Company** directed or requested the **Individual Insured** to serve in such other position or capacity;

N.    arising out of, based upon or attributable to a **Public Offering** or any violation of the Securities and Exchange Act of 1933, Securities and Exchange Act of 1934, Investment Act of 1940, any state "Blue Sky" securities law, or any other federal, state or local securities law or any amendments thereto or any rules or regulations promulgated thereunder or any other provision of statutory or common law used to impose liability in connection with the offer to sell or purchase, or the actual sale or purchase of securities; provided, however that this exclusion shall not apply:

    1.    to any **Private Offering**, subject to terms and conditions of Part 6, Section XVII;

PI-PRD-2 (09/02)

2.   to any **Claim** made by any securityholder of the **Private Company** for the failure of the **Insured** to undertake or complete a **Public Offering**.

## PART 6
### COMMON POLICY CONDITIONS

I.   LIMITS OF LIABILITY

Regardless of the number of **Insureds** involved, **Claims** made, the **Underwriter's** liability under the Policy is limited as follows:

A.   With respect to coverage under Part 1 of this Policy, the **Underwriter's** maximum aggregate liability under Part 1 for all **Loss** on account of all **Claims** made during the **Policy Period**, whether covered under Insuring Agreement A, B or C, shall be the Limit of Liability for each **Policy Period** as set forth in Item 3.(A) of the Declarations.

B.   With respect to coverage under Part 2 and Part 3 of this Policy, the **Underwriter's** maximum aggregate liability for all **Loss** on account of all **Claims** made during the **Policy Period** shall be the Limit of Liability for each **Policy Period** as set forth in Item 3.(B) and 3.(C), respectively, of the Declarations.

C.   The **Underwriter's** maximum aggregate liability for all **Loss** on account of all **Claims** first made during the **Policy Period** under all purchased Parts, combined, shall be the Aggregate Limit of Liability set forth in Item 3.(D) of the Declarations.  The Limits of Liability set forth in Item 3.(A), 3.(B), and 3.(C), are sub-limits that do not increase the **Underwriter's** maximum liability as set forth in Item 3.(D).

D.   **Defense Costs** are part of the Limit of Liability specified in Item 3. of the Declarations. Payment by the **Underwriter** of **Defense Costs** incurred on account of any **Claim** shall serve to reduce the Limit of Liability stated in Item 3. of the Declarations.  The **Underwriter** is not obligated to pay any **Loss** after the applicable Limit of Liability has been exhausted.

E.   The Limit of Liability for any Extension Period, if applicable, shall be a part of and not in addition to the respective Limit of Liability applicable to the **Policy Period**.

II.   RETENTION CLAUSE

The **Underwriter** shall only be liable for that portion of **Loss** arising from each **Claim** which is in excess of the respective Retention stated in Item 4. of the Declarations Page.  Such Retention shall be borne by the **Insured**, uninsured and at their own risk, provided no Retention shall apply to **Loss** incurred by **Individual Insureds** for which the **Private Company** is not permitted or required to indemnify the **Individual Insured** or is financially unable to do so.  A single Retention shall apply to **Loss** arising from all **Claims** alleging **Interrelated Wrongful Acts**.

III.   DEFENSE AND SETTLEMENT

A.   The **Insured** and not the **Underwriter** shall have the responsibility to defend any **Claim**. However, the **Insured** shall have the right, as soon as practicable after a **Claim** is first made, to tender the defense of such **Claim** to the **Underwriter**.  Upon written notice to the **Underwriter** of such election by the **Insured** and subject to all of the provisions of this Section III. DEFENSE AND SETTLEMENT, the **Underwriter** shall undertake and manage the defense of such **Claim**, even if such **Claim** is groundless, false or fraudulent.

PI-PRD-2 (09/02)

B.      If the **Insured** is defending a **Claim** pursuant to A. above, the **Underwriter** shall advance **Defense Costs** prior to the final disposition of a **Claim**. The **Insured** shall elect counsel of its choice subject to approval by the **Underwriter**, such approval shall not be unreasonably withheld. The **Underwriter** shall not be liable for **Loss** admitted by the **Insured** without the **Underwriter's** prior written consent, which shall not be unreasonably withheld. The **Underwriter** reserves the right, but not the duty, at any time to take over control of the defense of any **Claim** and with the consent of the **Insured**, settle any **Claim** as the **Underwriter** deems expedient.

C.      The **Underwriter** is not obligated to pay any **Loss** after the Limit of Liability has been exhausted.

D.      In the event that a **Claim** is made against the **Insured**, the **Insured** shall take reasonable measures to protect their interests.

E.      If more than one **Insured** is involved in a **Claim**, the **Underwriter** may, in its sole discretion, appoint separate counsel for one or more of such **Insureds** if there is a material (actual or potential) conflict of interest among any such **Insureds**.

F.      The **Insured** agrees to provide the **Underwriter** with all information, assistance and cooperation which the **Underwriter** reasonably requests and agree that in the event of a **Claim** the **Insured** will do nothing that may prejudice the **Underwriter's** position or its potential rights of recovery.

G.      If with respect to any **Claim** the **Insured** refuses to consent to the first settlement acceptable to the claimant which the **Underwriter** recommends to the **Insured** in writing, and elects to further contest the **Claim**, then the **Underwriter's** liability for such **Claim** shall not exceed the amount for which the **Claim** could have been settled, including **Defense Costs** incurred, up to the date of such refusal, plus 50% of covered **Loss** in excess of such first settlement amount, it being a condition of this insurance that the remaining 50% of such **Loss** excess of the first settlement amount shall be borne by the **Insured** at their own risk and be uninsured. Notwithstanding the foregoing, this paragraph shall not apply until the settlement amount exceeds the Retention amount stated in Item 4. of the Declarations Page.

In addition, if the **Underwriter** recommends a first settlement of a **Claim** within the Policy's applicable Limit of Liability that is acceptable to the claimant, and the **Insured** consents to such settlement, then the **Insured's** applicable Retention for such **Claim** shall be retroactively reduced by ten percent (10%). It shall be a condition to such reduction that the **Insured** must consent to the first settlement amount within thirty (30) days after the date the **Underwriter** recommends to the **Insured** such first settlement amount, or in the case of a first settlement amount which arises from a first settlement offer by the claimant, then within the time permitted by the claimant to accept such first settlement offer, but in all events no later than thirty (30) days after the **Underwriter** recommends to the **Insured** such first settlement offer. If the **Insured** does not consent to the first settlement within the time prescribed above, the applicable Retention amount shall remain the respective amount set forth in Item 4. of the Declarations Page, even if consent is given to a subsequent settlement.

H.      ORDER OF PAYMENTS

In the event of **Loss** arising from one or more **Claims** for which payment is otherwise due under Part 1 (Directors and Officers Liability Insurance) but which **Loss** in the aggregate exceeds the remaining available Limit of Liability for Part 1(Directors and Officers Liability Insurance), the **Underwriter** shall:

PI-PRD-2 (09/02)

1. first pay such **Loss** for which coverage is provided under Insuring Agreement A (INDIVIDUAL LIABILITY COVERAGE); then

2. with respect to whatever remaining amount of the Limit of Liability after payment of 1. above, pay such **Loss** for which coverage is provided under any other Insuring Agreement of Part 1 (Directors and Officers Liability Insurance).

IV.   NOTICE/CLAIM REPORTING PROVISIONS

Notice hereunder shall be given in writing to the **Underwriter** at the following address:

Philadelphia Insurance Companies
One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
Attention: Claims Department

The date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice. Any notice to the **Underwriter** shall specify the Part(s) of this Policy under which the notice is being given and shall be treated as notice only under such specified Part(s).

A.   In the event that a **Claim** is made against the **Insured**, the **Insured** shall, as a condition precedent to the obligations of the **Underwriter** under this Policy, give written notice to the **Underwriter** as soon as practicable after any of the directors, officers, governors, trustees, management committee members, or members of the Board of Members first become aware of such **Claim**, but, not later than 60 days after the expiration date of this Policy, Extension Period, or **Run-Off Policy**, if applicable.

B.   If during this **Policy Period** an **Insured** first becomes aware of any circumstances which may subsequently give rise to a **Claim** being made against any **Insured** for a specific alleged **Wrongful Act**, and as soon as practicable thereafter, but before the expiration or cancellation of this Policy, gives written notice to the **Underwriter** of the circumstances and the reasons for anticipating such a **Claim**, with full particulars as to the **Wrongful Act**, dates and persons involved, then any **Claim** which is subsequently made against the **Insured** arising out of such **Wrongful Act** will be considered made during this **Policy Period**.

C.   All **Loss** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** shall be deemed one **Loss** on account of a one **Claim**. Such **Claim** shall be deemed to be first made when the earliest of such **Claims** was first made or first deemed made pursuant to Clause B. hereinabove.

V.   CANCELLATION AND NON-RENEWAL

A.   The **Underwriter** may not cancel this Policy except for failure to pay the premium when due, in which case the **Underwriter** shall mail written notice of cancellation to the **Private Company** at least ten (10) days prior to the effective date of cancellation.

B.   The **Private Company** may cancel this Policy for itself and all other **Insureds** by surrender of this Policy to the **Underwriter** or any of its authorized agents or by mailing to the **Underwriter** written notice stating when thereafter the cancellation shall be effective. If the **Private Company** cancels, earned premium shall be computed in accordance with the customary short rate table procedure.

PI-PRD-2 (09/02)

C.    The **Underwriter** shall not be required to renew this Policy; however, written notice of the **Underwriter's** intent to non-renew this Policy shall be mailed to the **Private Company** at least sixty (60) days prior to expiration of the **Policy Period**.

VI.    REPRESENTATIONS AND SEVERABILITY

A.    The **Insured** represent that the particulars and statements contained in the **Application** are true and agree that (1) those particulars and statements are the basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy; (2) those particulars and statements are material to the acceptance of the risk assumed by the **Underwriter** under this Policy; and (3) this Policy is issued in reliance upon the truth of such representations.

B.    Except for material facts or circumstances known to the **Individual Insured** signing the **Application**, no statement in the **Application** or knowledge or information possessed by any **Insured** shall be imputed to any other **Individual Insured** for the purpose of determining the availability of coverage.

VII.    SUBROGATION

In the event of any payment under this Policy, the **Underwriter** shall be subrogated to the extent of such payment to all of the **Insured's** rights of recovery. The **Insured** shall execute and deliver such instruments and papers and do whatever else is necessary to secure such rights and shall do nothing to prejudice or compromise such rights without the **Underwriter's** express written consent.

VIII.    EXTENSION PERIOD

A.    If the **Underwriter** refuses to renew this Policy the following will apply:

For no additional premium, the **Underwriter** will provide a 60 day extension of the coverage granted under Part 1, 2, and 3 of this Policy for any **Claim** first made against the **Insured** during the 60 days after the non-renewal date, but only with respect to any **Wrongful Act** committed before such non-renewal date and otherwise covered by this Policy (the "Automatic Extension"). This Automatic Extension shall not apply if the **Insured** has purchased similar insurance from the **Underwriter** or any other insurer covering such **Claim.**

Upon expiration of the Automatic Extension, the **Private Company** shall have the right, upon payment of an additional 50%, 100%, 150% of this Policy's annual premium to an extension of the coverage granted by this Policy for any **Claim** first made against the **Insured** during the twelve (12) months, twenty-four (24) months, or thirty-six (36) months, respectively, after the expiration of the Automatic Extension, but only with respect to **Wrongful Acts** committed before the non-renewal date and otherwise covered by this

Policy (the "Extension Period"); provided however, that the request for this Extension Period must be made to the **Underwriter** in writing and payment of the additional premium must be made prior to the expiration of the Automatic Extension. In the event similar insurance is in force covering any **Claims** first made during this Extension Period, coverage provided by this Policy shall be excess over any such other insurance.

B.    If the **Private Company** cancels or does not renew this Policy or the **Underwriter** cancels for nonpayment of premium the following will apply:

The **Private Company** shall have the right, upon payment of an additional 50%, 100%, or 150% of this Policy's annual premium, to an extension of the cover granted under Parts 1, 2, and 3 of this Policy for any **Claim** first made against the **Insured** during the twelve (12) months, twenty-four (24) months, or thirty-six (36) months, respectively, after the date of such cancellation or non-renewal, but only with respect to any **Wrongful Acts** committed before the date of such cancellation or non-renewal and otherwise covered by this Policy (the "Extension Period"); provided however, that the request for this Extension Period must be made to the **Underwriter** in writing and payment of the additional premium must be made within 60 days following the date of such cancellation or non-renewal. In the event similar insurance is in force covering any **Claims** first made during this Extension Period, coverage provided by this Policy shall be excess over any such other insurance.

If the **Underwriter** cancels for the non-payment of premium, the **Parent Organization** may purchase the Extension Period only after any earned premium due to the **Underwriter** is paid within 10 days after the date of cancellation or Policy expiration, whichever comes first.

C.   All premium paid with respect to an Extension Period shall be deemed fully earned as of the first day of the Extension Period. For the purpose of this Section VIII, any change in premium or terms on renewal shall not constitute a refusal to renew.

IX.   CHANGES

Except by written endorsement issued to the **Insured** forming a part of this Policy, nothing shall effect a change in or addition to the provisions of this Policy. Furthermore, under no circumstances shall the **Underwriter** be deemed to have waived or be estopped from asserting any right under this Policy, at law, or in equity respecting any **Claim** except as stated in writing by the **Underwriter's** authorized Claims Department representative.

X.   ASSIGNMENT

Assignment of interest in this Policy shall not bind the **Underwriter** until the **Underwriter's** consent is endorsed hereon.

XI.   AUTHORIZATION CLAUSE AND NOTICES

By acceptance of this Policy, the **Insured** agrees that the **Private Company** shall act on behalf of any **Insured** with respect to the giving and receiving of any return premiums and notices that may become due under this Policy. Notice to the **Private Company** shall be directed to the individual named in the **Application**, or such other person as shall be designated by the **Private Company** in writing. Such notice shall be deemed to be notice to any **Insured**. The **Private Company** shall be the agent of any **Insured** to effect changes in this Policy.

XII.   OTHER INSURANCE

If the **Insured** has any other insurance for **Claims** covered hereunder, the insurance provided by this Policy shall be excess over such other insurance, regardless of whether such other insurance is collectible or designated as primary or excess.

In event of a **Claim** against the **Insured** arising out of serving in his/her capacity as a director, officer, governor or trustee of an **Outside Entity** or an **Employment Practices Act** against or committed by a leased **Employee**, coverage as is afforded by this policy shall be specifically excess of indemnification provided by such **Outside Entity** or such leasing company and any insurance provided to such **Outside Entity** or such leasing company.

PI-PRD-2 (09/02)

XIII.   ACCEPTANCE

This Policy embodies all agreements existing between the parties hereunder or any of their agents relating to this insurance

XIV.   ACTION AGAINST THE UNDERWRITER; ARBITRATION

A.   No person or entity shall have any right under this Policy to join the **Underwriter** as a party to any action against the **Insured** to determine the **Insured's** liability, nor shall the **Underwriter** be impleaded by the **Insured** or their legal representatives. Bankruptcy or insolvency of the **Insured** or their successors in interest shall not relieve the **Underwriter** of its obligations hereunder.

B.   Any dispute relating to this Policy or the alleged breach, termination or invalidity thereof, which cannot be resolved through negotiations between any **Insured** and the **Underwriter**, shall be submitted to binding arbitration. The rules of the American Arbitration Association shall apply except with the respect to the selection of the arbitration panel. The panel shall consist of one arbitrator selected by such **Insured**, one arbitrator selected by the **Underwriter** and a third independent arbitrator selected by the first two arbitrators.

XV.   CHANGE IN OWNERSHIP OR CONTROL

A.   If after the inception of the **Policy Period** a **Transaction** occurs then coverage under Parts 1, 2, and 3 of this Policy shall remain in force, but only for **Claims** made during the **Policy Period** for **Wrongful Acts** committed prior to the effective date of the **Transaction** and only if the following conditions are met:

1.   the **Insured** provides written notice of the **Transaction** (other than **Public Offering**) to the **Underwriter** as soon as practicable but no later than 45 days of the effective date of such **Transaction**; and

2.   the **Insured** provides the **Underwriter** with such information as the **Underwriter** deems necessary; and

3.   in the case of a **Public Offering**, the **Insured** provides written notice of the **Public Offering** to the **Underwriter** no later than 30 days prior to the filing of any registration statement with the United States Securities and Exchange Commission.  The **Underwriter** shall provide a quotation for the **Public Offering**.

If **Insured** fails to meet conditions 1., 2., & 3. above, coverage under this Policy shall cease as of the effective date of the **Transaction** and the **Underwriter** shall return any unearned premium on a pro-rata basis.

The **Insured** shall have the right, within 45 days after the **Transaction** (or such date the **Underwriter** may agree by endorsement), to request an offer from the **Underwriter** for a **Run-Off Policy** for a term up to 6 years.  If elected, such **Run-Off Policy** shall be conditioned upon payment during the **Policy Period** by the **Insured** of any additional premium, which shall be fully earned at inception, and shall be subject to any additional terms and conditions required by the **Underwriter**.

XVI.   TERRITORY AND VALUATION

This Policy shall extend to any **Wrongful Act** committed anywhere in the world.

PI-PRD-2 (09/02)

All premiums, limits, retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or another element of **Loss** under this Policy is stated in a currency other than United States of America dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in The Wall Street Journal on the date the final judgment is reached, the amount of the settlement is agreed upon or the other element of **Loss** is due, respectively.

XVII.   COVERAGE FOR A PRIVATE OFFERING

The **Insured** shall give the **Underwriter** written notice of a **Private Offering**, together with full details and as soon as practicable, but not later than 60 days after the effective date of such **Private Offering**. However, any **Claim** arising out of, based upon or attributable to a **Private Offering** shall be subject to the Private Offering Retention stated in Item 4. of the Declarations Page. Such Private Offering Retention shall be borne by the **Insureds**, uninsured and at their own risk, except that a Private Offering Retention shall not apply to **Loss** incurred by **Individual Insureds** for which the **Private Company** is not permitted or required to indemnify the **Individual Insured** or is financially unable to do so.

XVIII.   TWO OR MORE COVERAGE PARTS OR POLICIES ISSUED BY THE UNDERWRITER.

It is the **Underwriter's** stated intention that the various coverage parts or policies issued to the **Private Company** by the **Underwriter**, or any affiliated company, do not provide any duplication or overlap of coverage for the same **Claim**. Notwithstanding the foregoing, if more than one coverage part applies to the same **Wrongful Act** or **Interrelated Wrongful Acts**, then the maximum Limit of Liability under all such coverage parts combined shall not exceed the highest applicable Limit of Liability under any one coverage part. Notwithstanding the other insurance provision, if this Policy and any other policy issued to the **Private Company** by the **Underwriter**, or any affiliated company, apply to the same **Wrongful Act**, professional incident, occurrence, offense, accident or **Loss**, then the maximum Limit of Liability under all such policies combined shall not exceed the highest applicable Limit of Liability under any one policy.

XIX.   ALLOCATION

If both **Loss** covered by this Policy and **Loss** not covered by this Policy are incurred either because a **Claim** includes both covered and uncovered matters, or because a **Claim** is made against both the **Individual Insured** and/or the **Private Company**, and others, the **Insured** and the **Underwriter** shall use their best efforts to agree upon a fair and proper allocation of such amount between covered **Loss** and uncovered loss. Any such allocation shall be based upon the relative legal exposures of the parties to covered and uncovered matters.

PI-PRD-5 (09/02)

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## PROFESSIONAL SERVICES EXCLUSION

This endorsement modifies and is subject to the insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

This Policy is amended as follows:

With respect to coverage under Part 1, the **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against the **Insured** based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving the **Insured's** performance of or failure to perform professional services for others.

It is provided, however, that the foregoing shall not be applicable to any derivative or shareholder class action **Claim** alleging failure to supervise those who performed or failed to perform such professional services.

All other terms and conditions of this Policy remain unchanged

PI-PRD-22 (04/02)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## PAST ACTS EXCLUSION

This endorsement modifies and is subject to the insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

This Policy is amended as follows:

With respect to coverage under Part(s)          1          , the **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of, based upon or attributable to any **Wrongful Act** committed on or before 11/19/2004 .

All other terms and conditions of this Policy remain unchanged

PI-PRD-22 (04/02)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## PAST ACTS EXCLUSION

This endorsement modifies and is subject to the insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

This Policy is amended as follows:

With respect to coverage under Part(s)          2          , the **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of, based upon or attributable to any **Wrongful Act** committed on or before 11/19/2004 .

All other terms and conditions of this Policy remain unchanged

PI-PRD-38 (09/02)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## SHARED LIMITS ENDORSEMENT

This endorsement modifies and is subject to the insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

This Policy is amended as follows:

It is agreed the combined/shared Limit of Liability available for any **Claim** under Part(s)       1       and any **Claim** under Part(s)       2       shall be $    2,000,000    .

Notwithstanding the foregoing, the Limit of Liability available for any **Claim** under a coverage Part shall also be subject to such Parts Limit of Liability as stated in Item 3 of the Declarations.

All other terms and conditions of this Policy remain unchanged

Page 1 of 1

PI-PRD-55 (09/02)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## KNOWN CIRCUMSTANCES REVEALED IN THE APPLICATION EXCLUSION

This endorsement modifies and is subject to the insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

This Policy is amended as follows:

With respect to coverage under Part(s)       1, 2       , the **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against the **Insured** based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any matter, fact, or circumstance disclosed in connection with question       43       of the **Application** dated 05/07/2007 and submitted on behalf of the **Insured**.

The referenced **Application** is attached and made a part of this policy.

All other terms and conditions of this Policy remain unchanged

Page 1 of 1

PI-PRD-72 (05/06)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**BUSINESS ADVANTAGE PRO-PAK ELITE COVERAGE**

This endorsement modifies insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

In consideration of the premium paid, the policy is amended as follows:

**1.  OUTSIDE DIRECTORSHIP MODIFICATION**

**PART 1** DIRECTORS & OFFICERS LIABILITY INSURANCE, Section II (DEFINITIONS), item A. (**D&O Wrongful Act**), item 3. is replaced by the following:

> 3.  act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an **Individual Insured** arising out of serving in his/her capacity as a director, officer, governor or trustee of an **Outside Entity** if such service is at the written request or direction of the Private **Company.**

**2.  SECURITIES CLAIM CARVE BACK**

**PART 1** (DIRECTORS & OFFICERS LIABILITY INSURANCE), Section III (EXCLUSIONS), Items A. and F. are amended to include the following:

> Exclusions A. and F. shall not apply to any **Claim** brought by any security holder of the **Private Company** (whether directly or derivatively) provided that such security holder is acting totally independently of, and totally without the solicitation, assistance, participation, or intervention of any Director or Officer of the **Private Company**, or any affiliate thereof.

**3. AMENDMENT OF PRIOR AND PENDING LITIGATION**

**PART 5**, (COMMON POLICY EXCLUSIONS), item F. is replaced by the following:

> 1.  any litigation or demand against an **Insured** pending on or before the respective Prior and Pending Date set forth in Item 5 of the Declarations Page, or the same or essentially the same facts as alleged in such prior litigation; or
>
> 2.  any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other similar policy in which this Policy is a renewal or replacement .

**4.  DELETION OF EXCLUSIONS**

**PART 5**, (COMMON POLICY EXCLUSIONS), item G. and H. are hereby omitted in their entirety.

PI-PRD-72 (05/06)

### 5. SEVERABILITY AMENDMENT

PART 6, (COMMON POLICY CONDITIONS), Section VI (REPRESENTATIONS AND SEVERABILITY), items A. and B. are replaced by the following:

(A) In granting coverage to the **Insureds** under this Policy, the **Underwriter** has relied upon the declarations and statements in the written application(s) for this Policy. Such declarations and statements are the basis of the coverage under this Policy and shall be considered as incorporated in and constituting part of this Policy.

(B) Any written application(s) shall be construed as a separate application(s) for coverage by each **Insured**. With respect to the declarations and statements in such application(s):

(1) no fact pertaining to or knowledge possessed by any **Individual Insured** shall be imputed to any other **Individual Insured** for the purpose of determining if coverage is available; and

(2) only facts pertaining to and knowledge possessed by the Chief Financial Officer, President, general counsel, risk manager, Chief Executive Officer, director of human resources or Chairperson of any part of the **Private Company** or any other individual signing such application(s) shall be imputed to the **Private Company** for the purpose of determining if coverage is available.

### 6. MODIFIED CHANGE IN OWNERSHIP OR CONTROL

PART 6, (COMMON POLICY CONDITIONS), Section XV (CHANGE IN OWNERSHIP OR CONTROL), is replaced by the following:

If after the inception of the **Policy Period** a **Transaction** occurs then this Policy shall remain in force, but only for **Claims** made during the **Policy Period** for **Wrongful Acts** committed prior to the effective date of the **Transaction** and the premium shall immediately be considered fully earned.

However, in the case of a **Public Offering**, the **Insured** shall provide written notice of the **Public Offering** to the **Underwriter** no later than 30 days prior to the filing of any registration statement with the United States Securities and Exchange Commission. The **Underwriter** shall provide a quotation for the **Public Offering**.

The **Insured** shall have the right, within 45 days after the **Transaction** (or such date the **Underwriter** may agree by endorsement), to request an offer from the **Underwriter** for a **Run-Off Policy** for a term up to 6 years. If elected, such **Run-Off Policy** shall be conditioned upon payment during the **Policy Period** of any additional premium, which shall be fully earned at inception, and shall be subject to any additional terms and conditions required by the **Underwriter**.

### 7. FORMER OFFICER I VS. I CARVE BACK

PART 5, (COMMON POLICY EXCLUSIONS), item K. will not apply to any **Claim**:

1. in which the party bringing the **Claim** has not served as a director, trustee, manager, officer or equivalent executive of the **Private Company** within four (4) years immediately preceding the date the **Claim** is first made;

PI-PRD-72 (05/06)

2. in which the party bringing the **Claim** has not brought the **Claim** in concert or cooperation with, at the suggestion of, or with the participation, active assistance, or intervention of any other **Insured** not described in line 1 above; or

3. based upon, arising from, or attributable to any **Public Offering**.

## 8.  INDEPENDENT CONTRACTORS AS EMPLOYEES

<u>PART 4</u>, (COMMON POLICY DEFINITIONS), item E. is deleted and replaced with the following:

E.  **Employee** means any natural person whose labor or service is engaged by and directed by the **Private Company**, including part-time, seasonal, leased and temporary employed persons as well as volunteers, but only while that natural person is acting in his or her capacity as such. **Employee** shall include **Independent Contractor** as defined below.

**Independent Contractor** means an individual who is contracted to perform services for the **Private Company**; provided that such individual shall be deemed an **Employee** only if and to the extent that the **Private Company** provides indemnification to such individual for services rendered as if they were rendered by an actual **Employee** of the **Private Company**, and provided further that such individual(s) have been identified by the **Private Company** to the **Underwriter**.  This Policy does not cover any **Loss** which any **Insured** is obligated to pay an **Independent Contractor** for overtime pay, vacation pay, employee benefit, or any compensation for services rendered.

## 9.  AGGREGATE RETENTION

Part 6 (COMMON POLICY CONDITIONS), section II (RETENTION CLAUSE), is replaced by:

The **Underwriter** shall only be liable for that portion of **Loss** arising from each **Claim** which is in excess of the respective Retention stated in Item 4. of the Declarations Page.  Such Retention shall be borne by the **Insured**, uninsured and at their own risk, provided no Retention shall apply to **Loss** incurred by **Individual Insureds** for which the **Private Company** is not permitted or required to indemnify the **Individual Insured** or is financially unable to do so.  A single Retention shall apply to **Loss** arising from all **Claims** alleging **Interrelated Wrongful Acts**.

The Aggregate Retentions, which must be borne by the **Insured**, for all **Claims** made during the **Policy Period**, will be triple the amount of the per claim Retentions stated in Item 4. of the Declarations Page.

## 10.  CLAIM EXPENSES COVERED IN ADDITION TO LIMITS OF LIABILITY

Part 6 (COMMON POLICY CONDITIONS), section I (LIMITS OF LIABILITY) is replaced by:

I.  LIMITS OF LIABILITY

Regardless of the number of **Insureds** involved, **Claims** made, the **Underwriter's** liability under the Policy is limited as follows:

A.  With respect to coverage under Part 1 of this Policy, the **Underwriter's** maximum aggregate liability under Part 1 for all **Damages** on account of all **Claims** made during the **Policy Period**, whether covered under Insuring Agreement A, B or C, shall be the Limit of Liability for each **Policy Period** as set forth in Item 3. (A) of the Declarations.

PI-PRD-72 (05/06)

B. With respect to coverage under Part 2 and Part 3 of this Policy, the **Underwriter's** maximum aggregate liability for all **Damages** on account of all **Claims** made during the **Policy Period** shall be the Limit of Liability for each **Policy Period** as set forth in Item 3.(B) and 3.(C), respectively, of the Declarations.

C. The **Underwriter's** maximum aggregate liability for all **Damages** on account of all **Claims** first made during the **Policy Period** under all purchased Parts, combined, shall be the Aggregate Limit of Liability set forth in Item 3.(D) of the Declarations. The Limits of Liability set forth in Item 3.(A), 3.(B), and 3.(C), are sub-limits that do not increase the **Underwriter's** maximum liability as set forth in Item 3.(D).

D. **Defense Costs** paid by the **Underwriter** are in addition to and not a part of the Limit of Liability specified in Item 3. of the Declarations. Payment by the **Underwriter** of **Defense Costs** incurred on account of any **Claim** will not reduce the Limit of Liability stated in Item 3. of the Declarations. The most the **Underwriter** will pay for **Defense Costs** is equal to the applicable Limit of Liability stated in Item 3. of the Declarations. The **Underwriter** is not obligated to pay **Defense Costs** nor **Damages** after the applicable Limit of Liability has been exhausted.

E. The Limit of Liability for any Extension Period, if applicable, shall be a part of and not in addition to the respective Limit of Liability applicable to the **Policy Period**.

Part 6 (**COMMON POLICY CONDITIONS**), section III (DEFENSE AND SETTLEMENT), items C and G are replaced by.

C. The Underwriter is not obligated to pay any Loss after the Limit of Liability has been exhausted. The **Underwriter** may elect to tender an amount equal to the remaining Limit of Liability applicable to **Damages** to the **Private Company** at any time, which will be considered to fully satisfy the **Underwriter's** obligation with regard to that **Claim**.

G. If with respect to any **Claim** the **Insured** refuses to consent to the first settlement acceptable to the claimant which the **Underwriter** recommends to the **Insured** in writing, and elects to further contest the **Claim**, the **Underwriter's** liability for such **Claim** shall not exceed the amount for which the **Claim** could have been settled, up to the date of such refusal. Notwithstanding the foregoing, this paragraph shall not apply until the settlement amount exceeds the Retention amount stated in Item 4. of the Declarations Page.

In addition, if the **Underwriter** recommends a first settlement of a **Claim** within the Policy's applicable Limit of Liability that is acceptable to the claimant, and the **Insured** consents to such settlement, then the **Insured's** applicable Retention for such **Claim** shall be retroactively reduced by twenty-five percent (25%). It shall be a condition to such reduction that the **Insured** must consent to the first settlement amount within thirty (30) days after the date the **Underwriter** recommends to the **Insured** such first settlement amount, or in the case of a first settlement which arises from a first settlement offer by the claimant, then within the time permitted by the claimant to accept such first settlement offer, but in all events no later than thirty (30) days after the **Underwriter** recommends to the **Insured** such first settlement offer. If the **Insured** does not consent to the first settlement within the time prescribed above, the applicable Retention amount shall remain the respective amount set forth in Item 4. of the Declarations Page, even if consent is given to a subsequent settlement.

11. **MODIFICATION OF PART 3 (FIDUCIARY LIABILITY INSURANCE)**

**This section only applies if a Limit of Liability is noted for Fiduciary Liability on the Declarations Page.**

PI-PRD-72 (05/06)

Part 3, Section I (Insuring Agreement), is deleted in its entirety and is replaced by the following:

A.   The **Underwriter** shall pay on behalf of the **Insured**, **Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **Fiduciary Liability Act**.   This coverage shall not apply any claims arising out of any alleged violation of Title II of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and amendments to such law or regulations promulgated under such law concerning privacy of health information or arising out of **Managed Care** liability.

In the event of the Insured enters into a voluntary settlement program with the Internal Revenue Service (or any similar state or federal agency), the **Company**, following prior notice provided by the **Company** to the **Underwriter**, during the **Policy Period** (or any applicable Extended Reporting Period), of the **Company's** intent to enter into said settlement program, shall pay on behalf of the **Insureds** any fees, penalties or sanctions imposed by law under said settlement program for which Inured is legally liable as a result of a **Fiduciary Liability Act** in an amount not to exceed $50,000. Such amount shall be part of and not in addition to the Limit of Liability, as set forth in Item 3(A) of the Declarations.  In no case, however, shall the Underwriter pay for any costs of corrections.

B.   The **Underwriter** shall pay on behalf of the **Insured**, **Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **Fiduciary Liability Act** arising from any alleged violation of Title II of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and amendments to such law or regulations promulgated under such law concerning privacy of health information.   Coverage under this paragraph is subject to a sublimit of liability of $25,000.  Said sublimit shall be part of and not in addition to the Limit of Liability, as set forth in Item 3(A) of the Declarations.

C.   The **Underwriter** shall pay on behalf of the **Insured**, **Defense Costs** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **Fiduciary Liability Act** in connection with **Managed Care** liability solely as regards any **Managed Care** plans sponsored solely by the **Private Company** and insured and administered by an outside insurance carrier. Coverage under this paragraph is subject to a sublimit of liability of $100,000.  Said sublimit shall be part of and not in addition to the Limit of Liability, as set forth in Item 3(A) of the Declarations.

For the purposes of this endorsement **Managed Care** shall mean any plan providing comprehensive medical care to plan members on the basis of a prepaid contract and which by virtue thereof limits the choices of medical care and service providers available to plan members.

Part 3, Section II, Definitions, Paragraph B is deleted in its entirety and is replaced by the following:

B.   **Benefit Plan** means:

1.   any **Welfare Benefit Plan** which was, is now or becomes sponsored by the **Private Company** solely for the benefit of the **Employees** of the **Private Company**;

2.   any **Pension Benefit Plan** which was, on or prior to the effective date of this Policy, sponsored by the **Private Company** solely for the benefit of the **Employees** of the **Private Company**, provided that coverage was available in respect of such **Pension Benefit Plan** under any policy of which this Policy is a renewal or replacement and such **Pension Benefit Plan** has been reported in writing to the **Underwriter** as part of the **Application**;

PI-PRD-72 (05/06)

3.  any **Pension Benefit Plan** created or acquired (through merger, consolidation or otherwise) during the **Policy Period** by the **Insured** solely for the benefit of the **Employees** of the **Private Company**, but only upon the condition that within 90 days after such creation or acquisition, the **Insured** shall have (i) provided written notice to the **Underwriter** of such newly created **Pension Benefit Plan**, and (ii) agreed to any additional terms and paid any additional premium required by the **Underwriter** in its sole discretion.  The 90-day notice requirement shall not apply, however, if the total assets of the acquired or formed **Pension Benefit Plan**, as of the effective date of such acquisition or formation, do not exceed ten percent (10%) of the total plan assets shown on the most recent application submitted by the Insured Organization, or (2) the acquisition or formation occurs less than ninety (90) days prior to the end of the Policy Period; and

4.  any government-mandated benefit program for workers compensation, unemployment, social security or disability benefits for **Employees** of the **Private Company**.

However, **Benefit Plan** does not include any multi-employer plan or any employee stock ownership plan unless said plan is added by specific written endorsement to this policy.

Coverage for **Benefit Plans** which are sold, terminated or spun-off during or prior to the **Policy Period** shall apply only with respect to any **Fiduciary Liability Act** occurring prior to the date of such sale or spin-off, or in the case of termination, prior to the final date of asset distribution of such **Benefit Plan**.

## 12. AMEND DEFINITION OF THIRD PARTY

Part 2, Section II Definitions, Paragraph C is deleted in its entirety and replaced with the following:

C.  **Third Party** means any natural person who is not an **Employee** of the **Private Company**.

## 11. MODIFICATION OF SPOUSAL EXTENSION

PART 4, (COMMON POLICY DEFINITIONS), item G. paragraph 2, is deleted and replaced with the following:

2.  the lawful spouse or **Domestic Partner** of a director, officer, governor, trustee, or equivalent executive of the **Private Company**, but only for actual or alleged **Wrongful Acts** of such person for which such spouse may be liable as the spouse of such person.  Domestic Partner means any person who qualifies as a domestic partner under the provisions of any federal, state or local statute or regulation, or under the terms and provisions of any employee benefit or other program established by the **Private Company**;

PI-PRD-75 (12/03)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## AMENDMENT OF EXCLUSIONS

This endorsement modifies insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

Part 1 (**DIRECTORS & OFFICERS LIABILITY INSURANCE**), section III (EXCLUSIONS), item E. is replaced by:

E.  for any actual or alleged violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act  (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law; provided, however, this exclusion shall not apply to a **Claim** for **Retaliation**; provided, further, however, there is no coverage provided under this policy for any **Claim** related to, arising out of, based upon, or attributable to the refusal, failure or inability of any **Insured(s)** to pay **Earned Wages** (as opposed to tort-based back pay or front pay damages) or for improper payroll deductions taken by any **Insured(s)** from any **Employee(s)** or purported **Employee(s)**, including, but not limited to, (i) any unfair business practice claim alleged because of the failure to pay **Earned Wages**, or (ii) any **Claim** seeking **Earned Wages** because any **Employee(s)** or purported **Employee(s)** were improperly classified or mislabeled as "exempt."

Part 2 (**EMPLOYMENT PRACTICES LIABILITY INSURANCE**), section III (EXCLUSIONS), item B. is replaced by:

B.  for any actual or alleged violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act  (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law; provided, however, this exclusion shall not apply to a **Claim** for **Retaliation**; provided, further, however, there is no coverage provided under this policy for any **Claim** related to, arising out of, based upon, or attributable to the refusal, failure or inability of any **Insured(s)** to pay **Earned Wages** (as opposed to tort-based back pay or front pay damages) or for improper payroll deductions taken by any **Insured(s)** from any **Employee(s)** or purported **Employee(s)**, including, but not limited to, (i) any unfair business practice claim alleged because of the failure to pay **Earned Wages**, or (ii) any **Claim** seeking **Earned Wages** because any **Employee(s)** or purported **Employee(s)** were improperly classified or mislabeled as "exempt."

Part 4 (**COMMON POLICY DEFINITIONS**), is supplemented by:

**Earned Wages** means wages or overtime pay for services rendered.

PI-PL-CA (1/98)

**THIS ENDORSMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## CALIFORNIA AMENDATORY ENDORSEMENT

To be attached to and form a part of all policies written in California.

In consideration of the premium charged, it is understood and agreed that:

The CANCELLATION AND NONRENEWAL POLICY CONDITIONS is hereby deleted and replaced with the following:

A.  Cancellation

   1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

   2. All Policies In Effect For 60 Days Or Less

   If this policy has been in effect for 60 days or less, and is not a renewal of a policy we have previously issued, we may cancel this policy by mailing or delivering to the first Named Insured at the mailing address shown in the policy and to the producer of record, advance written notice of cancellation, stating the reason for cancellation, at least:

   a. 10 days before the effective date of cancellation if we cancel for:

   (1) Nonpayment of premium; or

   (2) Discovery of fraud or material misrepresentation by:

   (a) Any insured or his or her representative in obtaining this insurance; or

   (b) You or your representative in pursuing a claim under this policy.

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

   3. All Policies In Effect For More Than 60 Days

   a. If this policy has been in effect for more than 60 days, or is a renewal of a policy we issued, we may cancel this policy only upon the occurrence, after the effective date of the policy, of one or more of the following:

   (1) Nonpayment of premium, including payment due on a prior policy we issued and due during the current policy term covering the same risks.

   (2) Discovery of fraud or material misrepresentation by:

   (a) Any insured or his or her representative in obtaining this insurance; or

   (b) You or your representative in pursuing a claim under this policy.

   (3) A judgment by a court or an administrative tribunal that you have violated a California or Federal law, having as one of its necessary elements an act which materially increases any of the risks insured against.

Page 1 of 3

PI-PL-CA (1/98)

(4) Discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards, by you or your representative, which materially increase any of the risks insured against.

(5) Failure by you or your representative to implement reasonable loss control requirements, agreed to by you as a condition of policy issuance, or which were conditions precedent to our use of a particular rate or rating plan, if that failure materially increases any of the risks insured against.

(6) A determination by the Commissioner of Insurance that the:

   (a) Loss of, or changes in, our reinsurance covering all or part of the risk would threaten our financial integrity or solvency; or

   (b) Continuation of the policy coverage would:

      (1) Place us in violation of California law or the laws of the state where we are domiciled; or

      (2) Threaten our solvency.

(7) A change by you or your representative in the activities or property of the commercial or industrial enterprise, which results in a materially added, increased or changed risk, unless the added, increased or changed risk is included in the policy.

   (a) We will mail or deliver advance written notice of cancellation, stating the reason for cancellation, to the first Named Insured, at the mailing address shown in the policy, and to the producer of record, at least:

      (1) 10 days before the effective date of cancellation if we cancel for a reason listed in Paragraph 3.a.(1) or 3.a.(2); or

      (2) 30 days before the effective date of cancellation if we cancel for any other reason listed in Paragraph 3.a.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

B. The following is added and supersedes any provisions to the contrary:

NONRENEWAL

1. Subject to the provisions of Paragraphs B.2. below, if we elect not to renew this policy, we will mail or deliver written notice stating the reason for nonrenewal to the first Named Insured shown in the Declarations and to the producer of record, at least 60 days, but not more than 120 days, before the expiration or anniversary date.

   We will mail or deliver our notice to the first Named Insured, and to the producer of record, at the mailing address shown in the policy.

PI-PL-CA (1/98)

2. We are not required to send notice of nonrenewal in the following situations:

    (a.) If the transfer or renewal of a policy, without any changes in terms, conditions, or rates, is between us and a member of our insurance group.

    (b.) If the policy has been extended for 90 days or less, provided that notice has been given in accordance with Paragraph B.1.

    (c.) If you have obtained replacement coverage, or if the first Named Insured has agreed, in writing, within 60 days of the termination of the policy, to obtain that coverage.

    (d.) If the policy is for a period of no more than 60 days and you are notified at the time of issuance that it will not be renewed.

    (e.) If the first Named Insured requests a change in the terms or conditions or risks covered by the policy within 60 days of the end of the policy period.

    (f.) If we have made a written offer to the first Named Insured, in accordance with the timeframes shown in Paragraph B.1, to renew the policy under changed terms or conditions or at an increased premium rate, when the increase exceeds 25%.

3. If we fail to give the timely notice required in Paragraph B.1., the policy shall be continued, with no change in terms or conditions, for a period of 60 days after we deliver said written notice.

PI-SLD-001 (01/03)

# THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

# PROFESSIONAL LIABILITY

## *DIRECTORS AND OFFICERS LIABILITY*

With respect to any one or more "certified acts of terrorism", we will not pay any amounts for which we are not responsible under the terms of the federal Terrorism Risk Insurance Act of 2002 (including subsequent acts of Congress pursuant to the Act) due to the application of any clause which results in a cap on our liability for payments for terrorism losses.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002. The federal Terrorism Risk Insurance Act of 2002 sets forth the following criteria for a "certified act of terrorism":

1.  The act resulted in aggregate losses in excess of $5 million; and

2.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Includes copyrighted material of the Insurance Services Office Inc., used with its permission.

FILED
CIVIL BUSINESS OFFICE 8
CF

08 JAN 31  PM 4: 40

CLERK-SU     R COURT
SAN DIEGO COUNTY, CA

1    Dan Lawton (State Bar No. 127342)
     Joseph C. Kracht (State Bar No. 228507)
2    Matt Valenti (State Bar No. 253978)
     LAWTON LAW FIRM
3    550 West C Street, Suite 1400
     San Diego, CA  92101
4    E-mail: dlawton@lawtonlaw.com
     (619) 595-1370
5    (619) 595-1520 (Fax)

6    Attorneys for Plaintiffs TRAVEL SUPPORT
     CENTER, INC., by STEPHEN J. BARBER and
7    SUZANNE S. RILEY, suing derivatively and on
     behalf of themselves individually

8

9              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                  IN AND FOR THE COUNTY OF SAN DIEGO

11

12   TRAVEL SUPPORT CENTER, INC., a      )   Case No. 37-2008-00076652-CU-FR-CTL
     California corporation, by STEPHEN J.  )
13   BARBER, suing derivatively and on behalf of  )   COMPLAINT FOR DAMAGES FOR
     himself individually; and by SUZANNE S.  )   FRAUD AND DECEIT AND
14   RILEY, suing derivatively and on behalf of  )   BREACH OF FIDUCIARY DUTIES,
     herself individually,                )   RESCISSION OF MERGER
15                                         )   AGREEMENT, INVOLUNTARY
                  Plaintiffs,             )   DISSOLUTION, AND
16                                         )   DECLARATORY AND INJUNCTIVE
            v.                            )   RELIEF; DEMAND FOR TRIAL BY
17                                         )   JURY
     EZGDS, INC., a California corporation;  )
18   THOMAS J. DEROSA, a natural person;  )
     DONALD R. MEYETTE, a natural person;  )
19   FABRICE MODE, a natural person;  PAUL  )
     MODE, a natural person; TRAVEL SUPPORT  )
20   CENTER, INC., a California corporation; and  )
     DOES 1-20, inclusive,                )
21                                         )
                  Defendants.             )
22   _____     )

23

24          Plaintiffs TRAVEL SUPPORT CENTER, INC., a California corporation, by

25   STEPHEN J. BARBER, a natural person ("Mr. Barber"), and  SUZANNE S. RILEY, a

26   natural person ("Ms. Riley"), suing derivatively and on behalf of themselves individually,

27   (collectively "plaintiffs"), for their causes of action against defendants EZGDS, INC., a

28   California corporation ("EZGDS"), THOMAS J. DEROSA, a natural person ("Mr.

---

1  DeRosa"); DONALD MEYETTE, a natural person ("Mr. Meyette"); FABRICE MODE, a

2  natural person ("Fabrice Mode"); PAUL MODE, a natural person ("Paul Mode"); TRAVEL

3  SUPPORT CENTER, INC., a California corporation; and DOES 1-20, inclusive, by their

4  undersigned attorney, allege as follows:

5                                    JURISDICTION AND VENUE

6        1.      This Court has jurisdiction over this action pursuant to Article VI, Section 10

7  of the California Constitution and California Code of Civil Procedure section 410.10, *et seq.*

8        2.      Venue is proper in this County. TSC and EZGDS are California corporations

9  with their principal places of business in San Diego, California. Many of the wrongful acts

10  charged herein (including the fraud and deceit, breach of fiduciary duties, and other wrongful

11  acts alleged herein) occurred in this County. Thus, venue is proper in this County according

12  to the provisions of California Code of Civil Procedure Section 395.5.

13                                              PARTIES

14        3.      Plaintiff Stephen J. Barber is a natural person, a resident of this County and the

15  founder and former director of both TSC and EZGDS. He is a shareholder of 4.35% of the

16  stock of EZGDS.

17        4.      Plaintiff Suzanne Riley is a natural person, Mr. Barber's mother and a resident

18  of the County of Marin. She is one of the founders and former shareholders of TSC. She is

19  currently a shareholder of .56% of the stock of EZGDS.

20        5.      Defendant Thomas J. DeRosa is a natural person and a resident of this County.

21  He is a software programmer who, in 2004, was hired by Mr. Barber to write the code for the

22  Internet Booking Engine (IBE) software used by TSC's clients.

23        6.      Defendant EZGDS, Inc. is a corporation incorporated, organized and existing

24  under the laws of this State. Mr. Barber founded EZGDS in 2005 to provide software

25  services.

26        7.      Defendant Fabrice Mode is a natural person and a resident of the County of

27  San Diego. He was a co-founder with Mr. Barber of Cutratefares.com, LLC. He conspired

28  with Tom DeRosa, his father Paul Mode, and Don Meyette to remove Mr. Barber from his

1    job at TSC, and merge TSC with EZGDS.

2        8.      Defendant Donald Meyette is a natural person and a resident of the County of

3    San Diego.  He is Chief Financial Officer of TSC.  He was instrumental in proposing the

4    merger of TSC with EZGDS, and repeatedly misrepresented to plaintiffs, orally and in

5    writing, that the merger would only happen after an independent appraisal of TSC was made.

6    He also pressured Mr. Barber and Ms. Riley into signing the merger agreement.

7        9.      Defendant Paul Mode is a natural person and, on information and belief, a

8    resident of the County of San Diego.  He is the father of Fabrice Mode and a shareholder of

9    stock in TSC.

10        10.     The true names and capacities, whether individual, corporate, associate,

11   representative or otherwise, of DOES 1 through 20, inclusive, are unknown to plaintiffs, who

12   therefore sue them by such fictitious names.  Plaintiffs will seek leave to amend this

13   complaint to show the true names and capacities of said defendants when they are

14   ascertained.  Plaintiffs are informed and believe, and thereupon allege, that each of the

15   defendants named as a Doe, along with the named defendants, is responsible in some manner

16   for the occurrences herein alleged, and that its injuries herein alleged were legally or

17   proximately caused by said defendants.  Wherever it is alleged that any act or omission was

18   also done or committed by any specifically named defendant, or by defendants generally,

19   plaintiffs intend hereby to allege, and do allege, that the same act or omission as also done

20   and committed by each and every defendant named as a Doe, and each named defendant,

21   both separately and in concert or conspiracy with the named defendants.

22        11.     At all times mentioned herein, defendants, and each of them, were the agents,

23   servants, co-conspirators, or employees of one another, and the acts and omissions herein

24   alleged were done or suffered by them, acting individually and through or by their alleged

25   capacity, within the scope of their authority.  Each of the defendants aided and abetted and

26   rendered substantial assistance in the accomplishment of the acts complained of herein.  In

27   taking the actions, as particularized herein, to aid and abet and substantially assist in the

28   commission of the misconduct complained of, each defendant acted with an awareness of his,

COMPLAINT FOR DAMAGES FOR FRAUD AND DECEIT AND  BREACH OF FIDUCIARY DUTIES,  RESCISSION OF MERGER
AGREEMENT, INVOLUNTARY DISSOLUTION, AND DECLARATORY AND INJUNCTIVE RELIEF; DEMAND FOR TRIAL BY JURY
3

1    her or its primary wrongdoing and realized that his, her or its conduct would substantially

2    assist in the accomplishment of that misconduct and was aware of his, her or its overall

3    contribution to, and furtherance of the conspiracy, common enterprise, and common course

4    of conduct.  Defendants' acts of aiding and abetting included, *inter alia*, all of the acts each

5    defendant is alleged to have committed in furtherance of the conspiracy, common enterprise,

6    and common course of conduct complained of herein.

7                                <u>NATURE OF ACTION</u>

8       12.      Plaintiffs bring this action to redress injuries suffered by the Company and by

9    themselves individually as a direct result of defendants' fraud and deceit, breaches of

10    fiduciary duty, oppression, and persistent unfairness;  to rescind the merger agreement;  to

11    declare a non-compete agreement invalid, unconscionable, and unenforceable; and to

12    dissolve defendant EZGDS, Inc.

13                <u>DEFENDANTS' WRONGFUL COURSE OF CONDUCT</u>

14       13.      In 2000, Mr. Barber and Fabrice Mode founded an internet-based travel

15    services company, Cutratefares.com, LLC, a pioneer in internet airline ticketing.  Mr. Barber

16    originally held a 55% ownership interest in Cutratefares.com.  Using his own capital, Mr.

17    Barber purchased a travel agency, Travel Services of Coronado, in 2001.  Travel Services of

18    Coronado then provided the core business structure for Cutratefares.com.  Cutratefares.com

19    struggled at first.  In 2002, Cutratefares.com's members agreed to reorganize and set up a

20    new corporation, Coronado Travel Group, Inc. (later renamed Travel Services Center, Inc.

21    [hereinafter "TSC"]).  Per the reorganization, the members' respective percentages of

22    ownership were readjusted so as to give Mr. Barber and Fabrice Mode equal ownership (45%

23    each), with remaining interests to be owned by Don Meyette (1%), Suzanne Riley (5%), and

24    Danny Houghton (4%).

25       14.      In 2002, Paul Mode invested $12,000.00 in TSC.  Again the percentages of

26    equity ownership were adjusted, reducing Mr. Barber's and Fabrice Mode's interests to

27    43.5% each, and giving Paul Mode 3%.  TSC enjoyed rapid growth under Mr. Barber's

28    leadership as CEO.  By the end of 2003, air ticket sales had increased by nearly 2,000%, and

1 the company ranked fourth among San Diego-based travel agencies, with total sales

2 exceeding $16 million.

3   15. Mr. DeRosa embarked on a plan to oust Mr. Barber and Ms. Riley and take

4 control of TSC for himself.  He kept the IBE code password protected on TSC servers,

5 preventing TSC officers from having access to it.

6   16. On July 17, 2006, Mr. Meyette wrote to the shareholders of TSC enclosing a

7 Proposal of Merger Between EZGDS, Inc. and Travel Support Center.  Meyette's letter

8 stated that the proposed "buy-out" merger would involve EZGDS acquiring all of the shares

9 of TSC "under an exchange ratio to be determined after the completion of outside,

10 independent and professional appraisals of each company, and consequently the

11 establishment of an exchange ratio that will be equitable and consistently fair to each and

12 every shareholder."  The Proposal of Merger also stated "5. MERGER CONTINGENT

13 UPON APPRAISALS: consummation of the merger will be contingent upon the securing of

14 independent outside professional appraisals of the fair market value of each entity."

15   17. On August 5, 2006, Mr. Meyette wrote to Ms. Riley and again promised that

16 there would be "a professional outside evaluation of both companies to establish a fair basis

17 for the exchange of stock."  His letter also enclosed a "Checklist of Merger Terms and

18 Conditions" which stated:  "The basis for determining the value-equivalent number of shares

19 of authorized common stock of EZGDS, Inc., to be registered in the names of the

20 shareholders of Travel Support Center, Inc., in exchange for the common stock they give up,

21 will be based on an evaluation of the fair-market sales value of each corporate business

22 entity, such fair market evaluations determined by an outside, totally independent source . . ."

23 This Checklist of Merger Terms and Conditions also stated that "Upon the effective date of

24 the Merger, the corporate entity of EZGDS, Inc., will execute a licensing agreement in favor

25 of its wholly-owned subsidiary, Travel Support Center, Inc., that will forever grant this

26 wholly-owned corporate entity the non-cancellable right forever to use any and all of the

27 inventions, program-coding, software and any and all other tangible and intangible assets that

28 are the inventions and property of Thomas J. DeRosa . . ."

1    ///

2

3         18.    EZGDS was meant to hold the IBE code developed by Mr. DeRosa, who was

4    offered 33 percent stake in the new entity in exchange for putting the IBE code into EZGDS.

5    In mid to late 2005, Mr. DeRosa threatened to sell EZGDS, along with the IBE code which

6    constituted the lifeblood of TSC, to a venture capitalist unless TSC agreed to a joint venture

7    licensing agreement which would establish EZGDS as equal partner with TSC.  Mr. Barber

8    and the other officers of TSC reluctantly agreed to the joint licensing agreement, as the loss

9    of the IBE code would cripple TSC.

10         19.    In late 2006, Mr. DeRosa repeatedly refused Mr. Barber's requests to have the

11   independent appraisals performed and legal counsel consulted on the terms of the merger, as

12   well as his requests to include employment agreements for Mr. Barber and Fabrice Mode as

13   part of the merger.  Mr. DeRosa expressed that the merger was a "take it or leave it" deal,

14   and he falsely told the majority shareholders that Mr. Barber was trying to "kill the deal."

15   Mr. DeRosa, Mr. Meyette, and Fabrice Mode also made it clear to Mr. Barber that if he did

16   not sign the merger agreement he would be fired from his position as CEO of TSC, and that,

17   as majority shareholders, they would accomplish the merger "with or without" Mr. Barber's

18   and Ms. Riley's votes.  Also sometime in late 2006, Mr. Meyette took Ms. Riley aside into a

19   darkened empty office at TSC and insisted she immediately sign a preliminary approval for

20   the merger to go forward. Under the extreme duress of Mr. Meyette's pressure, Ms. Riley

21   signed the approval.

22         20.    In reliance on repeated false promises by defendants to have a fair appraisal of

23   the two companies performed, and fearing that Mr. Barber would lose his position otherwise,

24   Mr. Barber and Ms. Riley succumbed to the extensive duress placed on them by the

25   defendants and reluctantly signed the merger agreement on February 2, 2007.

26         21.    The final signed version of the merger agreement set the stock exchange ratio

27   at 10:1 in favor of EZGDS – an absurdly one-sided, unfair and inequitable ratio which

28   effectively rendered Ms. Riley's and Mr. Barber's equity in TSC forfeit.  It also included a

1 | non-compete agreement with a three year term purporting to bar Mr. Barber from competing

2 | with EZGDS anywhere in the world.

### FIRST CAUSE OF ACTION

(For Fraud and Deceit)

(Against All Defendants Except TSC)

6 |     22.    Plaintiffs reallege and incorporate by reference as though fully set forth herein

7 | preceding paragraphs 1 through 21.

8 |     23.    The claims asserted herein arise under statutory and common law, including

9 | without limitation California Corporations Code section 1507 and California Civil Code

10 | Sections 1709, 1710, and 1711.

11 |     24.    Defendants EZGDS, Mode, Meyette, and DeRosa repeatedly and falsely

12 | represented to plaintiffs that EZGDS shares issued them in exchange for their TSC shares

13 | would be issued and valued pursuant to an equitable and consistently fair exchange ratio

14 | determined after completion of an outside, independent and professional appraisal of each

15 | company. Defendants knew these representations to be false at the time they made them, but

16 | concealed their insincerity from plaintiffs (knowing that plaintiffs would never agree to the

17 | merger if defendants' true intent were revealed at that time).

18 |     25.    Defendants also omitted to state material facts necessary in order to make the

19 | statements they did make, in light of the circumstances under which they were made, not

20 | misleading. The omitted facts included, without limitation, the individual defendants' secret

21 | desires to enrich themselves at the expense of Mr. Barber and Ms. Riley and to render

22 | virtually forfeit their equity in TSC. Defendants knew these omissions made what they did

23 | say misleading.

24 |     26.    Plaintiffs justifiably relied on what they were told.

25 |     27.    As a direct and proximate result of these false representations and omissions to

26 | state material facts, plaintiffs were induced to consent to the merger agreement and Mr.

27 | Barber was induced to consent to a non-compete agreement and an at-will employment

28 | agreement, resulting in their near-total disenfranchisement and an inequitable and unfair

1   dilution of their equity investments in TSC. The merger did not adversely impact all

2   shareholders; it had a disproportionate adverse impact on plaintiffs, however.

3       28.    As a direct and proximate result, plaintiffs have suffered damages (in an

4   amount to be proven at trial).

5       29.    Defendants committed the acts of fraud alleged herein wantonly, willfully,

6   oppressively, maliciously, and fraudulently. As a consequence, plaintiffs are entitled to an

7   award of exemplary damages so as to punish and make an example of them and in order to

8   deter others from similar wrongdoing in the future.

9                           SECOND CAUSE OF ACTION

10                      (For Breaches of Fiduciary Duties)

11             (Against All Individual Defendants and EZGDS)

12       30.    Plaintiffs reallege and incorporate by reference as though fully set forth herein

13   preceding paragraphs 1 through 29.

14       31.    Defendants had duties of loyalty and care to plaintiffs.

15       32.    Defendants breached each of these duties (of loyalty and care) to plaintiffs.

16   This they did by causing TSC and plaintiffs to enter into a one-sided and inequitable merger

17   in which TSC's founders (Ms. Riley and Mr. Barber) suffered an unconscionable dilution

18   and near-forfeiture of their equity and investments in TSC. Defendants' actions resulted in

19   an inequitable expansion of their own equity in EZGDS and a virtual disenfranchisement of

20   plaintiffs. Plaintiffs' reward for reposing trust and confidence in defendants is a prospective,

21   complete, and ruinous forfeiture of their 48.5% equity in TSC — equity it cost them over $2

22   million to build. Defendants' actions were disloyal and careless, to the advantage of

23   themselves and the disadvantage of TSC.

24       33.    As a direct and proximate result of defendants' breaches of their fiduciary

25   duties as alleged hereinabove, plaintiffs and have been damaged in an amount to be proven at

26   trial.

27       34.    Defendants acted wantonly, willfully, maliciously, oppressively, and

28   fraudulently. As a consequence, they should be assessed exemplary damages so as to punish

1 and make an example of them and in order to deter others from similar misconduct in the

2 future.

3 <center>THIRD CAUSE OF ACTION</center>

4 <center>(For an Involuntary Dissolution of EZGDS)</center>

5 <center>(Against Defendant EZGDS Only)</center>

6   35.   Plaintiffs reallege and incorporate by reference as though fully set forth herein

7 preceding paragraphs 1 through 34.

8   36.   This cause of action is brought pursuant to pertinent law, including California

9 Corporations Code section 1800, subd. (b)(2), and is asserted by plaintiffs individually.

10 Plaintiffs are shareholders of stock in EZGDS, which is a close corporation for purposes of

11 section 1800.  Plaintiffs are shareholders of stock representing not less than 33⅓ % of the

12 stock of EZGDS (and should be so regarded for purposes of their standing to maintain this

13 cause of action), once the stakes of defendants guilty of the fraud and other misconduct

14 alleged herein are deducted.

15   37.   The individual defendants control EZGDS. They have been guilty of, and have

16 knowingly countenanced, persistent and pervasive fraud, abuse of authority, and persistent

17 unfairness toward plaintiffs.  In addition, the individual defendants are guilty of gross

18 mismanagement, positive misconduct, and fraud resulting in extreme circumstances of

19 imminent danger of great loss to the corporation.

20   38.   As a consequence, the Court should order EZGDS dissolved per the provisions

21 of California Corporations Code Section 1800, subd. (b)(4), appoint a receiver to take over

22 and manage TSC and preserve its property pending the hearing and determination of this

23 complaint for dissolution per California Corporations Code Section 1803, and decree a

24 winding up and dissolution of TSC per California Corporations Code Section 1804.

25   39.   In the alternative, and pursuant to the provisions of California Corporations

26 Code Section 2000, defendants should buy out plaintiffs pursuant to the mechanism

27 established by that statute.

28   40.   Defendants committed the acts of fraud, abuse of authority, and persistent

<center>COMPLAINT FOR DAMAGES FOR FRAUD AND DECEIT AND BREACH OF FIDUCIARY DUTIES, RESCISSION OF MERGER AGREEMENT, INVOLUNTARY DISSOLUTION, AND DECLARATORY AND INJUNCTIVE RELIEF; DEMAND FOR TRIAL BY JURY</center>
<center>9</center>

1  unfairness alleged hereinabove wantonly, willfully, oppressively, maliciously, and

2  fraudulently.  As a consequence, they should be assessed exemplary damages so as to punish

3  and make an example of them and in order to deter others from similar misconduct in the

4  future.

### FOURTH CAUSE OF ACTION

#### (For Rescission and Cancellation of Shares)

#### (Against All Defendants)

8      41.     Plaintiffs reallege and incorporate by reference as though fully set forth herein

9  preceding paragraphs 1 through 40.

10     42.     This cause of action is asserted on behalf of the plaintiffs individually.

11     43.     The merger was the result of fraud, oppression, and persistent unfairness.

12  Plaintiffs agreed to it based upon fraud and false pretenses proffered by defendants and under

13  duress.  As a consequence, plaintiffs hereby give notice that they rescind the merger

14  agreement and all transactional documents executed in connection therewith, and by such

15  service demand that defendants restore to them the voting rights and equity ownership which

16  plaintiffs previously held.

### FIFTH CAUSE OF ACTION

#### (For Declaratory Relief re Non-Compete Agreement)

#### (Against Defendant EZGDS)

20     44.     Plaintiffs reallege and incorporate by reference as though fully set forth herein

21  preceding paragraphs 1 through 43.

22     45.     This cause of action is asserted on behalf of Mr. Barber only.

23     46.     The non-compete agreement was the result of fraud, oppression, and persistent

24  unfairness, and is unconscionable and unenforceable according to California law.  Mr.

25  Barber agreed to it based upon fraud and false pretenses proffered by defendants and under

26  duress.

27     47.     An actual controversy exists concerning the parties' rights and liabilities vis-a-

28  vis the non-compete agreement. Per California Code of Civil Procedure section 1060, the

1  Court should declare those rights and liabilities and determine all questions of validity of the

2  non-compete agreement.

3                                    PRAYER FOR RELIEF

4         WHEREFORE, plaintiffs pray for relief as follows:

5         1.      For general and special damages according to proof at the time of trial;

6         2.      For exemplary damages;

7         3.      For an order rescinding the merger agreement and all related transactional

8  documents and restoring to plaintiffs their former equity positions in TSC;

9         4.      For an order decreeing dissolution of EZGDS or, in the alternative, an order

10  requiring defendants to buy out plaintiffs pursuant to the provisions of California

11  Corporations Code Section 2000;

12        5.      For an order declaring the non-compete agreement invalid, unconscionable,

13  and unenforceable according to California law;

14        6.      For an award of such attorney's fees and costs and expenses (including costs of

15  experts) as are warranted by contract and/or pertinent law;

16        7.      For prejudgment interest at the maximum legal rate; and

17        8.      For such other and further relief as the Court may deem just and proper.

18

19

20  Dated: January 31, 2008            LAWTON LAW FIRM

21

22                            By:      /s/ Dan Lawton

23                                     Dan Lawton
                                       Attorneys for Plaintiffs TRAVEL SUPPORT
24                                     CENTER, INC., by STEPHEN J. BARBER and
                                       SUZANNE S. RILEY, suing derivatively and on
25                                     behalf of themselves individually

26

27

28

COMPLAINT FOR DAMAGES FOR FRAUD AND DECEIT AND BREACH OF FIDUCIARY DUTIES, RESCISSION OF MERGER
AGREEMENT, INVOLUNTARY DISSOLUTION, AND DECLARATORY AND INJUNCTIVE RELIEF; DEMAND FOR TRIAL BY JURY

**EXHIBIT 3**

1  Kent L. Sharp, Esq.:  State Bar #179468
   Brian M. Holm, Esq.:  State Bar #255691
2  LA JOLLA LAW GROUP
   4330 La Jolla Village Drive, Suite 220
3  San Diego, CA  92122
   (858) 202-1321
4  (858) 202-1308 Facsimile

5  Attorneys for Plaintiffs, STEPHEN J. BARBER
   and SUZANNE S. RILEY
6

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              COUNTY OF SAN DIEGO – HALL OF JUSTICE

| | |
|---|---|
| 10  TRAVEL SUPPORT CENTER, INC., a California corporation, by STEPHEN J. | ) CASE NO. 37-2008-00076652-CU-FR-CTL |
| 11  BARBER, suing derivatively and on behalf of himself individually, and by | ) **VERIFIED THIRD AMENDED** |
| 12  SUZANNE S. RILEY, suing derivatively and on behalf of herself individually; and | ) **COMPLAINT FOR:** |
| 13  STEPHEN J. BARBER, | ) **(1)  CONSTRUCTIVE FRAUD** |
|  | ) **(2)  PROMISSORY FRAUD** |
|  | ) **(3)  INTENTIONAL** |
| 14              Plaintiffs, | )          **MISREPRESENTATION** |
|  | ) **(4)  FRAUD IN THE SALE OF** |
| 15              v. | )          **SECURITIES** |
|  | ) **(5)  BREACH OF FIDUCIARY DUTY** |
| 16  EZGDS, INC., a California corporation; | ) **(6)  DISSOLUTION OF** |
|  THOMAS J. DEROSA, a natural person; | )          **CORPORATION** |
| 17  DONALD R. MEYETTE, a natural | ) **(7)  BREACH OF CONTRACT** |
|  person; FABRICE MODE, a natural | ) **(8)  ACCOUNTING** |
| 18  person; PAUL MODE, a natural person; | ) **(9)  DECLARATORY RELIEF** |
|  TRAVEL SUPPORT CENTER, INC., a | ) |
| 19  California corporation; DANNY | ) |
|  HOUGHTON, and DOES 2-20, inclusive, | ) Assigned for all purposes to: |
| 20 | ) Honorable Judith F. Hayes |
|  | ) Department C-68 |
| 21              Defendants. | ) |
|  | ) Complaint Filed: January 31, 2008 |
| 22 | ) Trial Date:  None Set |
| 23 | ) |

24

25       PLAINTIFFS STEPHEN J. BARBER and SUZANNE S. RILEY (collectively

26  "PLAINTIFFS") allege as follows:

27  ////

28  ////

LA JOLLA
LAW
GROUP

4330 La Jolla Village Dr.
Suite 220
San Diego, CA  92122
(858) 202-1321
FAX (858) 202-1308

1
Third Amended Complaint

**GENERAL ALLEGATIONS**

1.     Plaintiff STEPHEN J. BARBER ("BARBER") is an individual, and at all times mentioned herein, was a resident of San Diego County, State of California. BARBER is the founder and former director of Travel Support Center, Inc. ("TSC"). BARBER is currently a shareholder of 4.35% of the stock of Defendant EZGDS, Inc.

2.     Plaintiff SUZANNE S. RILEY ("RILEY") is an individual, and at all times mentioned herein, was a resident of Marin County, State of California. RILEY is the mother of Plaintiff BARBER. RILEY is one of the founders and former shareholders of TSC, and is currently a shareholder of .56% of the stock of Defendant EZGDS, Inc.

3.     PLAINTIFFS are informed and believe and based thereon allege that at all relevant times mentioned herein, Defendant EZGDS, INC. ("EZGDS") was a California corporation, incorporated, organized, and existing under the laws of the state of California, with its principle place of business in San Diego County, California. Plaintiff BARBER assisted in the formation of Defendant EZGDS in April 2004 to provide software services to TSC.

4.     PLAINTIFFS are informed and believe and based thereon allege that at all relevant times mentioned herein, Defendant THOMAS J. DEROSA ("DEROSA") was an individual and a resident of San Diego County, California. DEROSA is currently a majority shareholder of EZGDS as well as its Chief Executive Officer. DEROSA was also the Chief Technology Officer of TSC, and was hired as a consultant by TSC in or around June 2003 to develop an Internet Booking Engine program to be used by TSC

5.     PLAINTIFFS are informed and believe and based thereon allege that at all relevant times mentioned herein, Defendant DONALD R. MEYETTE ("MEYETTE") was an individual and a resident of San Diego County, California. MEYETTE is currently a minority shareholder of EZGDS as well as its Chief Financial Officer. At all relevant times, MEYETTE was also the Chief Financial Officer and Corporate Secretary of TSC.

6.     PLAINTIFFS are informed and believe and based thereon allege that at all relevant times mentioned herein, Defendant FABRICE MODE was an individual and a

LA JOLLA
LAW
GROUP

4330 La Jolla Village Dr.
Suite 220
San Diego, CA 92122
(858) 202-1321
FAX (858) 202-1308

2
Third Amended Complaint

1  resident of San Diego County, California. FABRICE MODE is currently a minority

2  shareholder of EZGDS as well as its Chief Operating Officer. FABRICE MODE was also

3  the Chief Operating Officer of TSC.

4     7.     PLAINTIFFS are informed and believe and based thereon allege that at all

5  relevant times mentioned herein, Defendant PAUL MODE was an individual and a resident

6  of San Diego County, California. PAUL MODE is the father of Defendant FABRICE

7  MODE, and is currently a minority shareholder of EZGDS.

8     8.     PLAINTIFFS are informed and believe and based thereon allege that at all

9  relevant times mentioned herein, Defendant DANNY HOUGHTON ("HOUGHTON") was

10  an individual and a resident of San Diego County, California. HOUGHTON is currently a

11  minority shareholder of EZGDS.

12     9.     PLAINTIFFS do not know the true names and capacities of Defendants sued

13  herein as DOES 2 through 20, and therefore sue them by those fictitious names.

14  PLAINTIFFS are informed and believe, and on that basis allege, that each of those

15  Defendants was in some manner legally responsible for the events and happenings alleged

16  in this Second Amended Complaint, and for PLAINTIFFS' damages. The true names,

17  capacities, and relationships of DOES 2 through 20 will be alleged by amendment to this

18  Second Amended Complaint when they are ascertained.

19     10.     PLAINTIFFS are informed and believe and based thereon allege that at all

20  relevant times mentioned herein, Defendants, including those designated DOES 2 through

21  20, inclusive, were the agents, co-conspirators and employees of their Co-Defendants, and

22  in doing the things alleged in this Second Amended Complaint, were acting within the

23  course and scope of that agency, conspiracy and/or employment, and each of said

24  Defendants has authorized, and ratified the acts of said agents, employees or co-

25  conspirators.

26     11.     This Court has jurisdiction over this action pursuant to Article VI, Section 10

27  of the California Constitution and California Code of Civil Procedure Section 410.10, et

28  seq. PLAINTIFFS believe this court is proper because at least one of the Defendants was

LA JOLLA
LAW
GROUP

4330 La Jolla Village Dr.
Suite 220
San Diego, CA 92122
(858) 202-1321
FAX (858) 202-1308

3
Third Amended Complaint

1   and/or is conducting business in this Court's jurisdictional area, and the damage to

2   PLAINTIFFS occurred in its jurisdictional area.  Further, EZGDS is a California

3   Corporation with its principal place of business in San Diego, California.  Many of the

4   wrongful acts charged herein occurred in this County.

5   **BACKGROUND – FACTS AND ALLEGATIONS**

6       12.    PLAINTIFFS re-allege and incorporate herein by reference the allegations

7   contained in Paragraphs 1 through 11, inclusive, as though set forth fully herein.

8       13.    In November 2000, Plaintiff BARBER founded and formed an internet-based

9   travel services company called Cutratefares.com, LLC.  BARBER was the Chief Executive

10  Officer with a 55% ownership interest; FABRICE MODE was the Chief Operating Officer

11  with a 36% ownership interest; RILEY was an investor therein paying $25,000.00 for a 5%

12  interest; and HOUGHTON was an investor therein paying $20,000.00 for a 4% interest.

13  PLAINTIFFS are informed and believe and based thereon allege that prior to FABRICE

14  MODE and HOUGHTON becoming shareholders of Cutratefares.com LLC, they were

15  close friends.

16      14.    In 2001, BARBER personally guaranteed a $100,000.00 SBA loan and

17  purchased a travel agency, Travel Services of Coronado.  BARBER and FABRICE MODE

18  then started doing business as Cutratefares.com, LLC, with Travel Services of Coronado

19  providing the core business structure.

20      15.    The travel company initially struggled financially as a result of the September

21  11, 2001, terrorist attacks.  Therefore, in January of 2002, FABRICE MODE's father,

22  PAUL MODE, purchased 3% of the company for $12,000.00.  BARBER and FABRICE

23  MODE each agreed to give up 1.5% of their stock for the contribution by PAUL MODE.

24  The ownership percentages were adjusted to the following:  BARBER with 53.5%,

25  FABRICE MODE with 34.5%, RILEY with 5%, HOUGHTON with 4%, and PAUL

26  MODE with 3% ownership interest in Cutratefares.com, LLC.

27      16.    In June of 2002, Defendant MEYETTE informed BARBER and FABRICE

28  MODE that it was necessary to change the entity from an LLC to a C corporation because

LA JOLLA
LAW
GROUP

4330 La Jolla Village Dr.
Suite 220
San Diego, CA 92122
(858) 202-1321
FAX (858) 202-1308

1  it would lessen the tax liability of the individual owners and would be a better vehicle to

2  raise capital. Based on the representations of MEYETTE, the members of

3  Cutratefares.com decided to reorganize and set up a new corporation to market to the

4  affluent Coronado community. On or about June 25, 2002, PLAINTIFFS were informed

5  by MEYETTE that Cutratefares.com, LLC was changed to a C Corporation and

6  incorporated Coronado Travel Group, Inc. ("CTG"). Around the same time, MEYETTE, a

7  former co-worker and friend of Defendant FABRICE MODE, also became the Chief

8  Financial Officer of CTG, representing at said time both orally and in writing that he was a

9  Certified Public Accountant.

10      17.     CTG enjoyed rapid growth under BARBER's leadership as CEO. By the end

11  of 2003, air ticket sales had increased by nearly 2,000% and the company ranked fourth

12  among San Diego based travel agencies, with total sales exceeding $16,000,000.00.

13      18.     In or around June 2003, BARBER needed to develop a new search engine

14  program for CTG and Defendant FABRICE MODE recommended his former co-worker at

15  1-800 Fly-Cheap, namely Defendant DEROSA. Thereafter, CTG employed DEROSA as a

16  computer consultant to develop an Internet Booking Engine ("IBE") program. CTG created

17  an office space for DEROSA at their offices in Coronado, and provided DEROSA with all

18  the necessary hardware, computers, servers, software licenses, and third party agreements

19  to enable DEROSA to develop the IBE code. During the development of the IBE code,

20  CTG paid DEROSA over $100,000.00. During the ensuing six months, DEROSA,

21  BARBER, and FABRICE MODE agreed that a new technology company would be formed

22  whereby DEROSA would own approximately one-half of the new company and CTG

23  would own the other half, and that company would be the technology arm of CTG.

24      19.     Plaintiff BARBER is informed and believes and thereon alleges that after

25  DEROSA began working at CTG, MEYETTE began assisting DEROSA with his tax

26  problems.

27      20.     In March of 2004, twenty-one months after Cutratefares.com, LLC allegedly

28  changed its status to CTG, Defendant MEYETTE prepared a Stock Distribution and

LA JOLLA
LAW
GROUP

4330 La Jolla Village Dr.
Suite 220
San Diego, CA 92122
(858) 202-1321
FAX (858) 202-1308

1    Equalization Plan for BARBER's signature, purportedly to show that the Cutratefares.com,

2    LLC entity was terminated and that CTG was the new entity.

3        21.    Unbeknownst to BARBER at the time, MEYETTE drafted the Stock

4    Distribution and Equalization Plan which allegedly diluted BARBER's ownership interest

5    from 53.5% to 43.5% and MEYETTE never incorporated CTG.

6        22.    Pursuant to BARBER and DEROSA's oral agreement that they would share

7    in the ownership of the new technology company that would hold the IBE code, BARBER

8    purchased the domain name and built the site in the spring of 2004. At that time, BARBER

9    also instructed MEYETTE to prepare the necessary paper work to incorporate the new

10   technology company to be called EZGDS with CTG as a 50% shareholder. After the IBE

11   code was operational, and after CTG paid for the research and development of the code

12   plus a substantial salary to DEROSA, DEROSA insisted on being the 100% shareholder of

13   EZGDS. Without BARBER's knowledge MEYETTE incorporated EZGDS placing

14   DEROSA as the 100% shareholder.

15       23.    After learning that EZGDS was incorporated with DEROSA as a 100%

16   shareholder, BARBER acquiesced since he knew that CTG required the IBE code to keep

17   CTG running so successfully, and therefore agreed to DEROSA being 100% shareholder

18   provided that the IBE code would be put into the company. Upon getting 100% control of

19   the company, DEROSA agreed to put the IBE code into EZGDS; however, PLAINTIFFS

20   are informed and believe that he never put the IBE code into EZGDS. PLAINTIFFS are

21   further informed and believe that upon incorporation of EZGDS in April 2004, MEYETTE

22   became EZGDS' Chief Financial Officer. This essentially allowed DEROSA unfettered

23   access to the financial books of CTG as MEYETTE was also CTG Chief Financial Officer.

24       24.    PLAINTIFFS are informed and believe that in 2004, Defendants DEROSA,

25   MEYETTE, FABRICE MODE, PAUL MODE, and HOUGHTON devised a plan and

26   scheme to oust BARBER from CTG and take over the company.

27       25.    PLAINTIFFS are further informed and believe and thereon allege that in

28   furtherance of the scheme and plan to take over CTG and oust BARBER as its CEO,

LA JOLLA
LAW
GROUP

4330 La Jolla Village Dr.
Suite 220
San Diego, CA 92122
(858) 202-1321
FAX (858) 202-1308

6
Third Amended Complaint

1   MEYETTE informed BARBER in late 2004 that CTG would be changing their name to

2   Travel Support Center Inc. ("TSC").  Unknown to PLAINTIFFS, MEYETTE had already

3   formed and incorporated TSC on June 25, 2002, i.e., there was no name change necessary

4   since TSC already existed.  By May of 2005, CTG was no longer on the company letter

5   head which was replaced by TSC.

6         26.      PLAINTIFFS are informed and believe and thereon allege that contrary to

7   DEROSA's representations that the IBE code would be part of the new technology

8   company, EZGDS, and unknown to BARBER, DEROSA kept the IBE code password

9   protected so that the CTG officers could not access the same.  In the summer of 2005,

10  DEROSA threatened to sell EZGDS, including the IBE code, to an unknown outside

11  investor unless TSC agreed to a joint venture licensing agreement which would establish

12  EZGDS as an equal partner with TSC, whereby they would operate as 50/50 partners.

13  BARBER and TSC reluctantly agreed to the joint venture licensing agreement, as the loss

14  of the IBE code would critically cripple TSC.  In or around December 2005, TSC and

15  EZGDS entered into a joint venture licensing agreement which allegedly provided TSC

16  with full access to the IBE code.

17        27.      In June 2006, TSC moved its corporate headquarters from Coronado to

18  downtown San Diego.  The new office housed both TSC and EZGDS, whereby they

19  worked side by side on a daily basis together under the joint venture licensing agreement.

20  However, FABRICE MODE was upset about the move and began making statements to

21  others that he wanted BARBER fired.  Meanwhile, BARBER was busy growing TSC's

22  latest travel site, travelation.com, to be TSC's largest and its primary source of revenue.

23  TSC's 2005 annual sales exceeded $51,000,000.00.

24        28.      On July 17, 2006, while BARBER was on a two week vacation, FABRICE

25  MODE, PAUL MODE and MEYETTE held an unnoticed, unscheduled, impromptu special

26  shareholder meeting without BARBER or RILEY present where they allegedly voted in

27  favor of a proposed "buy-out" merger by and between TSC and EZGDS.  Thereafter,

28  Defendant MEYETTE wrote a letter to the shareholders of TSC including both the signed

LA JOLLA
LAW
GROUP

4330 La Jolla Village Dr.
Suite 220
San Diego, CA 92122
(858) 202-1321
FAX (858) 202-1308

7
Third Amended Complaint

1  "Call for a Special Meeting of the Shareholder's" document as well as the attached

2  "Proposal of Merger" document with terms between EZGDS and TSC included.

3  MEYETTE's letter stated that the proposed "buy-out" merger would involve EZGDS

4  acquiring all of the shares of TSC, "under an exchange ratio to be determined after the

5  completion of outside, independent, and professional appraisal of each company, and

6  consequently the establishment of an exchange ratio that will be equitable and consistently

7  fair to each and every shareholder." The Proposal of Merger also stated, "5. MERGER

8  CONTINGENT UPON APPRAISALS: consummation of the merger will be contingent

9  upon the securing of independent outside professional appraisals of the fair market value of

10  each entity."

11      29.      PLAINTIFFS are informed and believe and based thereon allege that prior to

12  July 17, 2006, Defendants MEYETTE, FABRICE MODE, and DEROSA had secretly

13  planned this so-called merger, which was actually a buyout, without Plaintiffs BARBER or

14  RILEY's knowledge or consent. PLAINTIFFS are further informed and believe and

15  thereupon allege that DEROSA and MEYETTE inflated the value of EZGDS to convince

16  the other shareholders that EZGDS was worth ten times that of TSC, even though 100% of

17  the revenues were collected through TSC.

18      30.      On August 5, 2006, MEYETTE wrote a letter to RILEY and again promised

19  that there would be "a professional outside evaluation of both companies to establish a fair

20  basis for the exchange of stock." The letter enclosed a "Checklist of Merger Terms and

21  Conditions," which said that input from the shareholders would be welcome and then

22  evolved into a final merger agreement. The letter and Checklist promised a professional

23  outside evaluation to establish a fair basis for the exchange of stock, and stated, "Then, and

24  only then, will another meeting of shareholders be called for a final vote."

25      31.      BARBER was opposed to a merger between EZGDS and TSC since they

26  already had a joint venture license agreement and therefore it was unnecessary. Despite

27  TSC already having a joint venture license agreement, MEYETTE, FABRICE MODE,

28  PAUL MODE, and HOUGHTON wanted to proceed with a merger, and collectively they

LA JOLLA
LAW
GROUP

4330 La Jolla Village Dr.
Suite 220
San Diego, CA 92122
(858) 202-1321
FAX (858) 202-1308

8

1  allegedly owned the majority shares of TSC.  Pursuant to the Proposal of Merger in the

2  winter of 2006, BARBER repeatedly asked DEROSA to have the independent appraisals

3  performed on the terms of the merger.  Despite the prior representations of DEROSA and

4  MEYETTE that an independent appraisal would be done, no independent appraisal was

5  ever completed.  DEROSA, MEYETTE, and FABRICE MODE made it clear to BARBER

6  that if he did not sign the merger agreement, he would be fired from his position as CEO of

7  TSC, and that, as the alleged majority shareholders, they would accomplish the merger

8  with or without BARBER and RILEY's votes.

9      32.    DEROSA promised BARBER that he would not be fired if he agreed to the

10  merger.  Fearing for his job, BARBER requested an employment contract as part of the

11  merger terms.  DEROSA agreed, and provided an employment offer letter in the final

12  Stock Purchase Agreement.

13      33.    On October 26, 2006, MEYETTE and DEROSA's attorney sent a Letter of

14  Intent to the TSC shareholders discussing "the proposed acquisition" of TSC.  The Letter

15  of Intent contained an "Exclusivity" provision in which the shareholders agree not to take

16  any action to encourage, solicit, or initiate any alternative proposals.  MEYETTE

17  repeatedly used this language against BARBER, stating that there was "nothing he could

18  do" to stop the so-called merger and that any action would be a breach of the Letter of

19  Intent.  Although MEYETTE, DEROSA, and FABRICE MODE continually represented to

20  TSC's shareholders that this was a merger, the Letter of Intent now stated that it was an

21  acquisition.

22      34.    In late 2006, MEYETTE took RILEY aside into an empty office at TSC and

23  insisted that she immediately sign a preliminary approval for the merger to go forward.

24  MEYETTE further represented to RILEY that the merger would be accomplished with an

25  outside independent appraisal that would be fair and equitable. Under the extreme duress of

26  MEYETTE's pressure, isolation, and intimidation, and RILEY fearing for her son's job

27  and welfare, RILEY signed the approval.  Pursuant to the representations of MEYETTE

28  and the written proposal of merger, RILEY believed that an appraisal would be completed

LA JOLLA
LAW
GROUP

4330 La Jolla Village Dr.
Suite 220
San Diego, CA 92122
(858) 202-1321
FAX (858) 202-1308

9
Third Amended Complaint

1  that would support the merger.

2      35.    On February 2, 2007, after a shareholder meeting for TSC, the final Stock

3  Purchase Agreement was approved and signed by all parties.  It set the stock exchange ratio

4  at 10:1 in favor of EZGDS – an unfair and inequitable ratio which effectively rendered

5  Plaintiffs RILEY and BARBER's equity in TSC forfeit.  The Stock Purchase Agreement

6  also included a non-compete agreement with a three year term purporting to bar BARBER

7  from competing with EZGDS anywhere in the world.  Although DEROSA promised that

8  he would receive an employment contract if he signed the Stock Purchase Agreement and

9  the Stock Purchase Agreement provides for an employment offer letter to BARBER,

10  DEROSA failed to provide the employment offer letter after BARBER executed the Stock

11  Purchase Agreement

12      36.    RILEY, an unsophisticated investor, signed the Stock Purchase Agreement

13  believing that an independent appraisal had been conducted that supported the merger/buy

14  out.  RILEY was also still quite fearful for her son's welfare and job security and felt she

15  had no choice but to sign.  BARBER reluctantly signed the Stock Purchase Agreement

16  because MEYETTE, CFO of EZGDS and TSC, informed BARBER in or around January

17  2007 on behalf of EZGDS and TSC that the stock exchange was fair and equitable, and that

18  there would be no need for an outside appraisal.  PLAINTIFFS allege upon information

19  and belief that at the time they executed the Stock Purchase Agreement, MEYETTE never

20  conducted any appraisal, valuation, or cash flow projections of TSC or EZGDS; DEROSA

21  and MEYETTE inflated the value of EZGDS, MEYETTE was disclosing confidential

22  financial information to DEROSA over the prior three years; MEYETTE never

23  incorporated CTG; MEYETTE secretly incorporated TSC in June 2002; and that

24  MEYETTE, DEROSA, and FABRICE MODE had been meeting in secret to plan and oust

25  BARBER and take over TSC.

26      37.    Approximately three weeks prior to the final Stock Purchase Agreement,

27  DEROSA hired his personal friend, Tom Allen, as the Chief Operating Officer of EZGDS.

28  PLAINTIFFS are informed and believe and thereupon allege that DEROSA and Allen were

LA JOLLA LAW GROUP
4330 La Jolla Village Dr. Suite 220
San Diego, CA 92122
(858) 202-1321
FAX (858) 202-1308
10
Third Amended Complaint

1   collectively scheming to oust BARBER from his position at EZGDS so that Allen could

2   step into BARBER's position which eventually occurred.

3       38.     After the execution of the Stock Purchase Agreement, BARBER continued to

4   work for EZGDS as its Vice President of Business Development pursuant to DEROSA's

5   promise.  BARBER'S duties included increasing the sales revenue of the company through

6   marketing and internet advertising.  By the end of March 2007, sales revenue had grown

7   420% over the same quarter in 2006.

8       39.     In April 2007, BARBER presented a proposal to DEROSA to launch a new

9   brand named Jetsetz.com, which would be majority-owned by BARBER and would pay

10  EZGDS for various travel related services and share the profits with EZGDS.  Under this

11  proposed deal, BARBER would continue to work for EZGDS, depending on how long it

12  took for the new site to become profitable.

13      40.     On April 24, 2007, DEROSA came into BARBER's office at 5:00 p.m. and

14  stood in the doorway demanding that BARBER sign the Separation Agreement that day

15  before he left the office.  The prepared Separation Agreement offered BARBER

16  $25,000.00 in severance pay, one month of C.O.B.R.A. payments, and that DEROSA on

17  behalf of EZGDS would complete and sign a new business relationship agreement in the

18  next 45 days.  When BARBER refused to sign the Separation Agreement, knowing that the

19  Jetsetz.com deal had yet to be consummated, DEROSA changed the last sentence of the

20  Separation Agreement to read "this offer is valid until May 24, 2007 at 5:00 pm, at which

21  time if unexecuted by either party the offer expires."  Due to the fact that DEROSA would

22  not let BARBER leave his office without signing the Separation Agreement, and in reliance

23  on DEROSA's statements both orally and in writing that BARBER would receive the

24  severance payment of $25,000.00, one month of C.O.B.R.A. payments, the agreement to

25  create and sign the Jetsetz.com deal, and that BARBER could rescind the offer, BARBER

26  signed the Separation Agreement.

27      41.     BARBER continued to work for EZGDS, now for no compensation, assisting

28  the company with all transition tasks.  The Jetsetz.com deal was negotiated over the next

LA JOLLA
LAW
GROUP

4330 La Jolla Village Dr.
Suite 220
San Diego, CA 92122
(858) 202-1321
FAX (858) 202-1308

month, but ultimately DEROSA refused to complete and sign the Jetsetz.com deal.  Before May 24, 2007, BARBER informed DEROSA that he was revoking the Separation Agreement pursuant to the handwritten revocation clause DEROSA added to the Separation Agreement and demanded his job back.  DEROSA on behalf of EZGDS refused to hire BARBER back, and thereafter failed to pay BARBER the agreed amount of $25,000.00, the one month of C.O.B.R.A. payments, and refused and failed to complete and sign the Jetsetz.com deal.

42.     After BARBER was forced out of EZGDS, he and RILEY learned that MEYETTE was never a Certified Public Accountant as he had previously represented.

### FIRST CAUSE OF ACTION
### Constructive Fraud
### (Against MEYETTE, FABRICE MODE, PAUL MODE, HOUGHTON, and DEROSA and DOES 2 through 20, inclusive)

43.     PLAINTIFFS re-allege and incorporate herein by reference the allegations contained in Paragraphs 1 through 42, inclusive, as though set forth fully herein.

44.     As the controlling shareholders of TSC, Defendants MEYETTE, HOUGHTON, FABRICE MODE, and PAUL MODE had a fiduciary duty to act in the best interests of PLAINTIFFS, as the minority shareholders, and TSC.  Instead of doing so, they agreed to an inequitable buyout ratio without the completion of an independent appraisal, as represented orally and in writing by DEROSA and MEYETTE.  The controlling shareholders of TSC refused to consult legal counsel, conduct any independent appraisal, valuation, or cash flow projections, and relied on the false statements of DEROSA and MEYETTE to the detriment of PLAINTIFFS and TSC.

45.     Additionally, MEYETTE was the CFO and Corporate Secretary for both TSC and EZGDS and was handling the financial and corporate records for both companies.  MEYETTE represented to PLAINTIFFS that he was a Certified Public Accountant, which unbeknownst to BARBER and RILEY, he was not.  MEYETTE had a duty to accurately represent the financial condition and valuation of both companies, as well as his expertise, and to draft the Stock Purchase Agreement on terms that were fair and reasonable to

LA JOLLA
LAW
GROUP

4330 La Jolla Village Dr.
Suite 220
San Diego, CA 92122
(858) 202-1321
FAX (858) 202-1308

12
Third Amended Complaint

1  PLAINTIFFS.  As the Corporate Secretary, MEYETTE had a duty to not take advantage of

2  his power position in both companies to the disadvantage of the other shareholders.

3  MEYETTE's failure to do so has caused PLAINTIFFS substantial damage.  At the time the

4  Stock Purchase Agreement was executed, MEYETTE and DEROSA failed to inform

5  BARBER and RILEY that CTG was never incorporated in California, that TSC was

6  secretly incorporated in June 2002, that the value of EZGDS was inflated to support a 10:1

7  stock ratio, that DEROSA and MEYETTE met secretly to discuss the take over and buy out

8  of TSC, that MEYETTE had allegedly increased his share from 1% to 1.2%, and that

9  DEROSA and MEYETTE were secretly using TSC to conduct undisclosed business.

10      46.     DEROSA owed a fiduciary duty to PLAINTIFFS to act in their best interests

11  due to the joint venture/licensing agreement between EZGDS and TSC, whereby the two

12  companies jointly operated together in substance and practicality as 50/50 partners.  The

13  two companies shared office space and both DEROSA and BARBER had control over the

14  daily operations of both companies.  Profits and losses were evenly split.  DEROSA owed

15  PLAINTIFFS a fiduciary duty to make sound business decisions and to negotiate in good

16  faith for a fair buyout ratio that was done in good faith and with inherent fairness.

17  DEROSA's failure to do so has caused PLAINTIFFS substantial harm.

18      47.     Both DEROSA and MEYETTE were officers of EZGDS and thereby acted

19  within the scope of their office on the company's behalf for purposes of these allegations.

20      48.     Defendants MEYETTE, FABRICE MODE, PAUL MODE, and

21  HOUGHTON breached their duties to PLAINTIFFS by misleading them down the path of

22  a merger that was inequitable and not supported by any appraisals or outside valuations.

23  Said Defendants orally made false promises of an independent appraisal of both TSC and

24  EZGDS.  DEROSA through MEYETTE further represented that the 10:1 stock ratio

25  exchange was fair and equitable, and was supported by the financial records of both

26  companies which caused PLAINTIFFS to enter into an inequitable buyout, by which

27  PLAINTIFFS suffered an unconscionable dilution of their equity and investments in TSC.

28  ////

LA JOLLA
LAW
GROUP

4330 La Jolla Village Dr.
Suite 220
San Diego, CA  92122
(858) 202-1321
FAX (858) 202-1308

49.     Defendants MEYETTE, FABRICE MODE, PAUL MODE, and HOUGHTON's constructive fraud resulted in an inequitable expansion of their own equity in EZGDS and a virtual disenfranchisement of PLAINTIFFS.  PLAINTIFFS' reward for reposing trust and confidence in said Defendants is a prospective, complete, and ruinous forfeiture of their 48.5% equity in TSC -- equity which cost them over $2,000,000.00 to build.  Defendants' actions were manipulative and to the advantage of themselves and the disadvantage of PLAINTIFFS.

50.     As a direct and proximate result of Defendants MEYETTE, FABRICE MODE, PAUL MODE, and HOUGHTON's constructive fraud as alleged herein, PLAINTIFFS have been damaged in an amount to be proven at trial.

51.     As a result of the aforementioned fraudulent conduct of Defendants as set forth herein above, this Court should rescind the Stock Purchase Agreement and the Stock Distribution and Equalization Plan.

52.     Defendants acted wantonly, willfully, oppressively, and fraudulently.  As a consequence, they should be assessed exemplary damages so as to punish and make an example of them and in order to deter others from similar misconduct in the future.

**SECOND CAUSE OF ACTION**
**Promissory Fraud**
**(RILEY Only Against DEROSA, MEYETTE, and EZGDS**
**and DOES 2 through 20, inclusive )**

53.     PLAINTIFFS re-allege and incorporate herein by reference the allegations contained in Paragraphs 1 through 52, inclusive, as though set forth fully herein.

54.     From July 2006 through February 2007, DEROSA and MEYETTE repeatedly promised RILEY that an independent, professional, outside valuation of both EZGDS and TSC would be conducted prior to a consummation of the "merger" in order to determine the value of both companies and to determine a fair buyout ratio.  At the time these promises were made, both DEROSA and MEYETTE were acting on behalf of EZGDS, as they were the CEO and CFO respectively.  MEYETTE was also the CFO of TSC. Additionally, MEYETTE represented himself to PLAINTIFFS as a Certified Public

LA JOLLA LAW GROUP

4330 La Jolla Village Dr. Suite 220 San Diego, CA 92122 (858) 202-1321 FAX (858) 202-1308

14
Third Amended Complaint

1    Accountant.

2        55.    As an unsophisticated investor, RILEY relied on DEROSA and MEYETTE's

3    promises when she signed the Proposal of Merger.  RILEY also relied on these promises

4    when she signed the Stock Purchase Agreement, as she had no knowledge that the

5    independent appraisals were not conducted before she signed.  RILEY's reliance on these

6    promises was reasonable, given her limited understanding of the process and said

7    Defendants' represented expertise.

8        56.    Neither DEROSA nor MEYETTE intended to have an independent appraisal

9    conducted at the time they made these promises to RILEY, and unbeknownst to RILEY, an

10   independent appraisal was never conducted that supported the Stock Purchase Agreement.

11       57.    RILEY's reliance on the Defendants' representations was a substantial factor

12   in causing her damages in a sum that exceeds the jurisdictional limit of this Court, and in

13   an amount to be proven at the time of trial.

14       58.    As a result of the aforementioned fraudulent conduct of Defendants as set

15   forth herein above, this Court should rescind the Stock Purchase Agreement and the Stock

16   Distribution and Equalization Plan.

17       59.    Defendants acted wantonly, willfully, oppressively, and fraudulently.  As a

18   consequence, they should be assessed exemplary damages so as to punish and make an

19   example of them and in order to deter others from similar misconduct in the future.

20                         **THIRD CAUSE OF ACTION**
                           **Intentional Misrepresentation**
21   **(Against DEROSA, MEYETTE, and EZGDS and DOES 2 through 20, inclusive)**

22       60.    PLAINTIFFS re-allege and incorporate herein by reference the allegations

23   contained in Paragraphs 1 through 59, inclusive, as though set forth fully herein.

24       61.    At all times relevant herein, Defendant MEYETTE represented to

25   PLAINTIFFS that he was a Certified Public Accountant.  This representation was false, as

26   MEYETTE is not a Certified Public Accountant, nor has he ever been.  At all times

27   relevant herein, MEYETTE knew that he was not a Certified Public Accountant.

28   ////

LA JOLLA
LAW
GROUP

4330 La Jolla Village Dr.
Suite 220
San Diego, CA 92122
(858) 202-1321
FAX (858) 202-1308

1    62.    MEYETTE intended that PLAINTIFFS rely on his misrepresentation in order

2  to gain an unfair advantage over them, whereby he wanted PLAINTIFFS to trust his

3  opinions regarding the valuation of both EZGDS and TSC for purposes of the Stock

4  Purchase Agreement.  PLAINTIFFS are informed and believe and thereon allege that

5  DEROSA was aware that MEYETTE was not a CPA.

6    63.    Both DEROSA and MEYETTE made repeated representations to

7  PLAINTIFFS that an independent, professional appraisal of both TSC and EZGDS would

8  be conducted prior to a final merger or buyout, and that the 10:1 stock ratio exchange was

9  fair and equitable and supported by the financial records of both companies.  These

10  statements were false, as neither DEROSA nor MEYETTE ever intended to have an

11  appraisal conducted nor was the 10:1 stock ratio exchange supported by the financial

12  records of either TSC or EZGDS.

13    64.    Both DEROSA and MEYETTE were officers of EZGDS and thereby acted on

14  the company's behalf for purposes of these allegations.

15    65.    PLAINTIFFS reasonably relied on said Defendants' representations and had

16  no reason to believe that the representations were not true.

17    66.    PLAINTIFFS' reliance on MEYETTE's intentional misrepresentations was a

18  substantial factor in causing them damages in a sum that exceeds the jurisdictional limit of

19  this Court, and in an amount to be proven at the time of trial.

20    67.    As a result of the aforementioned fraudulent conduct of Defendants as set

21  forth herein above, this Court should rescind the Stock Purchase Agreement and the Stock

22  Distribution and Equalization Plan.

23    68.    Said Defendants acted wantonly, willfully, oppressively, and fraudulently.  As

24  a consequence, they should be assessed exemplary damages so as to punish and make an

25  example of them and in order to deter others from similar misconduct in the future.

26  ////

27  ////

28  ////

LA JOLLA
LAW
GROUP

4330 La Jolla Village Dr.
Suite 220
San Diego, CA 92122
(858) 202-1321
FAX (858) 202-1308

_____16_____
Third Amended Complaint

**FOURTH CAUSE OF ACTION**
**Fraud in the Sale of Securities Pursuant to Corporations Code § 25401**
**(Against DEROSA, MEYETTE, and EZGDS and DOES 2 through 20, inclusive)**

69.     PLAINTIFFS re-allege and incorporate herein by reference the allegations contained in Paragraphs 1 through 68, inclusive, as though set forth fully herein.

70.     The statements made by DEROSA and MEYETTE, individually and on behalf of EZGDS, that the stock exchange ratio would be determined after an independent appraisal, and only then would the buyout become final, were untrue statements of material fact in the offer to buy PLAINTIFFS' shares of TSC stock.  DEROSA and MEYETTE knew the statements were false when they made them, and knew that an independent appraisal was never going to be performed.  PLAINTIFFS relied on these untrue statements to their detriment, and were forced into the buyout by fraudulent and unfair means.

71.     The purchase of PLAINTIFFS' shares of TSC should be rescinded pursuant to Corporations Code Section 25401.

**FIFTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**(Against all DEFENDANTS and DOES 2 through 20, inclusive)**

72.     PLAINTIFFS re-allege and incorporate herein by reference the allegations contained in Paragraphs 1 through 71, inclusive, as though set forth fully herein.

73.     Controlling shareholders of a corporation owe a fiduciary duty to act with the utmost good faith in the best interests of the minority shareholders.

74.     The controlling shareholders of TSC were Defendants MEYETTE, HOUGHTON, FABRICE MODE, and PAUL MODE.  These controlling shareholders had a fiduciary duty to act in the best interests of PLAINTIFFS, as the minority shareholders, and TSC.  Instead, said Defendants failed and/or refused to have any legal counsel review and analyze the Stock Purchase Agreement or any of the other corporate records of either TSC or EZGDS.  The majority shareholders, FABRICE MODE, MEYETTE, PAUL MODE, and HOUGHTON, failed and/or refused to get any independent appraisal of either corporation, and entered into an inequitable Stock Purchase Agreement that was not done in good faith, or at arms length by which PLAINTIFFS suffered an unconscionable dilution

LA JOLLA
LAW
GROUP

4330 La Jolla Village Dr.
Suite 220
San Diego, CA  92122
(858) 202-1321
FAX (858) 202-1308

1    of their equity and investments in TSC.

2        75.    Additionally, MEYETTE was the CFO and Corporate Secretary for both TSC

3    and EZGDS.  MEYETTE was handling the financial and corporate records for both

4    companies, and he was receiving a paycheck from both companies.  MEYETTE abused his

5    power of authority by misrepresenting the value of both companies and persuading the

6    TSC shareholders to agree to a buyout on inequitable terms without regard to the best

7    interests of PLAINTIFFS.

8        76.    MEYETTE also represented to PLAINTIFFS that he was a Certified Public

9    Accountant, which he was not.  His representation as a Certified Public Accountant was

10   intentionally misleading and a breach of his fiduciary duty to PLAINTIFFS, as minority

11   shareholders.

12       77.    DEROSA owed a fiduciary duty to PLAINTIFFS to act in their best interests

13   due to the joint venture agreement between EZGDS and TSC, whereby the two companies

14   jointly operated together in substance and practicality as 50/50 partners.  The two

15   companies shared office space and both DEROSA and BARBER had control over the daily

16   operations of both companies.  Profits and losses were evenly split.  DEROSA owed

17   PLAINTIFFS a fiduciary duty to make sound business decisions and to negotiate in good

18   faith for a fair buyout ratio.  DEROSA's failure to do so has caused PLAINTIFFS

19   substantial harm.

20       78.    Said Defendants' breach of their fiduciary duties resulted in an inequitable

21   expansion of their own equity in EZGDS and a virtual disenfranchisement of

22   PLAINTIFFS.  PLAINTIFFS' reward for reposing trust and confidence in Defendants is a

23   prospective, complete, and ruinous forfeiture of their 48.5% equity in TSC – equity which

24   cost them over $2,000,000.00 to build.  Defendants' actions were disloyal and careless, to

25   the advantage of themselves and the disadvantage of PLAINTIFFS.

26       79.    As a direct and proximate result of the Defendants' breaches of their fiduciary

27   duties as alleged herein, PLAINTIFFS have been damaged in an amount to be proven at

28   trial.

LA JOLLA
LAW
GROUP

4330 La Jolla Village Dr.
Suite 220
San Diego, CA 92122
(858) 202-1321
FAX (858) 202-1308

80.     Said Defendants acted wantonly, willfully, oppressively, and fraudulently.  As a consequence, they should be assessed exemplary damages so as to punish and make an example of them and in order to deter others from similar misconduct in the future.

### SIXTH CAUSE OF ACTION
#### Dissolution of EZGDS, Inc. Pursuant to Corporations Code § 1800, et seq.
#### (Against EZGDS, Inc. and DOES 2 through 20, inclusive)

81.     PLAINTIFFS re-allege and incorporate herein by reference the allegations contained in Paragraphs 1 through 80, inclusive, as though set forth fully herein.

82.     This cause of action is brought pursuant to California Corporations Code Section 1800(b)(4) and (b)(5).  PLAINTIFFS are shareholders of stock in EZGDS (and were shareholders of TSC, its wholly-owned subsidiary at the time the above-mentioned events occurred), which is a close corporation for purposes of section 1800.  PLAINTIFFS are shareholders of stock representing not less than 33 1/3% of the stock of EZGDS, once the stakes of the controlling persons discussed above guilty of the fraud and misconduct alleged herein are deducted.  EZGDS has eight shareholders.

83.     The controlling persons of EZGDS have knowingly countenanced persistent and pervasive fraud, mismanagement, abuse of authority, and persistent unfairness toward PLAINTIFFS.  In addition to all of the pre-buyout misconduct, EZGDS has refused to pay dividends to shareholders.  EZGDS has refused to provide quarterly financial statements despite its previous pattern of doing so and PLAINTIFFS' repeated requests for these documents.  EZGDS has refused to provide PLAINTIFFS with the Board of Directors meeting minutes and notice of the shareholder meetings.  EZGDS has effectively kept PLAINTIFFS in the dark since the takeover.

84.     The controlling shareholders are guilty of gross mismanagement, positive misconduct, and fraud resulting in imminent danger of great loss and actual losses to the corporation.  As a consequence, this Court should order EZGDS dissolved per the provisions of Corporations Code Section 1800(b)(4), appoint a receiver to take over and manage EZGDS (and its wholly-owned subsidiary, TSC), preserve its property pending the hearing and determination of this Third Amended Complaint for dissolution pursuant to

LA JOLLA
LAW
GROUP

4330 La Jolla Village Dr.
Suite 220
San Diego, CA  92122
(858) 202-1321
FAX (858) 202-1308

1   Corporations Code Section 1803, and decree a winding up and dissolution of EZGDS

2   pursuant to Corporations Code Section 1804.

3       85.    For the same reasons described above, liquidation is reasonably necessary for

4   the protection of the rights and interests of PLAINTIFFS pursuant to Section 1800(b)(5).

5       86.    In the alternative, and pursuant to Corporations Code Section 2000, EZGDS

6   should buy out PLAINTIFFS pursuant to the mechanism established by that statute.

7       87.    The controlling persons acting on behalf of EZGDS committed the acts of

8   fraud, abuse of authority, and persistent unfairness alleged herein wantonly, willfully,

9   oppressively, maliciously, and fraudulently.  As a consequence, EZGDS should be assessed

10  exemplary damages to as to punish, make an example of it, and to deter others from similar

11  misconduct in the future.

12                         **SEVENTH CAUSE OF ACTION**
                         **Breach of Contract/Rescission**

13  **(BARBER Only Against EZGDS and DOES 2 through 20, inclusive)**

14      88.    PLAINTIFFS re-allege and incorporate herein by reference the allegations

15  contained in Paragraphs 1 through 87, inclusive, as though set forth fully herein.

16      89.    On April 24, 2007, DEROSA as the CEO and majority shareholder of EZGDS

17  demanded that BARBER execute a pre-prepared Separation Agreement, and DEROSA

18  would not allow BARBER to leave his office until he executed the same.  In exchnage for

19  BARBER signing the Separation Agreement, DEROSA represented to BARBER both

20  orally and in writing that DEROSA, on behalf of EZGDS, would pay BARBER

21  $25,000.00, one month of C.O.B.R.A. payments, would create and sign a complete

22  agreement for the Jetsetz.com deal, and that BARBER could rescind the Separation

23  Agrement within thirty (30) days.  Based upon DEROSA's representations and

24  DEROSA'S confinement of BARBER in his office, BARBER signed a Separation

25  Agreement whereby BARBER had to resign from his position with EZGDS.

26      90.    BARBER has performed all conditions, covenants, and promises as required

27  on his part to be performed pursuant to the Separation Agreement.

28  ////

LA JOLLA
LAW
GROUP

4330 La Jolla Village Dr.
Suite 220
San Diego, CA 92122
(858) 202-1321
FAX (858) 202-1308

20
Third Amended Complaint

91.     EZGDS has not performed any of the terms and conditions of the Separation Agreement.  EZGDS has not paid BARBER the $25,000.00, has not paid the one month of C.O.B.R.A. payments, has refused to sign an agreement for the Jetsetz deal, and refused to re-employ BARBER.  After less than a month of BARBER assisting EZGDS with all of the transition tasks requested of him and negotiating the final terms of the Jetsetz.com deal, BARBER began to realize that DEROSA had misrepresented what he told him on April 24, 2007, and DEROSA, on behalf of EZGDS, was not going to execute any Jetsetz.com deal.  Before 5:00 p.m. on May 24, 2007, BARBER informed DEROSA that he was rescinding and cancelling the Separation Agreement offer and requested his job back.  DEROSA refused to hire BARBER back at EZGDS, refused and failed to pay BARBER the $25,000.00, refused and failed to pay BARBER one month of C.O.B.R.A. payments, and continues to refuse to excute a complete and definitive agreement for the Jetsetz.com deal.

92.     As a result of EZGDS' breach of the Separation Agreement offer, the misrepresentations to induce BARBER to execute the Separation Agreement offer, and the duress of confining BARBER to his office until he excuted the Separation Agreement offer, BARBER has been damaged in an amount to be determined at Trial, and in the alternative, BARBER requests that this Court rescind the Separation Agreement since it was procured by fraud and duress.

**EIGHTH CAUSE OF ACTION**
**Accounting**
**(Against EZGDS and DOES 2 through 20, inclusive)**

93.     PLAINTIFFS re-allege and incorporate herein by reference the allegations contained in Paragraphs 1 through 92, inclusive, as though set forth fully herein.

94.     PLAINTIFFS are informed and believe and based thereon allege that at all times herein, the Defendants acted in collusion in an attempt to defraud PLAINTIFFS into executing the buy-out agreement with a 10:1 stock exchange ratio in favor of EZGDS without performing any independent appraisal of the books and records maintained by EZGDS and TSC.  PLAINTIFFS are informed and believe and based thereon allege that the 10:1 stock exchange ratio between EZGDS and TSC was unfair and inequitable relative

LA JOLLA
LAW
GROUP

4330 La Jolla Village Dr.
Suite 220
San Diego, CA 92122
(858) 202-1321
FAX (858) 202-1308

1  to the valuations of the companies.  As such, the equity of the stock exchange ratio cannot

2  be ascertained without an accounting of the gross receipts and/or return of the books of the

3  accountings maintained by EZGDS and TSC or their accountants and bookkeepers.

4    95.   PLAINTIFFS are informed and believe and based thereon allege that the 10:1

5  stock exchange ratio was not equitable or fair, and any representations made by Defendants

6  MEYETTE and DEROSA that said exchange ratio was equitable and fair were false, as the

7  10:1 stock exchange ratio was neither fair nor equitable.

8    96.   PLAINTIFFS request a forensic accounting of the transaction described

9  herein above to prevent the perpetration of fraud, comingling, unfair dealings, and

10  improper handling of the funds, accounting, and representations as to the fair and equitable

11  nature of the stock exchange.

12    97.   Based upon the conduct of the Defendants as alleged in this Third Amended

13  Complaint concerning the multiple false representations that were made and the failure to

14  complete an appraisal by an independent third party, as well as the failure to seek outside

15  counsel, a forensic accounting is necessary at this time.

16                        **NINTH CAUSE OF ACTION**
                  **Declaratory Relief (Non-Compete Agreement)**
17       **(BARBER Only Against EZGDS and DOES 2 through 20, inclusive)**

18    98.   PLAINTIFFS re-allege and incorporate herein by reference the allegations

19  contained in Paragraphs 1 through 97, inclusive, as though set forth fully herein.

20    99.   The Non-Compete Agreement forced on BARBER by EZGDS and its

21  controlling shareholders was the result of fraud, oppression, and persistent unfairness, and

22  is unconscionable and unenforceable according to California law.  BARBER agreed to it

23  based on fraud and false pretenses proffered by DEROSA, EZGDS' CEO, and under

24  duress.

25    100   The Non-Compete Agreement is also void and unenforceable because it is

26  drastically overbroad in time and scope, and is an illegal restraint of trade pursuant to

27  Business & Professions Code Section 16601.

28  ////

LA JOLLA
LAW
GROUP

4330 La Jolla Village Dr.
Suite 220
San Diego, CA  92122
(858) 202-1321
FAX (858) 202-1308

1    101.   An actual controversy exists concerning the parties' rights and liabilities

2    related to the Non-Compete Agreement.  Per Code of Civil Procedure Section 1060, the

3    Court should declare those rights and liabilities and determine the validity of the Non-

4    Compete Agreement.

5        WHEREFORE, PLAINTIFFS pray for judgment against DEFENDANTS and each

6    of them as follows:

7    First Cause of Action:

8        1.    For general and/or special damages;

9        2.    For punitive damages;

10       3.    For attorneys' fees and costs;

11       4.    For prejudgment interest;

12       5.    For rescission of the Stock Purchase Agreement and the Stock Distribution

13             and Equalization Plan, and all transactional documents executed in

14             connection therewith;

15       6.    For restoration to PLAINTIFFS of the voting rights and equity ownership

16             which PLAINTIFFS previously held; and

17       7.    For such other relief as the Court deems just and proper.

18   Second Cause of Action:

19       1.    For general and/or special damages;

20       2.    For punitive damages;

21       3.    For attorneys' fees and costs;

22       4.    For prejudgment interest;

23       5.    For rescission of the Stock Purchase Agreement and the Stock Distribution

24             and Equalization Plan, and all transactional documents executed in

25             connection therewith;

26       6.    For restoration to PLAINTIFFS of the voting rights and equity ownership

27             which PLAINTIFFS previously held; and

28       7.    For such other relief as the Court deems just and proper.

LA JOLLA
LAW
GROUP

4330 La Jolla Village Dr.
Suite 220
San Diego, CA 92122
(858) 202-1321
FAX (858) 202-1308

23
Third Amended Complaint

<u>Third Cause of Action:</u>

1.   For general and/or special damages;

2.   For punitive damages;

3.   For attorneys' fees and costs;

4.   For prejudgment interest;

5.   For rescission of the Stock Purchase Agreement and the Stock Distribution and Equalization Plan, and all transactional documents executed in connection therewith;

6.   For restoration to PLAINTIFFS of the voting rights and equity ownership which PLAINTIFFS previously held; and

7.   For such other relief as the Court deems just and proper.

<u>Fourth Cause of Action:</u>

1.   For general and/or special damages;

2.   For punitive damages;

3.   For attorneys' fees and costs;

4.   For prejudgment interest;

5.   For rescission of the Stock Purchase Agreement and the Stock Distribution and Equalization Plan, and all transactional documents executed in connection therewith; and

6.   For restoration to PLAINTIFFS of the voting rights and equity ownership which PLAINTIFFS previously held; and

7.   For such other relief as the Court deems just and proper.

<u>Fifth Cause of Action:</u>

1.   For general and/or special damages;

2.   For punitive damages;

3.   For attorneys' fees and costs;

4.   For prejudgment interest; and

5.   For such other relief as the Court deems just and proper.

LA JOLLA
LAW
GROUP

4330 La Jolla Village Dr.
Suite 220
San Diego, CA 92122
(858) 202-1321
FAX (858) 202-1308

24
Third Amended Complaint

Sixth Cause of Action:

    1.    For an order requiring the directors of EZGDS to wind up the corporation's affairs and dissolve, under the supervision of the Court and in accord with the Corporations Code § 1800; and

    2.    For such other relief as the Court deems just and proper.

Seventh Cause of Action:

    1.    For general and/or special damages due and owing to BARBER;

    2.    For attorneys' fees and costs;

    3.    For Rescission of the Seperation Agreement;

    4.    For prejudgment interest; and

    5.    For such other relief as the Court deems just and proper.

Eighth Cause of Action:

    1.    For an order requiring the directors of EZGDS and TSC to perform an accounting of the gross receipts and/or return of the books of the accountings maintained by EZGDS and TSC or their accountants and bookkeepers; and

    2.    For such other relief as the Court deems just and proper.

Ninth Cause of Action:

    1.    For a judgment declaring the Non-Compete Agreement between BARBER and EZGDS null and void; and

    2.    For such other relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED:

DATED: February _12_, 2009           LA JOLLA LAW GROUP

By:    _____
KENT L. SHARP, ESQ.
Attorney for Plaintiffs,
STEPHEN J. BARBER and
SUZANNE S. RILEY

LA JOLLA
LAW
GROUP

4330 La Jolla Village Dr.
Suite 220
San Diego, CA 92122
(858) 202-1321
FAX (858) 202-1308

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN DIEGO – HALL OF JUSTICE

| | |
|---|---|
| TRAVEL SUPPORT CENTER, INC., a California corporation, by STEPHEN J. BARBER, suing derivatively and on behalf of himself individually, and by SUZANNE S. RILEY, suing derivatively and on behalf of herself individually; and STEPHEN J. BARBER,<br><br>        Plaintiffs,<br><br>    v.<br><br>EZGDS, INC., a California corporation; THOMAS J. DEROSA, a natural person; DONALD R. MEYETTE, a natural person; FABRICE MODE, a natural person; PAUL MODE, a natural person; TRAVEL SUPPORT CENTER, INC., a California corporation; DANNY HOUGHTON, and DOES 2-20, inclusive,<br><br>        Defendants. | CASE NO. 37-2008-00076652-CU-FR-CTL<br><br>**VERIFICATION OF STEPHEN J. BARBER TO THIRD AMENDED COMPLAINT**<br><br><u>Assigned for all purposes to:</u><br>Honorable Judith F. Hayes<br>Department C-68<br><br>Complaint Filed:  January 31, 2008<br>Trial Date:  None Set |

I, the undersigned, certify and declare that I have read the foregoing Third Amended Complaint and know the contents thereof.  I am a party to this action.  The matters stated in the Third Amended Complaint are true of my own knowledge and belief except as to those matters stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed this __16th__ day of February, 2009, in San Diego, California.

STEPHEN J. BARBER

LA JOLLA
LAW
GROUP

4330 La Jolla Village Dr.
Suite 220
San Diego, CA 92122
(858) 202-1321
FAX (858) 202-1308

1    SUPERIOR COURT OF THE STATE OF CALIFORNIA

2        COUNTY OF SAN DIEGO – HALL OF JUSTICE

3    TRAVEL SUPPORT CENTER, INC., a            )    CASE NO: 37-2008-00076652-CU-FR-CTL
     California corporation, by STEPHEN J.     )
4    BARBER, suing derivatively and on         )    **VERIFICATION OF SUZANNE S.**
     behalf of himself individually, and by    )    **RILEY TO THIRD AMENDED**
5    SUZANNE S. RILEY, suing derivatively      )    **COMPLAINT**
     and on behalf of herself individually; and )
6    STEPHEN J. BARBER,                         )
                                                )    Assigned for all purposes to:
7           Plaintiffs,                         )    Honorable Judith F. Hayes
                                                )    Department C-68
8        v.                                     )
                                                )    Complaint Filed: January 31, 2008
9    EZGDS, INC., a California corporation;     )    Trial Date: None Set
     THOMAS J. DEROSA, a natural person;        )
10   DONALD R. MEYETTE, a natural              )
     person; FABRICE MODE, a natural           )
11   person; PAUL MODE, a natural person;      )
     TRAVEL SUPPORT CENTER, INC., a            )
12   California corporation; DANNY             )
     HOUGHTON, and DOES 2-20, inclusive,       )
13                                              )
                                                )
14          Defendants.                         )
                                                )
15                                              )
                                                )
16   _____

17       I, the undersigned, certify and declare that I have read the foregoing Third Amended

18   Complaint and know the contents thereof.  I am a party to this action.  The matters stated in

19   the Third Amended Complaint are true of my own knowledge and belief except as to those

20   matters stated on information and belief, and as to those matters I believe them to be true.

21       I declare under penalty of perjury under the laws of the State of California that the

22   foregoing is true and correct.  Executed this 17 day of February, 2009, in Tiburon,

23   California.

24

25

26                                          _____
                                            SUZANNE S. RILEY
27

28

LA JOLLA
LAW
GROUP

4330 La Jolla Village Dr.
Suite 220
San Diego, CA  92122
(858) 202-1321
FAX (858) 202-1308

Verification of Suzanne S. Riley to Third Amended Complaint

**PROOF OF SERVICE**
*Travel Support Center, Inc., et al. v. ezGDS, Inc., et al.*
*San Diego Superior Court Case No. 37-2008-00076652-CU-FR-CTL*

I, STACIE L. RAMMELSBERG, declare:

I am a resident of the State of California and over the age of eighteen (18) years, and not a party to the within action; my business address is La Jolla Law Group, 4330 La Jolla Village Drive, Suite 220, San Diego, California 92122. On February 17, 2009, I served the within document(s) described as:

**VERIFIED THIRD AMENDED COMPLAINT FOR: (1) CONSTRUCTIVE FRAUD; (2) PROMISSORY FRAUD; (3) INTENTIONAL MISREPRESENTATION; (4) FRAUD IN THE SALE OF SECURITIES; (5) BREACH OF FIDUCIARY DUTY; (6) DISSOLUTION OF CORPORATION; (7) BREACH OF CONTRACT; (8) ACCOUNTING; (9) DECLARATORY RELIEF**

☐ By transmitting via **FACSIMILE** the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

☒ By placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States **MAIL** at San Diego, California addressed as set forth below.

☐ By causing **PERSONAL DELIVERY** of the document(s) listed above to the person(s) at the address(es) set forth below.

☐ I caused such envelope to be delivered via **OVERNIGHT DELIVERY** addressed as indicated on the attached service list. Such envelope was deposited for delivery by the **U.S. Postal Service** following the firm's ordinary business practices.

Daniel T. Pascucci, Esq.
Mintz Levin Cohn Ferris Glovsky and Popeo
3580 Carmel Mountain Road, Suite 300
San Diego, CA  92130

Lawrence J. Salisbury, Esq.
Majors & Fox LLP
Pacific Western Bank Building, 23rd Fl.
401 West A Street, Suite 2350
San Diego, CA  92101-7921

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on **February 17, 2009**, at San Diego, California.

STACIE L. RAMMELSBERG

LA JOLLA
LAW
GROUP

4330 La Jolla Village Dr.
Suite 220
San Diego, CA  92122
(858) 202-1321
FAX (858) 202-1308

MARKET PLAZA   STEUART TOWER, 8TH FLOOR   )FRANCISCO, CALIFORNIA 94105-1101

*www.sdma.com*   415.781.7900 *phone*   415.781.2635 *fax*



March 20, 2009

**COPY VIA EMAIL**

Eric R. Little, Esq.
**LITTLE REID & KARZAI**
3333 Michelson Drive, Suite 310
Irvine, California  92612

| | | |
|---|---|---|
| Re: | Insured: | EZGDS, Inc. |
| | Policy No.: | PHSD248785 |
| | Claim No.: | 309314 |
| | Claimant: | Travel Support Center, Inc., et al. |
| | Our File No.: | 875-011006 |

Dear Mr. Little:

Thank you for your letters dated January 20 and 30, 2009 and February 16, 2009, enclosing copies of defense cost invoices from Mintz Levin for the period February 1, 2008 through January 31, 2009, provided to us for the first time.

We also acknowledge receipt of your letters dated January 22, 2009 and February 4 and 10, 2009, in response to our letter to the Insured dated June 4, 2008.

Finally, we acknowledge receipt of your February 24, 2009 letter.

Please note that Philadelphia's continuing investigation remains pursuant to a full and complete reservation of all rights and defenses under the Policy, applicable law, and at equity.  Specification of certain issues below, or in any other communications, is not a waiver of any potential coverage defenses.  Philadelphia reserves the right to assert additional coverage defenses as they may be ascertained.

### CLAIM SUMMARY

Please see our June 4, 2008 letter, incorporated herein by reference.

### SUBSEQUENT DEVELOPMENTS/SECOND AMENDED COMPLAINT

On September 18, 2008, plaintiffs Barber and Riley (but not TSC) filed a second amended complaint.  The second amended complaint adds a former TSC shareholder,

*Celebrating 75 Years of Service 1933-2008*

Eric R. Little
LITTLE REID & KARZAI
Re: EZGDS, Inc.
Page 2

Danny Houghton, as a named defendant and dismisses TSC as a plaintiff and nominal
defendant. Plaintiffs have also dismissed their claim for wrongful discharge. Plaintiffs have
separated their prior claim for Fraud and Deceit into three causes of action (Constructive
Fraud, Intentional Misrepresentation, and Promissory Fraud), and have added an additional
fraud cause of action for Violation of Corporations Code Section 25401 (Fraud in the Sale of
Securities). Plaintiffs have also added causes of action for Breach of Contract and for an
Accounting, and have reasserted their causes of action for Breach of Fiduciary Duty,
Dissolution, and Declaratory Relief. Finally, plaintiffs have converted their prior cause of
action for Rescission to remedies for their causes of action for Fraud, Breach of Fiduciary
Duty, and Breach of Contract.

Your correspondence attempts to characterize the second amended complaint
as a material departure from the original pleadings. While plaintiffs allege additional facts
surrounding the formation of the two companies and the merger, and while certain legal
theories have been abandoned and other theories asserted, the core of plaintiffs' allegations
remain the same. That is, plaintiffs allege that the defendants made fraudulent
misrepresentations in order to induce plaintiffs to consent to the merger, to effectively
disenfranchise plaintiffs, and to oust Barber from the company.

Plaintiffs' new facts include allegations that the defendants' alleged
misrepresentations and scheme to oust Barber and to take over the company commenced as
early as March 2004. To effectuate the scheme, the defendants allegedly made
misrepresentations as respects the corporate status of TSC's predecessor (Cutratefares.com,
LLC), withheld access to valuable IBE code to pressure TSC into making EZ an equal
partner, held "secret" shareholder meetings without plaintiffs' knowledge or consent, and
"secretly us[ed] TSC to conduct undisclosed business." Plaintiffs also contend that Meyette
fraudulently increased his share in TSC from 1% to 1.2%, and that DeRosa and Meyette
inflated EZ' s value to convince the other shareholders that EZ was worth ten times that of
TSC.

Plaintiffs further allege that, in April 2007, Barber prepared a proposal to
launch a new brand name, Jetsetz.com, which would be majority-owned by Barber and
would pay EZ for various travel-related services and share profits with EZ. The proposal
also included the condition that Barber would continue to work for EZ until the new site
became profitable.

On April 24, 2007, DeRosa allegedly demanded that Barber execute a
Separation Agreement in exchange for $25,000 in severance pay. Barber contends that he
agreed to sign the Agreement in reliance on DeRosa's statements that the Jetsetz.com deal
would go forward and that Barber could rescind the Agreement by May 24, 2007, if the new
business did not work out, but that DeRosa thereafter refused to consummate the Jetsetz.com
deal.

Eric R. Little
LITTLE REID & KARZAI
Re: EZGDS, Inc.
Page 3

Plaintiffs seek unspecified general and special damages, including the $25,000 severance; punitive damages; interest; rescission of the merger and all transactional documents executed in connection with the merger; the restoration of plaintiffs' voting rights and equity ownership; an order requiring a winding up of EZ's affairs and dissolution; a forensic accounting; and a declaration that Barber's non-compete agreement is null and void.

We understand that plaintiffs have since filed a third amended complaint, which is currently being reviewed. To the extent, if any, the third amended complaint contains any new factual allegations which would cause Philadelphia to alter its analysis, we shall so advise under separate cover.

## COVERAGE ISSUES

Philadelphia incorporates herein by reference its June 4, 2008 letter and the coverage reservations raised therein. Additional coverage issues and reservations are discussed below.

**A.   No Coverage for Houghton.**

The Policy defines "Individual Insured" to include "any individual who has been, now is or shall become a director, officer, governor, trustee, Employee, volunteer, management committee member, or member of the Board of Managers of the Private Company." We understand that Mr. Houghton is solely a shareholder and did not serve in any capacity identified in the definition of Individual Insured. If our understanding is error, please advise us and provide supporting documentation reflecting Houghton's employment relationship (if any) with the Insured. Barring receipt of any such information, Philadelphia must respectfully decline coverage for Mr. Houghton.

**B.   TSC/Derivative Claims [Exclusion J].**

Your January 22, 2009 letter states that Exclusion J does not apply because TSC's and plaintiffs' derivative claims have been dismissed. Philadelphia's June 4, 2008 letter was based on the information and documents provided at the time (i.e., the first amended complaint), where derivative claims were being asserted. Philadelphia recognizes that those claims are not presently being asserted against any Insured.

**C.   Barber's Claims [Exclusion K].**

Your assertion that Barber's claims are not excluded by Exclusion K misconstrues the Policy wording. This Exclusion does not require that a claim be brought by multiple Insureds as your letter implies. Rather, it excludes claims brought by an Individual Insured as well as any claims brought by an Employee, who is not a director, officer, or equivalent executive, etc., with the aid of any such person. The carve out merely limits the time in which the director, officer or equivalent executive, etc. will be considered for

Eric R. Little
LITTLE REID & KARZAI
Re: EZGDS, Inc.
Page 4

purposes of this Exclusion.  Your letter concedes that Barber is an Individual Insured and
was an officer, director or equivalent executive during the requisite four year period.  As
such, the carve out does not apply to Barber, and <u>all</u> of his claims are excluded by
Exclusion K.

D.     <u>Riley's Claims [Insured Status/Known Circumstance Exclusion]</u>.

           Your January 22, 2009 letter states that there are no allegations in the
complaint and no known facts to support that Riley is an Individual Insured or Employee, yet
the Insured has not, despite requests, provided Philadelphia with documents which might
resolve this issue.  Philadelphia's rights in this regard remain fully reserved.  We again
request these documents, repeated below for your convenience.

           Your January 22, 2009 letter also states that the Known Circumstance
Exclusion does not apply to Barber or Riley because Barber no longer asserts a claim for
wrongful termination and because Riley's claims are not related to Barber's employment.
However, the Exclusion applies to any Claim "arising out of, directly or indirectly resulting
from or in consequence of, <u>or in any way involving any matter, fact, or circumstance
disclosed</u> in connection with" [emphasis added] the Insured's response to Question No. 43 of
the Application, which states:

> Mr. Barber has voluntary (sic) terminated his employment with
> ezGDS and while no comments have been made by Mr. Barber
> regarding any issues or problems (and he signed a full release),
> this action may cause future concerns.

           The "issues or problems" and "future concerns" do not appear to be limited to
employment issues, and the "full release" included in the April 24, 2007 Separation
Agreement is not narrowly tailored.  That Agreement provides, in relevant part, that:

> SETTLEMENT AND RELEASE:  For good and valuable
> consideration . . . Steve Barber . . . hereby releases, acquits and
> forever discharges [the] Company . . . <u>from any and all
> charges, controversies, claims</u> . . . including but not limited to
> any claims directly or indirectly arising out of, based upon or
> relating in anyway (sic) to Barber's employment with [the]
> Company (including its affiliates), the termination of such
> employment or <u>relating to or arising from **any** alleged act or
> omission</u> by any of the Released Parties.

<center>* * *</center>

> Barber expressly agrees that this Agreement and General
> Release <u>extends to all claims of every nature and kind,</u> . . .

Eric R. Little
LITTLE REID & KARZAI
Re: EZGDS, Inc.
Page 5

> including, without limitation, any alleged act or omission in
> connection with Barber's hiring or employment by, or the
> termination of his employment with, [the] Company (including
> its affiliates), provided, however, that nothing in this release
> shall affect Barber's right to enforce the terms of this
> Agreement. . . .

Emphasis added.

Plaintiffs' allegations include the defendants' alleged scheme to oust Barber from the company and to disenfranchise both he and Riley such that the allegations in the second amended complaint appear to "arise out of" and "directly or indirectly" and "in any way" "involve" the circumstances surrounding Barber's termination of employment.

In fact, the court in its February 9, 2009 minute order stated that "the separation agreement sued upon and referenced in plaintiffs' seventh cause of action contains unambiguous, unequivocal language that appears to waive the claims asserted in the SAC."

Accordingly Philadelphia's rights, including the right to deny coverage, as to the potential application of the Known Circumstance Exclusion remain respectfully reserved.

E.    **Past Acts Exclusion.**

Pursuant to Endorsement, the Policy provides that:

> With respect to coverage under Part(s) 1, the Underwriter shall
> not be liable to make any payment for Loss in connection with
> any Claim arising out of, based upon or attributable to any
> Wrongful Act committed on or before 11/19/2004.

The second amended complaint includes new allegations which may potentially implicate the Past Acts Exclusion. In this regard, plaintiffs allege that the defendants' fraudulent conduct arose out of a scheme commenced in the Spring of 2004 to oust Barber from his position with the company. In March 2004, Meyette allegedly prepared a Stock Distribution and Equalization Plan, which unbeknownst to Barber, "diluted [his] ownership interest from 53.5 % to 43.5% and Meyette never incorporated CTG." In addition, plaintiffs allege that, in April 2004, DeRosa misrepresented that he would share the IBE code with Barber and that they would both share a 50 percent interest in the new company that would hold the IBE code. However, Meyette allegedly incorporated EZGDS with DeRosa as the 100 percent shareholder, and DeRosa kept the IBE code to himself. Finally, plaintiffs allege that, "in 2004, Defendants DeRosa, Meyette, Fabrice Mode, Paul Mode, and Houghton devised a plan and scheme to oust Barber from CTG and take over the company." This alleged fraudulent scheme permeates each of plaintiffs' causes of action.

Eric R. Little
LITTLE REID & KARZAI
Re: EZGDS, Inc.
Page 6

Accordingly, Philadelphia's rights, including the right to deny coverage, on the basis of the potential application of the Past Acts Exclusion are respectfully reserved.

**F.     The Cooperation Clause.**

Common Policy Condition III.F. provides, in relevant part, that "the Insured agrees to provide the Underwriter with all information, assistance and cooperation which the Underwriter reasonably requests. . . ."

It has been nearly nine months since Philadelphia requested relevant information which may implicate Riley's insured status, the Known Circumstance Exclusion and/or the claim made date. After repeated requests, on July 30, 2008, the Insured agreed to provide the requested information and documents, if Philadelphia agreed to execute a confidentiality agreement. Philadelphia promptly did so within 24 hours of receipt on September 10, 2008. Still, no documents were provided for nearly two months. At that time, on November 1, 2008, the Insured provided some, but not all of the requested documents. Moreover, the Insured has redacted significant portions of the documents without explanation or justification.

An additional three months have now passed and, for the first time, your February 10, 2009 letter asserts that the documents and information requested will not be provided because it is "burdensome" and Philadelphia has purportedly provided no basis for the request. The Insured's current posture and continued delay is unreasonable. The Insured previously agreed to provide the documents, including Board minutes referenced in your February 10, 2009 letter, which are directly relevant to Riley's insured status, the Known Circumstance Exclusion, and the claim made date (as well as other coverage issues).

While we appreciate the supplemental documents provided with your February 24, 2009 letter, which we are in the process of reviewing, a significant portion of the requested documents appears to remain outstanding. The Insured has provided no reasonable basis for its continued delay and none is apparent. "The duty of good faith and fair dealing in an insurance policy is a two-way street, running from the insured to his insurer as well as vice versa." *Kransco v. American Empire Surplus Lines Ins. Co.* (2000) 23 Cal.4th 390, 402. This duty encompasses the insured's duty to make a full and prompt disclosure of known relevant information to the insurer so as not to delay or impede the insurer's claim investigation. Philadelphia's rights as to the Insured's potential breach of Condition III.F. are thus fully reserved.

We request copies of these documents, repeated below, within 30 days.

**G.     Additional Coverage Issues.**

With the exception of plaintiffs' cause of action for declaratory relief, all of plaintiffs' claims in the second amended complaint arise out of the alleged intentional and

Eric R. Little
LITTLE REID & KARZAI
Re: EZGDS, Inc.
Page 7

fraudulent conduct of the Insured.  Philadelphia's rights as to the potential application of
Exclusions A. [improper gaining of any profit, remuneration or advantage] and B. [dishonest
or fraudulent act] remain fully reserved.

Plaintiffs' new allegations regarding a fraudulent scheme with its genesis in
2004 raise issues as respects the Insured's representations in the Application and the potential
breach of Condition VI. [Representations and Severability].  In this regard, in response to
Question No. 43 of the Application, the Insured responded that "no person applying for this
coverage is aware of any facts or circumstances which he or she has reason to presume might
give rise to a future claim that would fall within the scope of any of the proposed coverages
for which the Applicant has applied, except . . . Mr. Barber has voluntary (sic) terminated his
employment with ezGDS and while no comments have been made by Mr. Barber regarding
any issues or problems (and he signed a full release), this action may cause future concerns."
The allegations of the second amended complaint appear to fall within this disclosure.
However, in the event the Insured disputes same, and if plaintiffs' allegations regarding a
fraudulent scheme commencing in 2004 are correct, then the Insured may have failed to
disclose in the Application "facts or circumstances" of which it was aware prior to the
Policy's inception and may have misrepresented that the statements contained in the
Application were "true" thus breaching Condition VI. [Representations and Severability].

As such, Philadelphia's rights as to the Insured's potential breach of Condition
VI. [Representations and Severability] remains fully reserved.

**H.     No Duty to Defend/Funding of Defense Costs.**

**1.     No Duty to Defend.**

Your February 4, 2009 letter erroneously asserts that "On January 14,
2009 . . . Philadelphia finally agreed to defend EZGDS. . . ."  At no time or in any
correspondence has Philadelphia assumed any such duty.  Rather, contrary to the positions
taken in your recent correspondence, Philadelphia has no duty to defend.  Common Policy
Condition III.A. provides that "[t]he Insured and not the Underwriter shall have the
responsibility to defend any Claim."

We also disagree with the positions taken in your February 4, 10, and 24
letters regarding the timing of payment or any interest owed.  In particular, no defense costs
were ever submitted to Philadelphia prior to January 20, 2009.

As noted below, Philadelphia is presently processing payment.

**2.     Definition of Defense Costs/Separate Representation.**

"Defense Costs" is defined, in pertinent part, to mean "any reasonable and
necessary legal fees and expenses incurred in the defense of a Claim . . . with the

Eric R. Little
LITTLE REID & KARZAI
Re:  EZGDS, Inc.
Page 8

Underwriters' consent," subject to certain exceptions.  In addition, Condition III.E. provides that "[i]f more than one Insured is involved in a Claim, the Underwriter may, in its sole discretion, appoint separate counsel for one or more of such Insureds if there is a material (actual or potential) conflict of interest among any such Insureds."  [Emphasis added.]

The Insured has not sought and has not obtained Philadelphia's consent for the retention of separate counsel for Donald Meyette, Fabrice Mode, or Paul Mode.

In addition, despite our repeated requests for information as to the reason for separate counsel, none was provided prior to your February 10, 2009 letter, which states:

The reason for the separate representation is that EZGDS has made a claim for indemnity against the TSC shareholders relating to issues discovered in an audit of TSC following the Stock Purchase.  This claim creates a conflict of interest between the defendants and necessitates separate representation for the Modes and Meyette.

No substantive information as respects this "claim for indemnity" has been provided.  Based on the very limited information gleaned from defense counsel's invoices, it would appear that the only conflict is that Mintz Levin is prosecuting the Insured's claims against TSC.  All of the individual directors and officers are otherwise aligned as respects their defense of plaintiffs' claims, as is reflected in their demurrers to the complaint and the fact that no claims for contribution or indemnity, as respects this lawsuit, have been asserted between and/or among the defendants.  Thus, while Mintz Levin may now have a conflict due to its representation of EZ in connection of what we understand to be an unrelated claim, there was and is no actual or potential conflict as between the directors and officers in connection with Barber's or Riley's claims.

Accordingly, Philadelphia's rights, including the right to deny coverage, as to whether any fees, costs, or other expenses submitted to Philadelphia for payment constitute "Defense Costs" are fully reserved.

We will be in touch with you and Majors & Fox to discuss this issue further.

3.    Rate Caps/Allocation.

By email dated February 19, 2008 from Philadelphia to the Insured (Tom Allen), Philadelphia consented to the Insured's choice of counsel (Mintz Levin), subject to Philadelphia's customary hourly rates of $190 (partners), $165 (associates), and $75 (paralegal).  Philadelphia also advised that:

[I]f there is a difference in rate, you can be responsible for it or we can recommend competent counsel at the approve[d] rates.

Eric R. Little
LITTLE REID & KARZAI
Re: EZGDS, Inc.
Page 9

You have a $25,000 retention which applies to Part 1 (D&O) liability coverage. It applies on a first dollar basis to defense costs or damages. Philadelphia Indemnity Insurance Company will credit the retention at our approved rates.

Mr. Allen raised no objection and chose to proceed with his selection of Mintz Levin as defense counsel. Accordingly, any Defense Costs in excess of the agreed fee rates are the responsibility of the Insured.

Your reliance on *State of California v. Pacific Indemnity Co.* 63 Cal.App.4th 1535 (1997) and *Zurich Ins. Co. v. Killer Music, Inc.* 998 F.2d 674 (9th Cir. 1993) is misplaced. Both of those actions involved a situation in which the insurer breached a duty to defend. No duty is owed here and none has been breached. Moreover, neither these cases nor your reference to California Civil Code section 2778 support your letter's contention that "the reasonableness [of defense counsel's fees] cannot be challenged in light of Philadelphia's delay in responding to the notice." They do not stand for the proposition asserted, and Philadelphia never delayed in responding to the notice. Philadelphia responded as early as February 19, 2008.

Further, Common Policy Condition XIX. [Allocation] provides that:

If both Loss covered by this Policy and Loss not covered by this Policy are incurred either because a Claim includes both covered and uncovered matters, or because a Claim is made against both the Individual Insured and/or the Private Company, and others, the Insured and the Underwriter shall use their best efforts to agree upon a fair and proper allocation of such amount between covered Loss and uncovered loss. Any such allocation shall be based upon the relative legal exposures of the parties to covered and uncovered matters.

Emphasis added.

Given that, among other things, there are two plaintiffs (Barber and Riley), that all of Barber's claims are excluded, that only eight of the nine causes of action are asserted by Riley, and that Riley's alleged percentage ownership (.56%) is significantly less than Barber's (4.35%) such that any compensatory damages for Riley would be far less than Barber's, Philadelphia believes the exposure from Barber's non-covered claims would be far greater than the exposure arising from Riley's potentially covered claims. Nevertheless, assuming coverage is afforded and in the interests of resolving this issue, Philadelphia will agree to a 50/50 allocation of reasonable and necessary Defense Costs, subject to a reservation of rights, including Philadelphia's right to reimbursement in the event of a determination of no coverage.

Eric R. Little
LITTLE REID & KARZAI
Re: EZGDS, Inc.
Page 10

        Based on the foregoing, and as set forth in detail on the attached Table A, for the time period indicated, Philadelphia calculates potentially covered Defense Costs as follows:

| | |
|---|---|
| Total Fees Submitted: | $293,084.50 |
| Less Insured's Agreed Deductions and Redacted Fees: | $18,999.50 |
| Subtotal: | $274,085.00 |
| Total Fees After Applied Philadelphia Fee Caps: | $95,880.50 |
| Less Philadelphia Fee Deductions: | $10,239.00 |
| Total Potentially Covered Fees: | $85,641.50 |
| Total Costs Submitted: | $35,065.42 |
| Less Philadelphia Cost Deductions:[1] | $29,687.44 |
| Total Potentially Covered Costs: | $5,377.98 |
| Total Potentially Covered Fees and Costs: | $91,019.48 |
| 50% Allocation: | $45,509.74 |
| Less Retention: | $25,000.00 |
| TOTAL: | $20,509.74 |

---

[1] Insufficient information has been provided in order to determine whether said costs are reasonable and necessary and were incurred in the defense of this action.

Eric R. Little
LITTLE REID & KARZAI
Re: EZGDS, Inc.
Page 11


          Philadelphia shall reimburse the Insured the amount of $20,509.74, subject to the right to seek repayment in the event of a determination that coverage is not afforded for this matter.

## REQUESTS

          We request the following materials and documents, much of which has been previously requested and outstanding since June 4, 2008:

        1.     Correspondence, including emails between Barber or Riley, on the one hand, and any named defendant, on the other hand, for the time period January 1, 2007 to January 31, 2008, including but not limited to copies of Barber's and the defendants' October 16, 2007 correspondence.  Please also provide copies of Barber's and Riley's responses to the Insured's (EZ) January 30, 2008 letter to Shareholders, if any.

        2.     Copies of all EZ and TSC Board meeting minutes for the period January 1, 2007 to January 31, 2008.  To date, we have received only one such document dated February 2, 2007.

        3.     Copies of redacted Bates number pages:  62, 63, 81, 90, 99, 108, 128, 132, 136, 140, 144, 148, 155, 159, 161, 163, 167, 169, 171, 173, 175, 324, 353, 354, 357, 387, and 392.

        4.     Copies of all correspondence between any Insured and Riley and all other documents in connection with TSC's and/or EZ's procurement, maintenance, or payment of all premiums and/or claims as respects health insurance coverage for Riley.

        5.     Please identify what document Bates number page 151 pertains to, provide a copy of same, and explain why arbitration (apparently) is not being requested in this matter.

        6.     Has any party other than Barber propounded any discovery?  If so, please provide copies of all such requests and responses thereto, including that propounded by each defendant.

        7.     Have any depositions been taken?  If so, please provide copies of the transcripts or summaries.  If no depositions have been taken, please advise the date on which depositions have been noticed (if any).

        8.     Please provide copies of the court's ruling and order on the defendants' demurrer, plaintiffs' amended complaint, and the defendants' responses thereto.

        9.     Please provide defense counsel's written liability evaluation, quantum, and settlement recommendations.

Eric R. Little
LITTLE REID & KARZAI
Re:  EZGDS, Inc.
Page 12


10.    Please provide copies of all invoices, receipts, or other documents reflecting all charges for westlaw, outside messengers, air freight, and photocopies for invoice nos. 8452753, 8459591, 8466903, 8470357, 8474451, 8480931, and 8488425.

## **CONCLUSION**

In the event that you or the Insureds believe that there is any other information or documentation, in addition to that requested, that Philadelphia has not considered and would cause it to alter its analysis, we request that such materials be provided to us at your earliest convenience.  Philadelphia will promptly consider any additional information submitted.

On behalf of Philadelphia, please ensure that we are kept advised on a contemporaneous basis of all litigation developments.  Thank you very much for your assistance.

Very truly yours,
SEDGWICK, DETERT, MORAN & ARNOLD LLP

By:  _Kelly T. Nugent_

Kelly T. Nugent


cc:    Thomas Allen (via e-mail)
       **EZGDS, Inc.**

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
ezGDS, Inc., and Thomas DeRosa

**DEFENDANTS**
Philadelphia Indemnity Insurance Company

**(b)** County of Residence of First Listed Plaintiff   San Diego, CA
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Philadelphia, PA
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

FILED
10 MAR 25  AM 8: 51
CLERK, US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY: _____ DEPUTY

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
3580 Carmel Mountain Rd., Ste. 300, San Diego, CA 92130

Attorneys (If Known)

'10 CV 0635 JAH   WVG

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** · **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane · ☐ 362 Personal Injury- Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability · ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander · ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability · **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle · ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability · ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury · ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | · ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** · **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting · ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment · **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations · ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare · ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment · ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other · ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights · ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. 1332 (a)
Brief description of cause:

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ 718,096

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions): JUDGE _____ DOCKET NUMBER _____

DATE 03/24/2010

SIGNATURE OF ATTORNEY OF RECORD
*Bridget Moorhead*

FOR OFFICE USE ONLY

RECEIPT # 11498   AMOUNT $350   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

AB 03.25.10

▯ ORIGINAL

```
Court Name: USDC California Southern
Division: 3
Receipt Number: CAS011498
Cashier ID: mbain
Transaction Date: 03/25/2010
Payer Name: CALEXPRESS
-------------------------------
CIVIL FILING FEE
 For: EZGDS V PHILADELPHIA INDEMNITY
 Case/Party: D-CAS-3-10-CV-000635-001
 Amount:        $350.00
-------------------------------
CHECK
 Check/Money Order Num: 54509
 Amt Tendered:  $350.00
-------------------------------
Total Due:      $350.00
Total Tendered: $350.00
Change Amt:     $0.00



There will be a fee of $45.00
charged for any returned check.
```